**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JASON DONNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:23-cv-03401-CRC |
| | ) | |
| FOX NEWS NETWORK, LLC, a Delaware | ) | |
| Limited Liability Company, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT FOX NEWS NETWORK, LLC'S**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 2

PROCEDURAL BACKGROUND...................................................................................... 8

LEGAL STANDARD.......................................................................................................... 8

ARGUMENT ....................................................................................................................... 9

I.      Plaintiff Fails to State a D.C. Human Rights Act Violation ................................... 9

      A.      Plaintiff Fails to Allege Discrimination Based on "Political Affiliation" ........... 10

            1.      Plaintiff's Own Allegations Show that His Alleged Complaints Had Nothing to Do with Affiliation with a Particular Political Party. ....................................................................................................... 10

            2.      The DCHRA Does Not Apply to Preferences for Certain "Factions" or "Views" Within a Political Party...................................... 13

            3.      Plaintiff Fails to Show that FNN Even Knew of His Political Affiliation......................................................................................... 14

            4.      Plaintiff's Allegations Do Not Give Rise to an Inference of Discrimination................................................................................... 15

      B.      Plaintiff Fails To Allege a Retaliation Claim Because His Alleged Reports Claiming False Reporting Are Not Reports Protected by the DCHRA.............. 16

      C.      Plaintiff's Aiding and Abetting Claim Is Legally Defective and Time Barred .............................................................................................................. 18

            1.      Plaintiff's Aiding and Abetting Claim Against the Network Fails as a Matter of Law. ...................................................................... 19

            2.      Any Aiding and Abetting Claim Against the Network Based on Independent Acts by Its Employees Is Also Time Barred...................... 20

II.     Plaintiff Fails to State a Wrongful Termination Claim.................................................... 21

III.    Plaintiff Fails to State a Paid Sick Leave Act Claim ...................................................... 27

CONCLUSION................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Achoe v. Clayton*,
   No. CV 17-02231 (CRC), 2018 U.S. Dist. LEXIS 156064 (D.D.C. Sep. 13,
   2018) ...........................................................................................................................17

*Adams v. George W. Cochran & Co.*,
   597 A.2d 28 (D.C. 1991) ............................................................................................26

*Angel v. Fed. Home Loan Mortg. Corp.*,
   815 F. App'x 566 (D.C. Cir. 2020)................................................................................9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................8, 14

*Battle v. Master Sec. Co., LLC*,
   298 F. Supp. 3d 250 (D.D.C. 2018) ...........................................................................18

*Beaulieu v. Barr*,
   No. CV 15-896 (TJK), 2019 WL 5579968 (D.D.C. Oct. 29, 2019) .........................15

*Bereston v. UHS of Delaware, Inc.*,
   180 A.3d 95 (D.C. 2018) ......................................................................................22, 25

*Blodgett v. Univ. Club*,
   930 A.2d 210 (D.C. 2007) ...........................................................................10, 11, 13, 14

*Brathwaite v. Vance Fed. Sec. Servs., Inc.*,
   613 F. Supp. 2d 38 (D.D.C. 2009) ..............................................................................26

*Clay v. Howard Univ.*,
   128 F. Supp. 3d 22 (D.D.C. 2015) ..............................................................................21

*D.A.M. v. Barr*,
   474 F. Supp. 3d 45 (D.D.C. 2020) ................................................................................3

*Davis v. Cmty. Alternatives of Washington, D.C., Inc.*,
   74 A.3d 707 (D.C. 2013) .............................................................................................25

*Fantasia v. Office of Receiver of Commc'n on Mental Health Servs.*,
   No. CV 01-1079 (LFO) 2001 U.S. Dist. LEXIS 25858 (D.D.C. Dec. 21, 2001)............11, 14

*Futrell v. Dep't of Labor Fed. Credit Union*,
   816 A.2d 793 (D.C. 2003) ...........................................................................................13

*Gatling v. Jubilee Hous., Inc.*,
   No. 20-cr-3770, 2022 WL 227070 (D.D.C. Jan. 26, 2022) ....................................................19

*Gaujacq v. EDF, Inc.*,
   601 F.3d 565 (D.C. Cir. 2010) ...........................................................................................19

*Gebretsadike v. Travelers Home & Marine Ins. Co.*,
   103 F. Supp. 3d 78 (D.D.C. 2015) ....................................................................................6, 9

*Geraci v. Moody-Tottrup, Int'l, Inc.*,
   82 F.3d 578 (3d Cir. 1996).................................................................................................12

*Harbour v. Univ. Club of Washington*,
   610 F. Supp. 3d 123 (D.D.C. 2022) ....................................................................................28

*Holcomb v. Powell*,
   433 F.3d 889 (D.C. Cir. 2006) ............................................................................................17

*Ihebereme v. Capital One, N.A.*,
   730 F. Supp. 2d 40 (D.D.C. 2010) ................................................................................10, 15

*Jones v. Ass'n of Am. Med. Colleges*,
   No. CV 22-1680 (EGS), 2023 WL 2327901 (D.D.C. Mar. 2, 2023)....................................15

*Joyner v. Morrison & Foerster LLP*,
   No. CV 20-1440 (TJK), 2023 WL 6313194 (D.D.C. Sept. 27, 2023)..............................22, 25

*Lambert v. Int'l Union of Bricklayers & Allied Craftworkers*,
   No. CV 23-309 (CKK), 2023 WL 6388953 (D.D.C. Sept. 29, 2023) ....................................9

*Leyden v. Am. Accreditation Healthcare Comm'n*,
   83 F. Supp. 3d 241 (D.D.C. 2015) ......................................................................................21

*Lubetski v. Applied Card Sys., Inc.*,
   296 F.3d 1301 (11th Cir. 2002) ..........................................................................................13

*Mazloum v. D.C. Metro. Police Dep't*,
   522 F. Supp. 2d 24 (D.D.C. 2007) ......................................................................................10

*McCain v. CCA of Tenn., Inc.*,
   254 F. Supp. 2d 115 (D.D.C. 2003) .....................................................................................17

*McCaskill v. Gallaudet Univ.*,
   36 F. Supp. 3d 145 (D.D.C. 2014) ........................................................................... *passim*

*Miami Herald Pub. Co. v. Tornillo*,
   418 U.S. 241 (1974).............................................................................................................23

*Pietrangelo v. Refresh Club, Inc.*,
   No. 18-CV-1943 (DLF), 2023 WL 6388880 (D.D.C. Sept. 29, 2023)...................................19

*Prebilich-Holland v. Gaylord Ent. Co.*,
   297 F.3d 438 (6th Cir. 2002) ..............................................................................................13

*Reed v. Great Lakes Cos., Inc.*,
   330 F.3d 931 (7th Cir. 2003) ..............................................................................................12

*Ruifang Hu v. K4 Sols., Inc.*,
   No. 18-CV-1240 (TSC), 2020 WL 1189297 (D.D.C. Mar. 12, 2020) ............................27, 29

*Sampay v. Am. Univ.*,
   294 A.3d 106 (D.C. 2023) ...................................................................................................17

*Shaffer v. Zaid*,
   No. 20-CV-2492 (CRC), 2021 WL 4399580 (D.D.C. Sept. 27, 2021) ...............................3, 9

*Sichani v. Washington Metro. Area Transit Auth.*,
   No. 22-CV-1584 (CRC), 2023 WL 7279254 (D.D.C. Nov. 3, 2023).........................21, 22, 25

*Stokes v. Cross*,
   327 F.3d 1210 (D.C. Cir. 2003) .............................................................................................8

*Toronka v. Cont'l Airlines, Inc.*,
   411 F. App'x 719 (5th Cir. 2011) ........................................................................................13

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir.2006) .............................................................................................8, 9

*Vogel v. D.C. Off. of Plan.*,
   944 A.2d 456 (D.C. 2008) ...................................................................................................17

*Wallace v. Skadden, Arps, Slate, Meagher & Flom*,
   715 A.2d 873 (D.C. 1998) ...............................................................................................26, 27

*Woodman v. WWOR-TV, Inc.*,
   411 F.3d 69 (2d Cir. 2005).................................................................................................12

**Statutes**

2 U.S.C. § 4108.....................................................................................................................3

18 U.S.C. § 111....................................................................................................................24

18 U.S.C. § 231....................................................................................................................24

18 U.S.C. § 241....................................................................................................................24

18 U.S.C. § 371 ..................................................................................................24

18 U.S.C. § 1361 ................................................................................................24

18 U.S.C. § 1512 ................................................................................................24

18 U.S.C. § 1752 ................................................................................................24

18 U.S.C. § 2101 ................................................................................................24

18 U.S.C. § 2383 ................................................................................................24

18 U.S.C. § 2384 ................................................................................................24

18 U.S.C. § 5104 ................................................................................................24

D.C. Code § 2-1401.02(25) ....................................................................10, 12, 14

D.C. Code § 2-1402.31(a) ..................................................................................10

D.C. Code § 2–1402.62 .......................................................................................19

D.C. Code § 2–1403.16(a) ...................................................................................20

D.C. Code § 22-1322 ..........................................................................................24

D.C. Code § 32-531.03 .......................................................................................28

D.C. Code §§ 32-531 ....................................................................................27, 28

Ga. Code § 21-2-603 ...........................................................................................24

**Other Authorities**

11 C.F.R. § 100.15 ..............................................................................................14

# INTRODUCTION

While Plaintiff Jason Donner has now amended his claims, the additional allegations in his First Amended Complaint, ECF No. 12 (the "FAC"), do nothing to cure the glaring deficiency in his initial pleading; namely, Plaintiff still has not alleged that he engaged in any conduct protected by the District of Columbia Human Rights Act ("DCHRA"), a statute that the D.C. Court of Appeals has made clear must be narrowly construed.

Plaintiff, a former Capitol Hill producer for Defendant Fox News Network, LLC ("FNN" or the "Network"), contends that his employment was terminated because of discrimination based on "political affiliation" or in retaliation for opposing such discrimination against other employees. But once his inflammatory rhetoric is stripped from the pleading, Plaintiff plainly has no actionable claims against FNN.  To the contrary, Plaintiff has alleged, at most, that he was terminated due to his personal disagreement with how FNN approached its news coverage.  Such allegations fail to state a claim under the DCHRA because that law does not protect employees of news media organizations based on alleged differences of opinion over reporting and commentary on matters of public concern.  Rather, the DCHRA's limited protection against discrimination based on "political affiliation" extends only to the status of membership in or endorsement of a *political party*, and Plaintiff does not plausibly allege that he was terminated as a result of belonging to, or even publicly endorsing, a particular political party.

Plaintiff's retaliation claim under the DCHRA fails for a similar reason:  Plaintiff fails to state any facts from which the Court could plausibly infer that he was terminated in retaliation for reporting alleged unlawful discrimination based on political affiliation by FNN.  In fact, the detailed facts in the FAC reveal just the opposite—that his complaints to FNN related entirely to how he believed FNN chose to cover the news and had nothing to do with alleged discrimination.

Plaintiff's claim for common law unlawful termination is similarly deficient.  Plaintiff has not stated a viable wrongful termination claim because he concedes in the First Amended Complaint, as he must, that his employment was at will.  While D.C. law recognizes a narrow public policy exception to the employment-at-will doctrine, no court has come close to suggesting that an employee's alleged objections to how a news organization covers the news falls within that narrow exception.  Rather, the law is clear that a common law claim for wrongful termination can only be maintained where a plaintiff alleges that he was terminated for refusing to engage in or complaining about conduct of his employer that *violates the law*, which Plaintiff cannot do.

Finally, Plaintiff's fallback claim, that FNN violated the D.C. Accrued Sick and Safe Leave Act (the "Sick Leave Act") by terminating him for failing to show up to work, also fails.  The FAC itself reveals that Plaintiff failed to comply with the Sick Leave Act's notice requirements and, in any event, Plaintiff does not plausibly allege that he was terminated in retaliation for properly taking sick leave.

Accordingly, because Plaintiff's claims do not support any cause of action even under a generous reading of the most recent complaint, the Court should dismiss the action with prejudice.

## FACTUAL BACKGROUND

Plaintiff Jason Donner went to work for Defendant FNN in 2010.  FAC ¶ 6.  For well over a decade, Plaintiff worked as one of the Network's news producers on Capitol Hill, generating news content for Fox News.  *See id.*  Although Plaintiff does not allege whether he has ever formally belonged to any political party, he describes himself as "traditionally a Republican," *id.* ¶ 42, and also states that he shares some (but allegedly not all) views expressed on the Network's opinion programming.  *Id.* ¶ 7.  Plaintiff also contends that "in the 2017 and 2020 elections," he "affiliated" with Democrats, but offers no explanation of what that means (other than the new assertion that he "support[ed]" some Democrats).  *Id.* ¶ 42.  Nor does he plausibly allege that FNN

ever knew of, or cared about, Plaintiff's alleged past affinity for Republicans or his new "affiliation" with Democrats during those two more recent elections. *See id.* ¶ 38. In fact, according to Plaintiff, after he "affiliated" with Democrats in 2017 the Network promoted him in 2018. *Id.* ¶ 6. He also boasts that he has been "recognized on Capitol Hill as a reporter always asking hard questions to politicians on both sides of the political spectrum." *Id.* ¶ 7. A few months after leaving the Network, Plaintiff became an adviser to a Republican congressman.[1]

The gravamen of Plaintiff's First Amended Complaint focuses on FNN's alleged shift in the tone and focus of its news coverage following the 2020 Presidential election. According to Plaintiff, "something changed at Fox News" after the 2020 election. FAC ¶ 8. He claims that the Network faced a post-election drop in ratings due to how it had covered certain aspects of the election results and that accordingly "Fox's corporate leadership purged the news division and those reporters who spoke out against claims of election fraud" in order "[t]o win back viewership." *Id.* ¶ 10. Nevertheless, Plaintiff readily concedes that he continued to work and generate content for the Network for approximately two years thereafter.

While Plaintiff alleges no legally protected conduct, he does make clear that he found himself increasingly unhappy with the Network's management of news coverage after the 2020 election. In particular, Plaintiff complains that "[a]fter January 6, 2021, Vice President of Editorial

---

[1] Plaintiff's employment by the U.S. House of Representatives is a matter of public record about which the Court may take judicial notice. *See Shaffer v. Zaid*, No. 20-CV-2492 (CRC), 2021 WL 4399580, at *3 & n.1 (D.D.C. Sept. 27, 2021); *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 (D.D.C. 2020) (Cooper, J.). Specifically, Plaintiff's role as "Senior Advisor" to Rep. Brian Fitzpatrick, which began on January 3, 2023, appears in several Statements of Disbursements, published quarterly by the Chief Administrative Officer of the U.S. House of Representatives pursuant to 2 U.S.C. § 4108. *See, e.g.*, Catherine L. Szpindor, Chief Administrative Officer, *Statement of Disbursement of the House from January 1, 2023 to March 31, 2023* (2023), at 1103–04 (PDF at 1111-12) (identifying names, titles, and dates of service for employees of the Office of Hon. Brian K. Fitzpatrick), https://www.house.gov/sites/default/files/2023-05/2023q1_singlevolume.pdf (last visited January 17, 2024).

for the D.C. Bureau, Doug Rohrbeck, began routinely participating in the daily morning Capitol Hill beat call that set the agenda for the daily reporting." *Id.* ¶ 23. Nor was Plaintiff fond of "D.C. Bureau Chief, [Bryan] Boughton . . . participating more frequently" on the same calls. *Id.* Plaintiff claims that change in the agenda-setting calls "was done so that Rohrbeck and Boughton could control what was reported by the news division every day." *Id.* Plaintiff makes it no secret that he did not appreciate this oversight or receiving input on what issues the Network's viewers may want covered.[2]

According to Plaintiff, he became increasingly vocal about his discontent over the next few months, making a handful of internal reports about what he perceived as "false reporting." In 2021, for example, Plaintiff complained that he, rather than a doctor, was asked to cover a Capitol Hill press conference at which a United States Senator questioned the efficacy of the COVID-19 vaccine. *Id.* ¶ 25. Plaintiff was also particularly unhappy, and made repeated reports about, January 6-related "theories" and "suggest[ions]" that former Fox News opinion commentator, Tucker Carlson, was promoting as part of a miniseries he created for Fox Nation, *id.* ¶¶ 27, 29— an entirely separate digital platform, *id.* ¶ 5, with which Plaintiff was not involved.

In any event, despite all of the foregoing, Plaintiff does not contend that the Network allegedly "began to discriminate and retaliate against [him]" until approximately *two years late*r, "[i]n Spring of 2022." *Id.* ¶ 30. And even then, none of his allegations have anything to do with his alleged political affiliation or complaints about alleged discrimination against other employees.

---

[2] Plaintiff believes these issues began in November 2020, when he claims to have been "reprimanded" for his Twitter post regarding one of Rudy Giuliani's press conferences. His supervisor raised concerns this post was opinion-based and not appropriate for a news producer. Plaintiff took from that exchange that FNN's "upper management" was "target[ing]" him, even though, as Plaintiff concedes, his supervisor agreed to "let it go" after Plaintiff disagreed with that characterization of the post. *Id.* ¶ 18. Plaintiff continued to work for FNN for approximately two years after that.

Indeed, even with the benefit of FNN's detailing in its first Motion to Dismiss the numerous shortcomings of Plaintiff's initial complaint, the most that Plaintiff alleges in the FAC is that he "engaged in protected activity by complaining of Fox News' [allegedly] false reporting on the 2020 election and January 6th, its advocacy for President Trump, and its advocacy of the far-right wing, radical conservative views of the MAGA faction of the Republic Party." *Id.* None of these allegations, however, constitute legally sound complaints of discrimination based on political affiliation.

Consistent with the conclusion that this case is really just about Plaintiff's efforts to monetize his disagreement with FNN's opinion commentary and editorial decisions at the Network, the FAC focuses heavily on detailing disagreements and confrontations with Plaintiff's then-supervisor, NuNu Japaridze.[3] These included Plaintiff's objection to Ms. Japardize's statement that he was creating a "toxic environment" during meetings and her request that he try to become more self-aware. *Id.* By Plaintiff's own account, these disagreements related to his supposed refusal to "comply with [his supervisors'] demands" with respect to reporting on the election and former President Trump, not to anything related to Plaintiff's membership in or endorsement of a political party. *Id.*

Indeed, in the written complaint Plaintiff submitted to Human Resources in May 2022, Plaintiff did not raise any claim of discrimination—let alone discrimination based on belonging to or endorsing any political party. *Id.* ¶ 31. Rather, the FAC says only that he again complained about the focus of the Network's news coverage and opinion commentary and its portrayal of individuals involved with the January 6 incident at the Capitol. *Id.* Plaintiff also does not contend

---

[3] If this action proceeds beyond the motion to dismiss phase, the evidence will demonstrate that Plaintiff's own antagonistic conduct and actions contrary to FNN's written policies ultimately led to his termination.

that he raised any claims about discrimination when he lodged another complaint about FNN's news coverage in August 2022.  *Id.* ¶ 32.  Indeed, the Amended Complaint itself characterizes that complaint as one about the Network's editorial focus:  Plaintiff himself alleges that he met with FNN's human resources (for more than two hours) to complain about "false" and "inaccurate" reporting by Tucker Carlson (someone Plaintiff does not claim to have interacted with at FNN) and the allegedly "toxic environment it breeds."  *Id.*

On Monday, September 26, 2022, Plaintiff failed to show up for (remote) work.  *Id.* ¶ 33.  According to Plaintiff, this was "because he was recovering from the COVID vaccine," which he had taken ***the previous week***.  *Id.*  According to Plaintiff, his reaction began the week of September 19, when he received the vaccine, but was so mild that he had continued working that entire week.  Plaintiff is silent about what he did the following weekend.  But by Monday morning, Plaintiff's body had allegedly "g[iven] out on him."  *Id.* ¶¶ 33-34.

Although Plaintiff omits the terms of the applicable sick leave policy from the FAC, the Network's "Sick and Safe Time" policy states that:  "If [an employee is] unable to work due to illness or injury, ***[the employee] should contact [his or her] supervisor as soon as possible*** and no later than two hours after [the] employee's normal starting time."  Kohlhofer Decl., Ex. A, Fox Employee Handbook (July 2022), at 22.[4]  Plaintiff concedes that he did not contact his supervisor as soon as possible.  Rather, he first messaged an unnamed co-worker about his absence.  *Id.* ¶ 33.  After that text message to a coworker, Plaintiff alleges that he spoke with his supervisor, but does not specify when.  Nor does he allege who initiated the call.  *Id.* ¶ 33.  In fact, the only specific

---

[4] Plaintiff (inaccurately) refers to and alleges compliance with this policy in his latest pleading. FAC ¶ 34.  "Because [the] complaint refers to [this] policy, the Court may consider the associated policy documents that [defendant] has attached to the motion to dismiss without converting the motion into one for summary judgment."  *Gebretsadike v. Travelers Home & Marine Ins. Co.*, 103 F. Supp. 3d 78, 82 (D.D.C. 2015) (Cooper, J.).

communication that Plaintiff describes with his supervisor, concerning his September 26th absence, occurred the next day, September 27, *when Ms. Japaridze was forced to call Plaintiff for an explanation*—by that point, allegedly frustrated and questioning Plaintiff's work ethic. *See id.* ¶ 34 (alleging that, on September 27, Plaintiff's supervisor called and yelled at him for his absence on September 26). Plaintiff concedes that his supervisor believed he was "irresponsible" in the way he handled the issue. *Id.* ¶ 34. Plaintiff does not state that he was ever told that FNN was denying the requested leave. Nor does Plaintiff contend that he was not paid for work on September 26.

Plaintiff's employment with FNN was terminated on September 28, 2022, nearly 23 months after the 2020 presidential election. When FNN notified him, Plaintiff claims to have been given at least two reasons, including that he "was late for work and did not show up for work." *Id.* ¶ 35. Plaintiff "presumed" that the termination was prompted by his absence on September 26, although as noted he does not dispute that FNN had expressed ongoing concerns regarding the "toxic environment" created by Plaintiff. He also does not dispute FNN's contention that he had an issue showing up to work on time – a serious issue for producers in a news division driven by deadlines in the news cycle.

Plaintiff ultimately concludes that the Network's explanations for his termination, *i.e.*, tardiness and absence issues, were pretext. Plaintiff contends that FNN actually terminated him because (i) he complained about the Network's news and editorial content, and (ii) in the 2017 and in 2020 presidential elections, he "supported" some Democrats (something he does not contend he or anyone else ever told the Network and even though he was promoted after his purported support for Democrats began).

Shortly after his termination, Plaintiff left the news business entirely and instead went into Republican politics.  Specifically, Plaintiff was appointed as a "senior advisor" to a Republican congressman.  Approximately nine months after starting that new job, and one year (to the day) from his termination from FNN, Plaintiff filed this lawsuit.

## PROCEDURAL BACKGROUND

Plaintiff commenced this action in Superior Court on September 27, 2023.  He alleges three violations of the DCHRA (discrimination, retaliation, and aiding and abetting), one count of wrongful termination under D.C. common law, and one count under the Accrued Sick and Safe Leave Act.

FNN removed the proceeding to this Court on November 13, 2023, because the parties are completely diverse and the amount in controversy easily exceeds $75,000.  ECF No. 1 (Notice of Removal).  On December 6, 2023, FNN timely moved to dismiss with prejudice.  ECF No. 11.  Plaintiff was due to respond on December 20, 2023, however, Plaintiff amend his pleading and filed the First Amended Complaint.  ECF No. 12.  Because Plaintiff still has not and cannot cure the many legal defects in his claims, FNN again moves to dismiss with prejudice.

## LEGAL STANDARD

A motion to dismiss must be granted if the allegations in the complaint do not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To survive a motion to dismiss, a plaintiff must have alleged facts that would establish the defendant's liability.  *See Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir. 2003).  While the Court must accept adequately pled facts as true, the Court need not accept as true "a legal conclusion couched as a factual allegation" or an inference unsupported by the facts set forth in the Complaint.  *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir.2006) (quoting *Papasan v. Allain*,

478 U.S. 265, 286 (1986)).[5]  When assessing the motion, in addition to reviewing allegations appearing within the four corners of a complaint, the Court may consider matters appropriate for judicial notice, *id.* at 183, including facts appearing in the public record, such as records published by Congress, *Shaffer*, 2021 WL 4399580, at *3 & n.1 (D.D.C. Sept. 27, 2021) (Cooper, J.).  The Court may also consider "documents . . . incorporated by reference in the complaint" or "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Lambert v. Int'l Union of Bricklayers & Allied Craftworkers*, No. CV 23-309 (CKK), 2023 WL 6388953, at *5 (D.D.C. Sept. 29, 2023) (quoting *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011)); *Gebretsadike*, 103 F. Supp. 3d at 82 (Cooper, J.).  Ultimately, "[d]ismissal with prejudice is warranted when [as here] the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Angel v. Fed. Home Loan Mortg. Corp.*, 815 F. App'x 566, 569 (D.C. Cir. 2020) (quoting *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015)).

## ARGUMENT

## I.      PLAINTIFF FAILS TO STATE A D.C. HUMAN RIGHTS ACT VIOLATION

The fatal shortcoming in Plaintiff's FAC is that he fails to allege that the DCHRA's protections are in any way implicated by his termination.  That is, while he describes a number of disagreements with FNN, none has anything to do with his membership in a protected class or engagement in protected activity.   Although he attempts to salvage his lawsuit by invoking

---

[5] As discussed in section II, *infra*, the same standards apply to the Court's assessment as to whether Plaintiff has sufficiently invoked the public policy exception in his wrongful termination claim, which, *inter alia*, requires that Plaintiff to have plausibly alleged that defendant actually committed the underlying violations of public policy upon which he claims the exception is based.

"political affiliation," the facts he relies on in this regard reveal that they have nothing to do with the narrow protections afforded to the status of "political affiliation" as defined by the DCHRA.

### A.   Plaintiff Fails to Allege Discrimination Based on "Political Affiliation"

To establish a prima facie case of discriminatory treatment under the DCHRA, a plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 152 (D.D.C. 2014). "A claim of discrimination under the DCHRA requires a plaintiff to show a nexus between his disparate treatment and [a protected trait]." *Ihebereme v. Capital One, N.A.*, 730 F. Supp. 2d 40, 53 (D.D.C. 2010). Moreover, Plaintiff "must [establish that this was] intentional discrimination." *Mazloum v. D.C. Metro. Police Dep't*, 522 F. Supp. 2d 24, 41 (D.D.C. 2007) (citation omitted); *see* D.C. Code § 2-1402.31(a) (adverse action must be "wholly or partially for a discriminatory reason based on" the protected trait). Here, however, Plaintiff's allegations do not support any inference that he was terminated because of his political affiliation.

### 1.   Plaintiff's Own Allegations Show that His Alleged Complaints Had Nothing to Do with Affiliation with a Particular Political Party.

The D.C. Court of Appeals has made clear that, in this context, "political affiliation" must be narrowly construed. *Blodgett v. Univ. Club*, 930 A.2d 210, 221–22 (D.C. 2007). Under the DCHRA, "'[p]olitical affiliation' means the state of belonging to or endorsing any political party." D.C. Code § 2-1401.02(25) (emphasis added). The Court of Appeals has similarly held that "political party" refers only to an "organization which nominates a candidate for election to any Federal office whose name appears on the election ballot as the candidate of such . . . organization." *Blodgett*, 930 A.2d at 222 n.10 (quoting 2 U.S.C. § 431(16) (2007)); *accord McCaskill*, 36 F. Supp. 3d 145 at 153 ("After all, the D.C. and U.S. Codes treat as political parties only those groups that

nominate candidates for recognized public elections."). Thus, to survive dismissal, Plaintiff must have plausibly alleged an adverse action "based on his affiliation with" (i.e., the state of belonging to or endorsing) a formal, recognized political party—not "'political reasons' or his 'politics generally.'" *Id.* at 221.

Even on this second attempt to plead his case, the FAC comes nowhere close to meeting that standard. The crux of Plaintiff's allegations remains that he was terminated because he openly protested FNN's editorial choices. While he tries to shoehorn these facts into the protections of the DCHRA by contending that his termination relates to his refusal to endorse the "MAGA faction" of the Republican party, and further tries to label that a "political affiliation," *see* FAC ¶ 49, his allegations fall short. Even if Plaintiff's protests were premised on, or generally aligned with, a particular political position, that still does not give Plaintiff a basis for an actionable DCHRA claim because that is not what "political affiliation" means under D.C. law. *McCaskill*, 36 F. Supp. 3d at 153-54; *Blodgett*, 930 A.2d at 221-22; *see Fantasia v. Office of Receiver of Commc'n on Mental Health Servs.,* No. CV 01-1079 (LFO) 2001 U.S. Dist. LEXIS 25858, at *22 (D.D.C. Dec. 21, 2001) (dismissing DCHRA claim where the political affiliation serving as basis of claim was merely derived from, *inter alia*, positions that employee had taken in another litigation, not based on "the state of belonging to or endorsing a political party").

For example, in *McCaskill*, Chief Judge Boasberg held that although the plaintiff alleged that a "political stance" generated the controversy that led to her adverse treatment, 36 F. Supp. 3d at 153, the complaint demonstrated that her employer had "discriminated against her *because of her actions* . . . and not because of her membership in any group, let alone any political party," *id.* at 154 (emphasis added). Accordingly, Chief Judge Boasberg found that plaintiff had failed to state a claim under the DCHRA. Here, as in *McCaskill*, Plaintiff has stated no facts that would

allow for an inference that his employment was adversely affected because he belonged to a political party.  Rather, the FAC, if taken as true, shows that Plaintiff was terminated because of his actions, *i.e.*, disagreements about news and opinion content and editorial decisions including, among other things, what Plaintiff calls "false reporting," which Plaintiff claims put him at odds with his employer.

Importantly, nowhere in the FAC does Plaintiff allege that he actually "belong[s] to or endors[es] any political party," D.C. Code § 2-1401.02(25).  Nor does he contend that FNN "perceive[d]" Plaintiff as "belonging to or endorsing any political party," *id.* §§ 2-1401.02(25), 2-1402.31(a).  The absence of any such allegations is similarly fatal to Plaintiff's DCHRA theory, particularly where, as here, Plaintiff admits that he is "traditionally a Republican," FAC ¶ 42, shares some views with the same editorial staff he claims to be the source of the purported discrimination, *id.* ¶ 7, and, within a few months of leaving the Network, became a senior aide to a Republican member of the U.S. House of Representatives.

It is not enough that, as Plaintiff puts it, "in the 2017 and 2020 elections," he voted for Democratic candidates or supported their positions, *id.* ¶ 42, particularly where he does not claim that he ever actually joined or outwardly endorsed the Democratic party and does not claim that FNN knew anything (or cared) about his alleged "affiliation."  *See Reed v. Great Lakes Cos., Inc.*, 330 F.3d 931, 934 (7th Cir. 2003) (Posner, J.) ("It is difficult to see how an employer can be charged with discrimination on the basis of an employee's [membership in a protected group] when he doesn't know [that affiliation.]"); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005) ("discriminatory intent cannot be inferred, even at the *prima facie* stage, from circumstances unknown to the defendant"); *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578 (3d Cir. 1996) ("We cannot presume that an employer most likely practiced unlawful discrimination when it did not

know that the plaintiff even belonged to the protected class."); *Toronka v. Cont'l Airlines, Inc.*, 411 F. App'x 719, 723 n.2 (5th Cir. 2011) ("[I]n the case of discrimination based on a protected status of which the employer would not obviously be aware, as is, for example, sometimes the case with religion or national origin, the employee must show that the employer was sufficiently aware of the employee's status to have been capable of discriminating based on it."); *Prebilich-Holland v. Gaylord Ent. Co.*, 297 F.3d 438, 444 (6th Cir. 2002) ("[T]he employee bears the burden of demonstrating that the employer had actual knowledge of her pregnancy at the time that the adverse employment action was taken[.]"); *Lubetski v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1305 (11th Cir. 2002) ("*prima facie* case is established if the plaintiff demonstrates the challenged employment decision was made by someone who was aware of the plaintiff's religion").[6]

## 2. The DCHRA Does Not Apply to Preferences for Certain "Factions" or "Views" *Within* a Political Party.

Recognizing the problems with his DCHRA theory, Plaintiff endeavors to navigate around the problem by redefining "political affiliation." He now contends that "[b]y refusing to endorse the MAGA/Republican view that the election was stolen and/or that January 6th was a false flag operation propagated by the Democratic party, [he] was affiliating with the Democratic party" for purposes of the DCHRA. FAC ¶ 42. But there is nothing whatsoever in the DCHRA that supports the argument that aligning with a particular "faction" within a political party constitutes protected "membership or endorsement" of that party. Rather, Plaintiff's alleged opposition to the "MAGA faction" of the Republican party, *id.* ¶ 38, is simply an endorsement of a particular set of political *positions*, which courts have consistently held is not protected under D.C. law. *See Blodgett*, 930

---

[6] It is well established that courts may apply Title VII jurisprudence when analyzing and deciding claims under the DCHRA. *See Futrell v. Dep't of Labor Fed. Credit Union,* 816 A.2d 793, 802 (D.C. 2003).

A.2d at 221; *McCaskill*, 36 F. Supp. 3d 145, 153–54; *Fantasia,* 2001 U.S. Dist. LEXIS 25858, at *22.[7]

Plaintiff cannot rewrite the DCHRA to substitute a "*faction* of the Republican Party," FAC ¶ 41 (emphasis added), for the party itself.  Plaintiff's own description of that "faction" makes clear that it is a "movement" or subset of a party, not a group that itself nominates candidates for office.  *See Blodgett*, 930 A.2d at 222 n.10 (citing D.C. Code § 1–1101.01(10) (2001); 2 U.S.C. § 431(16) (2007); D.C. Code § 1–204.01(b)(2) (2001)); *see also* 11 C.F.R. § 100.15 (Federal Election Commission regulation defining "[p]olitical party" as "an association, committee, or organization which nominates or selects a candidate for election to any Federal office, whose name appears on an election ballot as the candidate of the association, committee, or organization").

### 3.    Plaintiff Fails to Show that FNN Even Knew of His Political Affiliation.

Plaintiff's discrimination claims further fails for the simple reason that Plaintiff does not indicate his employer knew anything about his political affiliation.  Even in his amended pleading, Plaintiff still has not alleged that he or anyone else ever told FNN that he "was a member of or endorsed" any "political party," *see* D.C. Code § 2-1401.02(25).  To plug that hole, the FAC includes one conclusory sentence, surmising that FNN must have "kn[own] [he] was not affiliated with the MAGA faction of the Republican party," because of Plaintiff's many complaints about the Network's editorial approach, e.g., his recurring refrain about "false reporting." FAC ¶ 41.  But again, a faction affiliation is not a party affiliation.  And, in all events, that unsupported leap in logic is little more than a threadbare recital about FNN's purported knowledge of that affiliation.

---

[7] There similarly is no support in the text of the DCHRA for protections based on *a refusal to endorse* an employer's alleged political as opposed protections based on discriminations because an employee belongs to or has otherwise endorsed its own preferred (recognized) political party. D.C. Code § 2-1401.02(25).

*See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not well-pleaded facts sufficient to withstand dismissal); *see also, e.g.*, *Jones v. Ass'n of Am. Med. Colleges*, No. CV 22-1680 (EGS), 2023 WL 2327901, at *12 (D.D.C. Mar. 2, 2023) (discrimination claim failed because it contained no more than conclusory allegations of discrimination); *Ihebereme*, 730 F. Supp. 2d at 54 ("Simply including the conclusory clause 'by virtue of his race and ethnicity' . . . after recounting defendant's behavior, without any factual allegations that address the relevance of race and ethnicity, does not state a claim for discrimination.").

### 4. Plaintiff's Allegations Do Not Give Rise to an Inference of Discrimination

Finally, Plaintiff has failed to plead facts creating a plausible inference that his termination "was not attributable to [a] . . . legitimate reason." *McCaskill*, 36 F. Supp. 3d at 152 (quoting *George v. Leavitt,* 407 F.3d 405, 412 (D.C. Cir. 2005)). "To satisfy that [DCHRA claim] requirement, [plaintiff] must plead facts that show that the adverse action was taken *because of* h[is] protected status—that is, that the action 'was not attributable to [a] common legitimate reason.'" *Id.* "Mere speculation as to the employer's motivation cannot establish a prima facie case of discrimination." *Id.* Yet, as noted above, speculation (and thus unsupported conclusory assertion) is all Plaintiff has, since he does not even contend that he or anyone else told his employer that he had allegedly temporarily "affiliated" with Democrats, let alone that the Network would have had some reason to terminate him for it.

Nor, for that matter, does Plaintiff contend that other similarly situated employees with a different "political affiliation" were somehow treated differently than Plaintiff. *See Beaulieu v. Barr*, No. CV 15-896 (TJK), 2019 WL 5579968, at *4 (D.D.C. Oct. 29, 2019) ("The Court is therefore left with no allegations—save for the bare assertion that Beaulieu was the only Hispanic

female assigned to her unit—that allow the Court to infer that Defendants were motivated by discrimination based on Beaulieu's [protected classes]. She does not, for example, identify any 'comparator' employees who were treated differently. . . .  Nor does she 'identif[y] specific statements purportedly made' by a supervisor 'reflecting an animus against individuals of' her protected class.") (citations omitted).

Ultimately, the allegations in the FAC do not give rise to any inference that political affiliation is what caused Plaintiff's termination, particularly taken alongside his other allegations that his employer was plainly unhappy with his job performance for some time, that Plaintiff and his supervisor both shared the view that Plaintiff's workplace dynamic had become "toxic," FAC ¶¶ 30, 32, that Plaintiff repeatedly describes himself as at odds with FNN's management and the editorial direction of its news and opinion commentary, *e.g.*, *id.* ¶¶ 23, 25, 27, 29, and that the Network offered Plaintiff at least two reasons for his termination, including being late to work and failing to show up at all, *id.* ¶ 35.  Indeed, Plaintiff acknowledges that the same Network *promoted* him back in 2018, *id.* ¶ 6, shortly after the first time Plaintiff purportedly "affiliated with the Democratic party in the 2017 . . . election[]," *id.* ¶ 42.  Accordingly, even if Plaintiff had adequately alleged a protected status, he still has not sufficiently alleged that such status was the reason for his termination.

**B.      Plaintiff Fails To Allege a Retaliation Claim Because His Alleged Reports Claiming False Reporting Are Not Reports Protected by the DCHRA.**

Under the DCHRA, "[t]o establish a prima facie case of retaliation, the plaintiff must present evidence that (1) []he engaged in [a statutorily protected activity]; (2) the employer took an adverse employment action against her; and (3) the adverse action was causally related to the

exercise of her rights." *Holcomb v. Powell*, 433 F.3d 889, 901-02 (D.C. Cir. 2006).[8]  But "'[n]ot

every complaint garners its author protection' from retaliation under the DCHRA." *Vogel v. D.C.*

*Off. of Plan.*, 944 A.2d 456, 464 (D.C. 2008).  "To constitute 'protected activity,' the complaint

must allege an employment practice that is prohibited by the DCHRA." *Id.*  In addition, when

making the complaint at issue, the "employee must [have] alert[ed] the employer that []he [wa]s

lodging a complaint about allegedly [unlawful] discriminatory conduct." *Sampay v. Am. Univ.*,

294 A.3d 106, 115 (D.C. 2023) (quoting *Vogel*, 944 A.2d at 464).

The FAC identifies six discrete instances of internal "complaints" that Plaintiff lodged

between November 2020 and August 2022.  FAC ¶ 49.  Those six reports consist solely of

complaints about what Plaintiff thought was the Network's alleged "false reporting on the 2020

election and January 6th, its advocacy for President Trump, and its advocacy of the far-right wing,

radical conservative views of the MAGA faction of the Republican Party." *Id.*  While

"[e]xpressing workplace concerns . . . may constitute protected activity . . . those expressions must

make *some* reference to discrimination that would be unlawful under [the statute]." *Achoe v.*

*Clayton*, No. CV 17-02231 (CRC), 2018 U.S. Dist. LEXIS 156064, at *26 (D.D.C. Sep. 13, 2018)

(addressed in Title VII context).

Here, not one of Plaintiff's six complaints raised a concern of discrimination against

Plaintiff or any other FNN employee on the basis of political affiliation or any other protected

characteristic.  *See* FAC ¶ 49.  Although Plaintiff now contends that when he made these reports

he "had a good-faith reasonable belief that [FNN] was violating the [DCHRA] by discriminating

against its employees based on their political affiliation and views," by "purging . . . reporters who

---

[8] "The elements of a retaliation claim under the DCHRA are the same as those under the federal employment discrimination laws." *McCain v. CCA of Tenn., Inc.*, 254 F. Supp. 2d 115, 124 (D.D.C. 2003).

were unwilling to support, endorse, or affiliate with the MAGA faction of the Republican Party," he does not argue his reports had anything to do with that "purging" of reporters. *See id.* In fact, the "retaliation" allegations in the First Amended Complaint plainly do not mention any reports about employment practices at all. Instead, each of Plaintiff's complaints is related to his personal belief that FNN was engaged in inaccurate news reporting. *See id.* A news organization's decisions concerning how to cover current events are exercises of journalistic prerogatives, and an employee's disagreements with them is not "protected activity." *See generally McCaskill*, 36 F. Supp. 3d at 154 (neither the plaintiff nor the Court could find authority "support[ing] the notion that general political activity [or] political . . . speech . . . constitutes protected activity under the DCHRA's retaliation provision").

Therefore, Plaintiff's allegations show that, at most, he disagreed with how his employer ran its business and how it presented diverse viewpoints in its reporting and commentary on matters of public importance. Because such disagreements are not protected by the DCHRA or any other law, the Court must dismiss his claims. *See Battle v. Master Sec. Co., LLC*, 298 F. Supp. 3d 250, 253 (D.D.C. 2018) (Cooper, J.) (Plaintiff's complaints about employer's "wrongful procedures" including, e.g., "pay discrepancies" and "unfair labor practices" did not reference "discrimination" and thus did not support actionable retaliation claim).

### C. Plaintiff's Aiding and Abetting Claim Is Legally Defective and Time Barred

Plaintiff separately alleges that FNN violated the DCHRA when it "aided and abetted the discriminatory and retaliatory conduct of [three of FNN's employees: Bryan Boughton, Doug Rohrbeck, and NuNu Japaridze]." FAC ¶ 55. Because FNN cannot "aid or abet" its own alleged violation of the DCHRA, and because any allegation that Boughton, Rohrbeck or Japaridze engaged in independent violations of the DCHRA that FNN aided or abetted is necessarily time-barred, Plaintiff's claim fails.

1.    **Plaintiff's Aiding and Abetting Claim Against the Network Fails as a Matter of Law.**

Plaintiff fails to state a viable aiding and abetting claim because DCHRA's aiding and abetting provision is aimed at employees, not employers.  The provision makes it "an unlawful discriminatory practice for any *person* to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provision of this chapter or to attempt to do so."  D.C. Code § 2–1402.62 (emphasis added).  "The aiding-and-abetting clause is meant to prohibit *an individual* from assisting another person in discriminating, retaliating, or creating a hostile work environment." *McCaskill*, 36 F. Supp. 3d at 156 (emphasis added).  "[T]hus, the actors who performed the discriminatory acts cannot also aid and abet the alleged discrimination." *Pietrangelo v. Refresh Club, Inc.*, No. 18-CV-1943 (DLF), 2023 WL 6388880, at *13 (D.D.C. Sept. 29, 2023) (quoting *Gatling v. Jubilee Hous., Inc.*, No. 20-cr-3770, 2022 WL 227070, at *6 (D.D.C. Jan. 26, 2022)).

It is axiomatic that one cannot be held liable for aiding and abetting oneself.  Here, although Plaintiff identifies three FNN employees in his aiding and abetting claim, throughout the First Amended Complaint, the allegedly improper conduct of those employees is also attributed to FNN. Plaintiff points to no conduct by those individuals distinct from their roles at FNN.  Because "[t]hese are the same acts that Defendants allegedly committed in violation of [the DCHRA]," there is no separately cognizable aiding and abetting claim against FNN.  *Gatling*, 2022 WL 227070, at *6 ("Defendants cannot aid and abet their own allegedly discriminatory acts.").  And, of course, since Plaintiff's allegations of discrimination and retaliation against FNN fail to state a viable claim, as discussed above, any claim for aiding and abetting such alleged violations must necessarily fail as well.  *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010) (holding that

supervisor did not aid and abet unlawful discrimination since the employer did not discriminate against plaintiff).

> ### 2. Any Aiding and Abetting Claim Against the Network Based on Independent Acts by Its Employees Is Also Time Barred

Even if an aiding and abetting claim could be pursued against an employer based on conduct of its employees, this one could not because it is time barred. Under the DCHRA, "[a] private cause of action . . . shall be filed in a court of competent jurisdiction within one year of the unlawful discriminatory act." D.C. Code § 2–1403.16(a). Plaintiff commenced this action on September 28, 2023, meaning any claim that accrued before September 28, 2022, is untimely.

Plaintiff rests his DCHRA "aiding and abetting" allegation on the theory that the Network "knew or should have known about" and "failed to stop" the "discriminatory and retaliation conduct" [*sic*] of Doug Rohrbeck, Bryan Boughton, and Nunu Japaridze. FAC ¶ 54. But the FAC does not identify what particular "discriminatory and retaliation conduct" [*sic*] of those three individuals allegedly forms the basis of this claim.

In any event, Plaintiff fails to plead *any* potentially relevant conduct by *any* of those three individuals, occurring on or after September 28, 2022, that could even arguably form the basis for an independent, primary DCHRA violation. Indeed, aside from Plaintiff's termination (i.e., the alleged basis for Plaintiff's primary DCHRA claims, which cannot also support an aiding and abetting claim), none of the allegations about these individuals that even arguably could be discriminatory or retaliatory occurred on or after September 28, 2022. *See, e.g.*, FAC ¶ 25 (June 2021 exchange with Rohrbeck when Plaintiff was allegedly "[f]orced to cover" a press conference about the COVID-19 vaccine); *id.* ¶ 31 (Plaintiff's May 2022 complaint to Japaridze that he was being criticized by Rohrbeck for "reporting on topics 'the network does not care about'"). Indeed, because Plaintiff was terminated on September 28, 2022, FNN logically cannot have "failed to

stop," these individuals from any relevant "discriminatory and retaliation conduct," FAC ¶ 54, occurring thereafter.  Thus, for this additional reason, Plaintiff's alleged aiding and abetting claim fails as a matter of law and should be dismissed with prejudice.

## II.   PLAINTIFF FAILS TO STATE A WRONGFUL TERMINATION CLAIM

Plaintiff, who concedes (as he must) that he was an at-will employee of FNN, fails to plead a viable wrongful termination claim.  "District of Columbia law . . .  presumptively bars wrongful termination claims brought by at-will employees."  *Leyden v. Am. Accreditation Healthcare Comm'n*, 83 F. Supp. 3d 241, 248 (D.D.C. 2015) (Cooper, J.) (quoting *Vreven v. Amer. Ass'n of Retired Persons,* 604 F.Supp. 2d 9, 13 (D.D.C. 2009)).  An at-will employee may have a claim for wrongful discharge only if (i) "the sole reason for the discharge is the employee's refusal to violate the law," *Sichani v. Washington Metro. Area Transit Auth.*, No. 22-CV-1584 (CRC), 2023 WL 7279254, at *5 (D.D.C. Nov. 3, 2023) (quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 34 (D.C. 1991)), or (ii) he "was fired after acting in furtherance of a public policy 'solidly based on a statute or regulation that reflects the particular public policy,'" *Leyden*, 83 F. Supp. 3d at 248 (quoting *Carl v. Children's Hosp.*, 702 A.2d 159, 163 (D.C. 1997) (Terry, J., concurring)).

Here, Plaintiff does not allege that he was fired for refusing to violate any law.  Instead, he attempts to invoke the *Carl* exception.  Under *Carl*, a plaintiff must "point to some identifiable policy that has been officially declared in a statute or municipal regulation, or in the Constitution, and [demonstrate] a close fit between the policy and the conduct at issue in the allegedly wrongful termination."  *Id.* at *6 (quoting *Harris v. D.C. Water & Sewer Auth.*, 195 F. Supp. 3d 100, 106 (D.D.C. 2016)).  As this Court has observed, a "common denominator" among qualifying cases is "the existence of *specific* laws or regulations that clearly reflect a policy prohibiting the activity about which the employee complained."  *Clay v. Howard Univ.*, 128 F. Supp. 3d 22, 29 (D.D.C. 2015) (quoting *Leyden*, 83 F. Supp. 3d at 248) (Cooper, J.)) (emphasis added).  The Plaintiff

"cannot 'establish[] the 'close fit' required by the D.C. Court of Appeals to recognize a new public policy exception' where the complained-of conduct is unmoored from 'a specific public policy prohibiting [the employer] from engaging in the conduct [the employee] alleges.'" *Joyner v. Morrison & Foerster LLP*, No. CV 20-1440 (TJK), 2023 WL 6313194, at \*11 (D.D.C. Sept. 27, 2023) (quoting *Leyden*, 83 F. Supp. 3d at 249).  In addition, "Plaintiff's complaint must at least 'contain factual allegations that substantiate [his] conclusory assertions and beliefs regarding the illegality of [the employer's] request'—or, in this case, its violation of public policy.'" *Joyner*, No. CV 20-1440 (TJK), 2023 WL 6313194, at \*11 (quoting *Bereston v. UHS of Delaware, Inc.*, 180 A.3d 95, 107 (D.C. 2018)).[9]  This Court and the D.C. Court of Appeals have repeatedly emphasized the "limited" scope of that "very narrow" exception.  *Sichani*, 2023 WL 7279254, at \*5 (Cooper, J.); *Bereston*, 180 A.3d 95 at 110 ("When this court formulated the *Adams–Carl* exception . . . we took pains to emphasize that the tort of wrongful discharge in contravention of public policy is a very narrow one.").

The *Carl* exception does not apply here for several reasons.  First, Plaintiff's repeated complaints boil down to his own disagreement with FNN's news and commentary focus and editorial positions, not complaints that FNN itself was somehow violating the law.  FAC ¶¶ 61–65.  Indeed, the First Amended Complaint itself reveals that Plaintiff's true complaint is with what he saw as FNN "pushing a far-right wing agenda" to "appeal to [its] viewers." *E.g.*, *id.* ¶ 61.  But there is no recognized public policy, much less one "solidly based on a statute or regulation" as this "very narrow" *Carl* exception requires, *see Sichani*, 2023 WL 7279254, at \*5 (Cooper, J.),

---

[9] "'[I]t is not enough for a plaintiff to show only that [he] had [a] 'reasonable belief' that [his] employer was violating the law; [he] must show that [he] complained about an *actual violation* [by his employer].'" *Id.* (quoting *Omwenga v. United Nations Found.*, No. CV 15-786 (TSC), 2020 WL 5798428, at \*5 (D.D.C. Sept. 29, 2020)).

that protects the right of individual reporters like Plaintiff to object to and demand input into the news and opinion content that a news organization provides to the public.

Nor could such a policy exist in our legal system—because the First Amendment guarantees that Congress shall make no such law abridging the freedom of the press, meaning news organizations must be free to cover the news and offer commentary on matters of public concern as they deem appropriate. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time."). Thus, if anything, the public policy of the District of Columbia must be that news organizations are free to report on matters of public concern as they deem appropriate without the threat of harassing employee lawsuits seeking to monetize editorial disagreements. It is decidedly not the public policy of the District of Columbia, or for that matter the U.S. government or any State in the Union, that an employer news organization is subject to liability under anti-discrimination laws every time it takes a personnel action with respect to an employee who claims they disagree with organization's editorial policy and practices.

After FNN previously highlighted the critical absence of any statute that could support an unlawful discharge claim based on Plaintiff's allegations, *see* FNN Mem. in Supp. of Mot. to Dismiss, ECF No. 11-1, at 17, Plaintiff took a kitchen sink approach to his amended pleading— citing, and saying little else about, dozens of statutory and constitutional provisions (nearly 30 in

total) all somehow purportedly related to the 2020 Presidential election and/or events of January 6, 2021.  FAC ¶¶ 62-65.  Yet none of these provisions provide a basis for relief under *Carl*.

Unsurprisingly, not one of the laws Plaintiff now advances purports to govern how a news media organization covers current events.[10]  Nor, for that matter, does Plaintiff even allege that the Network itself violated, or that he "spoke out" against FNN violating, any these laws.  Rather, Plaintiff can only point to laws that he believes were violated by individuals who were covered by FNN's news reports.  *Cf.* FAC ¶ 62 (alleging Plaintiff "spoke out against the [January 6] insurrection," which he claims "constituted criminal conduct in violation of [15 different statutory provisions]"); *id.* ¶ 65 (alleging that "attempts to overturn the election by President Trump, Rudy Giuliani, and the MAGA faction of the Republican Party in Georgia constituted criminal conduct in violation of [a dozen Georgia state code provisions]") (emphasis added).  After claiming that others broke these laws, Plaintiff contends that he "spoke out against" the Network's alleged "aid

---

[10] Specifically, in FAC ¶ 62, Plaintiff alleges that he complained about violations of 18 U.S.C § 2383 (rebellion or insurrection), 18 U.S.C. § 2384 (seditious conspiracy), 18 U.S.C. § 2101 (riots), 18 U.S.C. § 1752 (restricted building or grounds), 18 U.S.C. § 1361 (willful injury or depredation against government property), 18 U.S.C. § 231 (*inter alia*, transporting firearms with knowledge that they will be used in furtherance of a civil disorder), 18 U.S.C. § 111 (assault on officers), 18 U.S.C. § 5104 (unlawful activities on the grounds of the United States Capitol), 18 U.S.C. § 1512 (witness tampering), 18 U.S.C. § 1512(k) (conspiracy to commit witness tampering), 18 U.S.C. § 371 (conspiracy to commit offense against the United States), 18 U.S.C. § 241 (conspiracy against rights), and D.C. Code § 22-1322 (rioting or inciting to riot).  Later, Plaintiff cites several other laws, including the Twelfth Amendment to the U.S. Constitution, the Electoral Count Act (3 U.S.C. § 15 (2021)), and several Georgia statutes: Ga. Code § 16-14-4(c) (conspiracy to engage in racketeering), Ga. Code § 16-4-7 (criminal solicitation), Ga. Code § 16-10-1 (violation of oath by public officer), Ga. Code § 16-10-20 (willful falsification of writings within jurisdiction of Georgia agency), Ga. Code § 16-10-21 (conspiracy to defraud Georgia by agreeing to commit theft of state property), Ga. Code § 16-4-8 (conspiracy to commit a crime), Ga. Code § 16-10-23 (impersonating Georgia public officer), Ga. Code § 16-4-1 (criminal attempt), Ga. Code § 16-10-20.1 (knowingly filing materially false or altered public records), Ga. Code § 21-2-603 (conspiracy to violate Georgia election law), and Ga. Code § 21-2-566 (interference with Georgia elections by, *inter alia*, preventing poll officers from holding primaries, threatening violence, or depositing fraudulent ballots).  One of the provisions listed, "Ga. Code § 93," does not refer to any Georgia statute that Defendant could identify.

and support of this illegal conduct," *id.* ¶ 63, when it covered those issues in its news and editorial programming. *See id.* ¶ 64 (alleging that FNN "had become the bullhorn for President Trump and the MAGA faction of the Republican Party" to "spread falsehoods about the 2020 election and the January 6th insurrection"); *id.* ¶ 65 (alleging that "after January 6, 2021, [FNN] continued to support those engaging in the insurrection" by, *e.g.*, airing a Tucker Carlson program on a separate digital streaming platform). But complaining about news coverage of the allegedly illegal actions of others, even in a manner allegedly favorable to such individuals, is a far cry from complaining about an employer's own unlawful conduct, as is necessary to invoke the *Carl* exception. *See Joyner*, 2023 WL 6313194, at *12 (no "close fit" between conduct employee reported "and any clear antitrust policy prohibiting that activity" because "Plaintiff d[id] not even squarely allege that [his former employer] had violated any law"); *Sichani*, 2023 WL 7279254, at *8 ("Because none of these [cited] laws clearly reflects a policy prohibiting [his former employer's] conduct, [Plaintiff] has failed to state a claim for wrongful termination in violation of public policy[.]"); *Bereston*, 180 A.3d at 107 (To "state a plausible wrongful discharge claim, [plaintiff's] complaint must contain factual allegations that substantiate [any] conclusory assertions and beliefs regarding the illegality of [the employer's] conduct.").

Separately, putting aside the other problems with this claim, Plaintiff also has not plausibly alleged that any protected conduct at issue was the sole or even a substantial cause for his termination. At best, Plaintiff contends that FNN should have operated differently in light of what others, e.g., rioters at the Capitol on January 6, were doing. But it is well established that the *Carl* exception does not apply where the allegation is merely that an employer has not gone "above and beyond what the law requires," *Davis v. Cmty. Alternatives of Washington, D.C., Inc.*, 74 A.3d 707, 711 (D.C. 2013).

In *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, the D.C. Court of Appeals clarified that its "narrow exceptions to the "employment at-will" doctrine . . . recognized in *Adams* and *Carl* were not designed to prevent an employer from terminating an at-will employee in order to eliminate unacceptable internal conflict and turmoil." 715 A.2d 873, 886 (D.C. 1998). There, the Court of Appeals observed that the "plaintiff's complaint [had] depict[ed] a working environment in which [plaintiff] and several of her superiors were frequently, if not constantly, at each other's throats." *Id.* Because that plaintiff's "own complaint reveal[ed] that she was not terminated solely, or even substantially, for engaging in conduct protected by . . . an exception," her claim failed.

Similarly, here, Plaintiff's own allegations describe an increasingly confrontational workplace dynamic with Plaintiff increasingly at odds with colleagues and supervisors. As Plaintiff concedes, for some time, both he and the Network viewed Plaintiff's work environment as "toxic." FAC ¶¶ 20, 30, 32. Plaintiff reveals that his supervisor had also become frustrated with Plaintiff's "work ethic" and likewise believed he had handled communications regarding his last absence from work "irresponsibly." *Id.* ¶ 34. Plaintiff even reveals that he was given multiple reasons for his termination, including one (his failure to show up to work on time) that he does not even dispute. *Id.* ¶ 35.

Plaintiff certainly does not support his causal allegations with any comparison to similarly situated employees being treated more favorably, *see Brathwaite v. Vance Fed. Sec. Servs., Inc.*, 613 F. Supp. 2d 38, 49 (D.D.C. 2009) (comparison to other employees did not support causation, which undermined plaintiff's invocation of policy exception for wrongful termination claim). Rather, without explanation, Plaintiff points to other employees purportedly aligned with his views *who were allegedly terminated en masse nearly two years before Plaintiff. Cf.* FAC ¶¶ 8, 10 (alleging January 2021 "purge" of "approximately 20" FNN employees who purportedly "did not

support the messaging of the MAGA faction of the Republican Party").  Thus, here, as in *Wallace*, because Plaintiff's description of the facts undermine the conclusion that any allegedly protected conduct was the sole or substantial reason for his termination, "[i]t matters little, if at all, who was most at fault" because District employment law does "not require[] [employers] to tolerate an intolerable working environment."  715 A.2d at 886.

For each of these reasons, the Court should dismiss Plaintiff's wrongful discharge claim.

## III.   PLAINTIFF FAILS TO STATE A PAID SICK LEAVE ACT CLAIM

Under the Accrued Sick and Safe Leave Act, an employer "shall not interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided by [the Act]," nor may an employer "discharge or discriminate in any manner against an employee because the employee . . . uses paid leave provided under [the Act]."  D.C. Code § 32-531.08(a), (b)(4).  Plaintiff alleges that the Network violated both provisions.  FAC ¶¶ 72–73.  In either case, his claim fails.

To state a claim under the "interference" provision of the Sick Leave Act, Plaintiff must allege that he was "eligible for and denied sick leave," *Ruifang Hu v. K4 Sols., Inc.*, No. 18-CV-1240 (TSC), 2020 WL 1189297, at *10 (D.D.C. Mar. 12, 2020).  Here, Plaintiff does not allege that he asked for but was denied the opportunity to take covered sick leave.  Indeed, his allegations are that he *did* take sick leave and then was terminated.  *E.g.*, FAC ¶ 73.  He does not claim that the Network withheld payment for the day of work upon which he bases his claim (September 26, 2022), or otherwise explain how the Network denied his right to use sick leave.  Thus, based on his own allegations, Plaintiff plainly does not state a plausible claim for interference with his rights under the Sick Leave Act.

Plaintiff's retaliation claim also fails.  To plead retaliation under the Sick Leave Act, a plaintiff must establish that: (i) he took a protected act under the statute (i.e., taking leave as set out in the D.C. Sick Leave Act), (ii) the employer took an adverse personnel action, and (iii) "a

causal connection between the two exists." *Harbour v. Univ. Club of Washington*, 610 F. Supp. 3d 123, 135 (D.D.C. 2022) (Cooper, J.).

Initially, even accepting Plaintiff's misplaced allegation that he was terminated solely for missing one day of work, Plaintiff's allegations do not give rise to a fair inference that he satisfied the notice requirements contemplated by the Sick Leave Act.  Under the Sick Leave Act, "[p]aid leave shall be provided upon the written request of an employee upon notice as provided in this section," meaning "[t]he request shall include a reason for the absence involved and the expected duration of the paid leave."  D.C. Code § 32-531.03.  In addition, "[i]f the paid leave is foreseeable, the request shall be provided at least 10 days, or as early as possible, in advance of the paid leave." *Id*.  Otherwise, "[i]f the paid leave is unforeseeable, an oral request for paid leave shall be provided prior to the start of the work shift for which the paid leave is requested." *Id*.  The Sick Leave Act separately contemplates that employers may maintain their own paid leave policies that are at least as favorable to employees as the provisions of District law, *see* D.C. Code §§ 32-531.03, 32-531.05, 32-531.07, as the Network has done, setting out how notice must be given consistent with the Sick Leave Act's requirements.  The FNN policy required that Plaintiff notify his supervisor, Ms. Japaridze, "as soon as possible" but at latest two hours after the start of Plaintiff's shift.  *See* Ex. A, Fox Sick and Safe Leave Policy.

Even with in his second bite at the apple, Plaintiff's amended pleading fails to allege plausibly that he satisfied these notification requirements, including (i) whether Plaintiff timely gave notice to his supervisor the morning of his absence, "as soon as possible," and (ii) whether he provided the requisite information regarding the expected duration of the leave.  To the contrary, the Complaint affirmatively indicates that Plaintiff did not properly invoke his entitlement to leave.

Plaintiff claims that on Monday, September 26, 2022, the same day as his absence from work, he "called in sick," FAC ¶ 33. Yet the earliest specific notice that he identifies was to a *co-worker*, FAC ¶ 33, not a supervisor, as required by FNN's policy. While Plaintiff contends that he "then spoke with his supervisor, [Ms.] Japaridze, to inform her that he would be out sick," he does not allege that this conversation took place within the time required by FNN's policy and instead only describes a call with his supervisor that occurred the following day. FAC ¶ 34 (describing call from supervisor, the day after Plaintiff's absence, during which Plaintiff alleges that his supervisor faulted him for being out sick the day before).

Further, the allegations in the Complaint also do not give rise to a fair inference that Plaintiff was terminated because he took protected sick leave, which is similarly fatal to the claim. Plaintiff (still) does not actually plead (even in conclusory fashion) that the Network terminated him because he took leave under the Sick Leave Act. Rather, Plaintiff claims that FNN's reliance on his absence was a "pretext" for FNN's actual discrimination under the DCHRA. FAC ¶¶ 36, 70. Accordingly, Plaintiff does not allege in good faith (or for that matter believe) that the Sick Leave Act applies to his termination. *See Ruifang Hu*, 2020 WL 1189297, at *10 (dismissing Sick Leave Act claim, which was brought alongside a discrimination claim, because the plaintiff "d[id] not claim that the Defendants fired her for reasons related to her medical leave, but because she sent an 'illegal' email complaining about the Defendants' allegedly discriminatory conduct").

Accordingly, for each of these reasons, Plaintiff's Sick Leave Act claim must be dismissed.

## **CONCLUSION**

For the foregoing reasons, Plaintiff has failed to state a claim, and FNN respectfully requests that the Court dismiss the Complaint with prejudice in its entirety.

Dated: January 17, 2024        Respectfully submitted,
       Washington, D.C.

By: /s/ *Vincent H. Cohen, Jr.*
    Vincent H. Cohen, Jr., Esq. (Bar No. 471489)
    Christina G. Sarchio, Esq. (Bar No. 456254)
    D. Brett Kohlhofer, Esq. (Bar No. 1022963)
    DECHERT LLP
    1900 K Street, N.W.
    Washington, D.C. 20006-1110
    Tel: 202 261 3300
    Fax: 202 261 3333
    vincent.cohen@dechert.com
    christina.sarchio@dechert.com
    d.brett.kohlhofer@dechert.com

    J. Ian Downes (*Pro Hac Vice*)
    DECHERT LLP
    2929 Arch Street
    Philadelphia, PA 19104
    Tel: (215) 994-2000
    Fax: (215) 994-2222
    ian.downes@dechert.com

    *Attorneys for Defendant Fox New Network, LLC*