## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JASON DONNER**, | |
| Plaintiff, | |
| v. | Case No. 23-cv-3401 (CRC) |
| **FOX NEWS NETWORK, LLC**, | |
| Defendant. | |

### MEMORANDUM OPINION AND ORDER

"There can be no higher law in journalism," the renowned newspaper columnist Walter Lippmann once observed, "than to tell the truth and to shame the devil." WALTER LIPPMANN, LIBERTY AND THE NEWS 4 (1920). Lippmann surely captured a basic "law" of journalism. But when it comes to employment law in the District of Columbia, the allegation that a journalist was terminated for insisting that his network report the truth and hold wrongdoers accountable does not amount to an actionable claim.

Plaintiff Jason Donner, a former Capitol Hill producer for Defendant Fox News Network ("Fox News" or "Fox"), alleges he was fired for opposing Fox's false reports of voter fraud in the 2020 election and inaccurate coverage of the riot at the Capitol on January 6, 2021. One year to the day after his dismissal, Donner filed this lawsuit against Fox. His amended complaint advances three sets of claims. First, Donner claims he was discriminated and retaliated against based on his "political affiliation," in violation of the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 et seq., for refusing to align himself with former President Trump and the "MAGA faction of the Republican Party." Second, Donner asserts a wrongful termination claim against Fox on the ground that it violates public policy to fire a journalist for speaking out against dishonest reporting that undermines confidence in the U.S. electoral system and

endangers our democracy.  Third, Donner argues that even Fox News' "pretextual" reason for firing him—that he called in sick one day in September 2022—violates the D.C. Accrued Sick and Safe Leave Act ("Sick Leave Act"), D.C. Code § 32-531.01 et seq.  Fox has moved to dismiss the amended complaint in full under Federal Rule of Civil Procedure 12(b)(6).

The Court will, in the main, grant Fox's motion.  On the DCHRA claim, Donner has not plausibly alleged that he was discriminated against because of his "political affiliation," which is narrowly defined as membership in or endorsement of a political party, or that his termination was reprisal for engaging in any protected activity.  At most, the amended complaint suggests Donner may have been fired due to his political disagreements with Fox's management and for voicing concerns about the journalistic integrity of the network's programming.  Regardless of whether Donner was justified in speaking out, however, his allegations do not support a claim under the DCHRA.  In the same vein, Donner also has not alleged a viable claim of wrongful termination because he was an at-will employee and has not identified an established public policy that Fox violated when firing him.  By contrast, Donner fares better when it comes to his contention that Fox violated the Sick Leave Act when it purportedly fired him for staying home one workday.  Though Donner surmises that this stated reason was a fig leaf for punishing him for protesting the network's inaccurate news coverage, the allegation that Fox expressly told Donner that he was being cashiered for failing to show up to work after he had called in sick is sufficient to state a plausible claim of retaliation under the Act.  The Court will therefore grant Fox's motion in part and deny it in part.

## I.   Background

The Court draws the following background from Donner's complaint.  Fox News no doubt contests many of his allegations.

Donner began working for Fox News in 2010 as a Desk Assistant.  FAC ¶ 6.  Over the next decade, he was steadily promoted to Associate Producer, Producer, and then Capitol Hill Producer starting in 2018.  Id.  As the Capitol Hill Producer, he was tasked with reporting on the never-ending political news cycle inside the Beltway.  Id.  In his telling, Donner "prided himself on his journalistic standards of reporting truthfully and accurately" and was widely "recognized on Capitol Hill as a reporter always asking hard questions to politicians on both sides of the political spectrum."  Id. ¶ 7.  "While he did not share many of the views expressed by Fox News' Opinion page, or the evening hour television commentators," he insists that this difference of opinion "did not impact his ability to report on Capitol Hill."  Id.  But that all changed after the 2020 election.  Id. ¶ 8.

The supposed shift started after Fox News became the first major media outlet to call closely contested Arizona for President Joe Biden in November 2020—a move that reportedly angered many Fox News viewers, including then-President Trump.  Id.  "Facing backlash from Trump supporters," Donner alleges, "Fox News immediately capitulated to President Trump and his supporters by firing Chris Stirewalt, the onscreen reporter during the projection for Arizona." Id.  Bill Sammon, the Vice President and D.C. Managing Editor who oversaw the decision to call Arizona, followed suit by retiring in the face of criticism from Fox executives over his handling of the network's election coverage.  Id.  "Shortly thereafter, approximately 20 journalists were laid off due to what Fox News called a realignment of 'business and reporting structure to meet the demands of this new era.'"  Id.  This "realignment" was backed by corporate leadership— including the CEO of Fox News, Suzanne Scott, and the CEO of the parent company, Lachlan Murdoch—who sought to regain viewer trust by becoming "the bullhorn for President Trump's Make America Great Again ('MAGA') faction of the Republican Party."  Id. ¶¶ 9–10.

Consistent with that new strategy, "[i]n the days after the 2020 election, Fox News'

reporting became focused on the unsubstantiated stolen election conspiracy advanced by

President Trump's supporters."  Id. ¶ 16.  These "stolen election" stories that Fox News aired

were patently false, Donner alleges, citing Dominion Voting Systems' ("Dominion") defamation

lawsuit against the network, which unearthed communications between Fox News executives

and reporters openly acknowledging that the election conspiracies that Fox had amplified were

meritless.  Id. (citing US Dominion, Inc. v. Fox News Network, LLC, 293 A.3d 1002 (Del.

Super. Ct. 2023)).  And still, top brass at Fox News continued to pressure reporters to push

"election fraud claims."  Id.  The D.C. Bureau Chief, Bryan Boughton, allegedly told Donner in

December 2020 that their "reporting [was] going to change," as the network was embracing a

"different focus."  Id. ¶ 19.  Donner took this as a clear signal that "management was looking to

appease the MAGA faction of the Republican party."  Id.

Those who resisted suffered the consequences, as "Fox's corporate leadership purged the

news division [of] those reporters who spoke out against claims of election fraud."  Id. ¶ 10.

They included prominent on-screen personalities.  Geraldo Rivera, a longtime host and

correspondent at Fox, reportedly griped that he was "muzzled" and suspended three times for

"complaining about Tucker Carlson, when he had the outlandish theory that January 6 was

staged."  Id. ¶¶ 12–13.  News anchor Chris Wallace, meanwhile, left Fox News soon afterward

because he purportedly found the network's false reporting about the 2020 election and the

January 6 riot "unsustainable."  Id. ¶ 11.  Donner claims this "purge in the news division came

from the top all the way down to the on-the-ground reporters, such as [him]."  Opp'n at 5.

It started soon after the 2020 election, Donner says.  On November 19, 2020, Fox News

aired a press conference where Rudy Giuliani and Sidney Powell falsely claimed that Dominion

had perpetrated voter fraud to steal the election from President Donald Trump.  FAC ¶ 17.  Fox's White House correspondent Kristen Fisher responded on air by informing viewers:  "That was certainly a colorful news conference from Rudy Giuliani, but it was light on facts. . . .  So much of what he said was simply not true, or has already been thrown out in court. . . .  The Trump campaign has yet to provide . . . hard evidence of voter fraud and irregularities widespread enough to overturn the outcome of the election."  Id.  Fischer was allegedly reprimanded for this basic fact-checking by Boughton, who "emphasized that higher-ups at Fox News were also unhappy with it" and instructed her "to do a better job . . . 'respecting [Fox's] audiences.'"  Id.

Donner, who attended the press conference, suffered a similar fate when he posted on social media:  "At this presser, Rudy Giuliani keeps claiming voter fraud in Philadelphia, but he said this to a Pennsylvania court:  'This is not a fraud case.'"  Id. ¶ 18.  Later that day, Donner's direct supervisor, Anita Siegfriedt, "reprimanded Donner for the tweet, stating that [he] was not permitted to tweet . . . his 'opinions.'"  Id.  After Donner protested that his commentary was not opinion, but rather a verifiable fact, Siegfriedt purportedly responded that she would "let it go" but admonished Donner to be "careful moving forward."  Id.  Donner construed this as a warning from "upper management" and feared that he now "had a target on his back."  Id.

Things worsened two months later.  In the run up to the congressional certification of the presidential election results, Donner recounts that Fox regularly aired conspiracy theories about election fraud aimed at riling up Trump supporters.  Id. ¶ 20.  On the fateful day of January 6, 2021, when Congress was set to certify the results, "Donner was inside the U.S. Capitol in the Fox News booth above the Senate Radio-TV Gallery Studio to report on the certification" when rioters breached the Capitol building.  Id. ¶ 21.  Even after D.C. Metropolitan Police declared a "riot" and Vice President Mike Pence was forced to evacuate the Capitol with an angry mob at

his heels, Fox News reported that the protests were "peaceful."  Id.  This rosy coverage of the violent riot purportedly continued even after shots were fired and crowds continued to flood the Capitol, endangering the lives of members of Congress, staffers, officers, and reporters like Donner.  Id.  After Donner heard Fox's "false reporting of the insurrection," he called into the Fox News control room and decried:  "I'm your Capitol Hill Producer inside the Capitol where tear gas is going off on the second floor in the Ohio Clock corridor, rioters are storming the building, reports of shots fired outside the House chamber.  I don't want to hear any of this f****** s*** on our air ever again because you're gonna get us all killed."  Id. ¶ 22.

In the wake of January 6, as Fox allegedly "tightened the reins" over the news division, Donner continued objecting to Fox's publication of misinformation.  Opp'n at 7.  That spring, Donner complained to his supervisor, Ms. Siegfriedt, about Fox's "lack of support [for its reporters] during the aftermath of the January 6th insurrection."  FAC ¶ 24.  Siegfriedt relayed the message to Boughton, informing the Bureau Chief that Donner had "called it demoralizing and struggled to come to work everyday when the network allows those falsehoods to be put on the air."  Id.  A few months later, in June, Donner objected to Fox's decision to cover Senator Ron Johnson's press conference disparaging the COVID-19 vaccine and recommended that a "Fox News doctor cover the story."  Id. ¶ 25.  Forced to cover the presser himself, Donner says he "debunked/fact-checked each of Senator Johnson's claims," earning him the praise of fellow staffers but the ire of Fox management.  Id.  Around the same time, Donner allegedly "pushed back" on Vice President of Editorial for the D.C. Bureau Doug Rohrbeck's efforts to have the news division report on "far-right-wing opinion articles" on the ground that "an editorial is not news."  Id. ¶ 26.

In late October 2021, Donner complained to Boughton about Fox News anchor Tucker Carlson's amplification of conspiracy theories about January 6.  Id. ¶ 27.  Specifically, Donner objected to Carlson's three-part documentary Patriot Purge, broadcast on "Fox Nation," which promoted the lie that the January 6 riot was orchestrated by Antifa and the FBI.  Id. ¶¶ 27–29. Boughton reportedly replied that there was "nothing they could do because Tucker had gotten bigger than the network and was out of control."  Id. ¶ 27.

Starting in the spring of 2021, Donner alleges that Fox News "began to discriminate and retaliate against" him.  Id. ¶ 30.  His new supervisor, NuNu Japaridze, purportedly accused Donner of creating a "toxic environment."  Id.  When pressed for details, though, Japaridze was either unable or unwilling to substantiate the accusation.  She instead offered only vague guidance that Donner needed greater "self-awareness when talking during zoom meetings" and counseled him on the "importance of sending out editorial guidance."  Id.  Donner had never before received this sort of criticism during his previous five years at Fox even though, on his account, "his work ethic and performance remain[ed] unchanged."  Id.  Donner surmised that this negative feedback was reprisal for "speaking out against the false reporting on the election and the January 6th insurrection, and for his political affiliation."  Id.  Shortly thereafter, Donner says he "was forced by Fox News to go out on medical leave," though he offers no additional details on this involuntary hiatus.  Id.

In May 2022, Donner complained to Fox News' HR department and Japaridze in writing. Id. ¶ 31.  In addition to contesting Rohrbeck's criticism of his reporting on topics "the network does not care about," such as Supreme Court Justice Ketanji Brown Jackson's confirmation, he also complained about Fox News' programming on the January 6 riot.  Donner wrote:

> Fox has not supported its journalists since the January 6, 2021 attack on the Capitol. By allowing highly paid hosts and contributors to make factually false statements

> about that day is not only demoralizing but creates a hostile work environment.  I
> barely watch our programming or read our website anymore because it's hard to
> stomach these untruths being aired and written.

Id.  He then listed the instances in which he had previously voiced similar concerns over the past

year, including his complaints concerning Carlson's Patriot Purge series.  Id.  Donner concluded

his letter by remarking that his and other reporters' lives were endangered on January 6 and that

it was "difficult to feel supported" when his employer "allows these lawbreakers to continually

be portrayed as victims."  Id.  That August, Donner reiterated these grievances during a two-

hour-long meeting with HR where he "complained about the false reporting by Tucker Carlson

and the toxic environment it breeds at Fox News, as well as the lack of support from the network

for reporters."  Id. ¶ 32.

Then, on September 26, 2022, Donner "called in sick because he was recovering from the

COVID vaccine that he had recently received."  Id. ¶ 33.  Donner had received the vaccine the

prior week and continued working because he did not want to leave his coworkers shorthanded.

Id.  But after his symptoms only worsened, the following Monday "he called in sick for the

remote workday."  Id.  Donner says he "texted his coworker to let her know that he would be out

sick and then spoke with his supervisor, Japaridze, to inform her that he would be out sick."  Id.

He further alleges his "illness was unforeseeable" and that "he requested leave in accordance

with Fox News' policy, the request was prior to the start of his workday, and the request was

within 24 hours of the onset of his unexpected, emergent illness."  Id.

The following day, September 28, Japaridze called Donner.  Id. ¶ 34.  During the call,

Japaridze allegedly questioned his work ethic and screamed at him for being "irresponsible" by

calling in sick the prior day.  Id.  One day later, while Donner was working on Capitol Hill,

Boughton summoned him back to the Bureau.  Id. ¶ 35.  Once there, Donner was confronted by

Boughton, who informed him that he was being fired because he had been "late for work and did not show up for work."  Id.  Donner understood this as a reference to his sick leave two days earlier.  Id.  But, when he requested specific examples of malingering, Boughton refused to provide any.  Id.  Donner ultimately resolved that this rationale was "pretextual" and that, in actuality, he had been terminated for his "refusal to report false information regarding the 2020 election and January 6th, and for his engaging in protected activity."  Id. ¶ 36.  "Ultimately," he says, "Fox News wanted to purge the news division of any staff that would not get in line with the directive to only report information that appease[d] the Trump supporters and former President Trump."  Id.

Believing his termination was unlawful, Donner marked the one-year anniversary of his firing by filing suit against Fox in the Superior Court for the District of Columbia.  His complaint alleged three violations of the DCHRA (discrimination, retaliation, and aiding and abetting); one count of wrongful termination under D.C. common law; and one count under the Sick Leave Act.  See Notice of Removal, Ex. 1.  Fox News removed the case to this Court based on diversity jurisdiction and then timely moved to dismiss all counts.  See Notice of Removal.  In lieu of responding to Fox's motion, Donner opted to amend his original complaint.  While the amended complaint furnishes some new factual allegations, the roster of claims remain unchanged.  Once more, Fox News has moved to dismiss Donner's amended complaint in full under Federal Rule of Civil Procedure 12(b)(6).

## II.   Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A claim is plausible on its face if it "pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court evaluating a Rule 12(b)(6) motion will "construe the complaint 'liberally,' granting plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). But a "court need not accept a plaintiff's legal conclusions as true, . . . nor must a court presume the veracity of legal conclusions that are couched as factual allegations." Alemu v. Dep't of For-Hire Vehicles, 327 F. Supp. 3d 29, 40 (D.D.C. 2018) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2009)).

### III.  Analysis

Donner's core complaint is that Fox News targeted and eventually sacked him because of his political views and his vocal opposition to Fox's false reporting about the "stolen" 2020 election and the violent riot at the Capitol on January 6, 2021. This central charge grounds Donner's discrimination and retaliation claims under the DCHRA, as well as his common-law claim of wrongful termination. The allegations in the amended complaint do not support either claim, however. On the DCHRA claim, Donner has not plausibly alleged that his termination was tied to any protected trait, including "political affiliation," which the statute narrowly cabins to membership in or endorsement of a political party. And on his wrongful termination claim, Donner has not located any established public policy, recognized in D.C. law, that protects reporters who object to the accuracy or integrity of their network's news coverage.

By contrast, Donner has plausibly stated a claim on his secondary allegation that Fox News violated the Sick Leave Act by terminating him for calling in sick to work on September 26, 2022. Indeed, Donner claims Fox explicitly told him that the reason it was firing him was because he had failed to show up to work. Though Donner may contend that this rationale was

"pretextual" and that Fox actually axed him because of his persistent objections to the network's programming, the amended complaint still gives rise to a plausible inference that Donner may have been unlawfully punished for properly availing himself of Fox's sick-leave policy.

    A.  <u>D.C. Human Rights Act</u>

    Donner first contends that Fox News violated the DCHRA by terminating him for his political views and vocal disagreement with Fox's false programming.  But he fails to show that his alleged mistreatment was due to his membership in a protected class or participation in any protected activity.  Though Donner tries to shoehorn his claims into the DCHRA's prohibition against discriminating based on "political affiliation," the shoe doesn't fit.

    *1.  Discrimination Based on Political Affiliation*

    The DCHRA makes it illegal to "discriminate against any individual, with respect to . . . compensation, terms, conditions, or privileges of employment" and to "limit, segregate, or classify . . . employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or her status as an employee" on the basis of membership in a protected class.  D.C. Code § 2-1402.11(a)(1)(A).  To establish a prima facie case of discriminatory treatment under the DCHRA, a plaintiff must show (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  <u>See</u> <u>Lemmons v. Georgetown</u> <u>Univ. Hosp.</u>, 431 F. Supp. 2d 76, 87 (D.D.C. 2006).  Donner's allegations fall short because they do not support a reasonable inference that he suffered an adverse employment action because of any protected characteristic.

    Donner contends that he was discriminated against based on his "political affiliation." <u>See</u> Opp'n at 12–16.  Under the DCHRA, though, "political affiliation" is narrowly defined as

"the state of belonging to or endorsing any political party."  D.C. Code § 2-1401.02(25).  While the DCHRA does not define "political party," the D.C. Court of Appeals has construed the term in accordance with other statutes to refer only to an  "organization which nominates a candidate for election to any office and qualifies . . . to have the names of its nominees appear on the election ballot as the candidate of that association, committee, or organization."  Blodgett v. Univ. Club, 930 A.2d 210, 221 n.10 (D.C. 2007) (quoting D.C. Code § 1-1101.01(10)); id. (quoting 2 U.S.C. § 431(16), which defines "political party" as "an association, committee, or organization which nominates a candidate for election to any Federal office whose name appears on the election ballot as the candidate of such association, committee, or organization"); accord McCaskill v. Gallaudet Univ., 36 F. Supp. 3d 145, 153 (D.D.C. 2014) ("After all, the D.C. and U.S. Codes treat as political parties only those groups that nominate candidates for recognized public elections.").  Donner's alleged activities do not fit this mold.

At root, Donner alleges he was targeted because he objected to Fox News' fallacious reporting and its editorial decision to align the network with President Trump and the "MAGA faction of the Republican Party."  FAC ¶ 38.  The Court does not doubt that, apart from trying to uphold basic standards of journalistic integrity, Donner's objections to Fox's reporting had a political valence.  But that is not enough to state a valid claim because the DCHRA protects "political affiliations," not political positions or perspectives.  The plain language of the DCHRA quoted above makes this much clear, as does the caselaw.  In Blodgett v. University Club, for instance, Todd Blodgett alleged that he had been expelled from a private club because of his involvement in a far-right, white-supremacist group called the National Alliance.  Though the D.C. Court of Appeals acknowledged that the National Alliance had a political viewpoint, it resolved that Blodgett could not satisfy the definition of "political affiliation" merely by

claiming discrimination based on "political reasons" or "politics generally."  930 A.2d at 221–22.  He instead needed to show that he was discriminated against for affiliating with a "political party," which he could not do because the National Alliance was not a political party "under any ordinary sense and with the meaning commonly attributed to that term."  Id. (quotation marks omitted).  Similarly, in McCaskill v. Gallaudet University, Angela McCaskill alleged she had been demoted for signing a petition in favor of a Maryland ballot initiative to ban same-sex marriage.  See 36 F. Supp. 3d at 149–50.  Recognizing this allegation "might initially appear promising since McCaskill's political stance on an issue" purportedly led to her demotion, the court concluded that the "DCHRA does not sweep so broadly," as the statute's prohibition against discrimination because of "political affiliation" is limited to discrimination for aligning with a recognized political party.  Id. at 153.  McCaskill's contention that "the university discriminated against her because of her actions—namely, that she signed the Maryland petition—and not because of her membership in any group, let alone any political party," did not suffice.  Id. at 153–54.

The same is true here.  Donner contends he was terminated because he objected to Fox News' reporting about political affairs, which he viewed as dishonest.  But his allegations, at most, give rise to an inference that he was targeted because of his political objections to the network's programming rather than because of his affiliation with any political party.

Donner's efforts to repackage his allegations by claiming he was fired for refusing to countenance Fox's appeals to the "MAGA faction of the Republican Party" do not salvage his discrimination claim.  FAC ¶ 38.  For starters, the "MAGA faction" is not an "organization which nominates a candidate for election to any . . . office," as the DCHRA requires.  Blodgett, 930 A.2d at 221 n.10.  Donner cannot rewrite the DCHRA to substitute a "*faction of* a political

party" for the party itself.  Moreover, Donner does not even plausibly allege that he was discriminated against for refusing to join or endorse the "MAGA faction of the Republican Party."  Rather, his amended complaint claims he was targeted for speaking out against false stories that Fox was publishing and promulgating to appease its viewers.  Yet, as Blodgett and McCaskill held, such "political action" does not amount to the sort of "political affiliation" the DCHRA protects.

Perhaps recognizing as much, Donner alleges in his amended complaint that while he was "traditionally a Republican," he "affiliated with the Democratic party in the 2017 and 2020 elections by supporting Democratic candidates."  FAC ¶ 42.  Putting aside the vagueness of this allegation, Donner never alleges he outwardly endorsed any Democrats or that anyone at Fox News knew of his decision to cross party lines after 2016.  Absent such allegations, there is no reasonable basis for inferring that his supposed change in political allegiance factored into Fox's calculus.  See Reed v. Great Lakes Cos., 330 F.3d 931, 934 (7th Cir. 2003) ("It is difficult to see how an employer can be charged with discrimination on the basis of an employee's [membership in a protected group] when [it] doesn't know [that affiliation].").  In fact, Donner alleges that he was promoted to Capitol Hill Producer *after* his supposed support for Democratic candidates commenced, undercutting any allegation that his private decisions at the ballot box caused Fox News to axe him.  Id. ¶ 6.  Donner thus offers no basis for believing he was discriminated against due to political affiliation, or any other protected trait.

### 2. Retaliation

Donner's claim that he was retaliated against for complaining about Fox's bogus reporting fares no better.  "The elements of a retaliation claim under the DCHRA are the same as those under the federal employment discrimination laws."  McCain v. CCA of Tenn., Inc., 254 F.

Supp. 2d 115, 124 (D.D.C. 2003).  "To establish a prima facie case of retaliation, the plaintiff

must present evidence that (1) she engaged in [statutorily protected activity]; (2) the employer

took an adverse employment action against her; and (3) the adverse action was causally related

to the exercise of her rights."  Holcomb v. Powell, 433 F.3d 889, 901–02 (D.C. Cir. 2006).  "Not

every complaint garners its author protection from retaliation under the DCHRA," however.

Vogel v. D.C. Off. of Plan., 944 A.2d 456, 464 (D.C. 2008) (quotation marks omitted).  To

constitute "protected activity," an employee must have "a reasonable good faith belief that the

practice she opposed was unlawful under the DCHRA."  Howard Univ. v. Green, 652 A.2d 41,

46 (D.C. 1994).  The employee also must "alert the employer that she is lodging a complaint

about allegedly unlawful discriminatory conduct."  Vogel, 944 A.2d at 464 (cleaned up).

"Although no magic words are required, employees are required to put their employer on notice

of the grounds on which discrimination is alleged."  Sampay v. Am. Univ., 294 A.3d 106, 115

(D.C. 2023) (cleaned up).

　　　Donner falters at the outset because he has not alleged that he engaged in any statutorily

protected activity by complaining that he was being mistreated because of his political affiliation

(or for any other reason).  His amended complaint identifies six instances, each discussed above,

where he allegedly "engaged in protected activity by complaining of Fox News' false reporting

on the 2020 election and January 6th, its advocacy for President Trump, and its advocacy of the

far-right-wing, radical conservative views of the MAGA faction of the Republic[an] Party":

> (1) on November 19, 2020 when he tweeted about [Rudy] Giuliani's inconsistent
> statements made during a press conference regarding election fraud; (2) on January
> 6, 2021 during the insurrection on the Capitol; (3) in the Spring of 2021 when he
> complained to Anita Siegfriedt regarding the false claims being reported on Fox
> News regarding the election and January 6th; (4) in later October 2021 when he
> complained to the D.C. Bureau Chief Boughton about the false reporting on
> election fraud and January 6th conspiracies; (5) on May 24, 2022 when Donner
> complained in writing to Fox News' HR department and to his direct supervisor

NuNu Japaridze about the false reporting on January 6th; and (6) on August 2022 when Donner met with HR to complain about the false reporting by Tucker Carlson and the toxic environment it created for reporters that did not share those political views or affiliation.

FAC ¶ 49.  None of these complaints, however, refer to discrimination or any other practice that the DCHRA prohibits.  That's because Donner was not actually complaining about unlawful employment practices; he was lodging complaints about Fox's editorial decisions.  But voicing disagreements about editorial decisions is not the same thing as complaining about unlawful workplace practices.  And while informal expressions of workplace concerns *can* constitute protected activity, "those expressions must make *some* reference to discrimination that would be unlawful under" the DCHRA.  <u>Achoe v. Clayton</u>, No. 17-cv-02231 (CRC), 2018 WL 4374926, at *9 (D.D.C. Sept. 13, 2018) (emphasis in original).  The six complaints above flunk that test.

The closest Donner comes to alleging protected activity is his May 24, 2022 letter to his supervisor and HR where he complained, in part, that the network's false reporting on January 6 created a "hostile work environment" for reporters—especially those who were present inside the Capitol that day.  FAC ¶ 31.  But just as there are no "magic words" an employee must say when complaining of unlawful workplace practices, <u>see</u> <u>Sampay</u>, 294 A.3d at 115, merely uttering the words "hostile work environment" does not transform a workplace complaint into protected activity.  What matters most is the content of the message, and whether it reasonably communicates that the employee is alleging unlawful discrimination.  <u>See</u> <u>Williams v. Spencer</u>, 883 F. Supp. 2d 165, 177 (D.D.C. 2012).  Donner's letter did not.  It instead bemoaned Fox News' coverage of January 6.  Though Donner alleges that the network's deceptive spin on what transpired that day was demoralizing, especially to a reporter who was inside the Capitol during the attack, that does not amount to a hostile work environment under the DCHRA.  Indeed, Donner never tied his complaints about Fox's coverage of January 6 to any protected

characteristic under the DCHRA.  This complaint therefore did not put Fox on notice that Donner was objecting to an alleged unlawful employment practice.  In this way, Donner's letter is akin to the complaints in <u>Vogel</u>, where the D.C. Court of Appeals upheld the dismissal of a DCHRA retaliation claim because the plaintiff never "linked" her workplace grievances to any protected characteristic.  944 A.2d at 465.  "[T]he onus is on the employee to clearly voice her opposition' to illegal discrimination," the court held, and "a vague charge of discrimination will not support a subsequent retaliation claim."  <u>Id.</u>; <u>accord</u> <u>Sampay</u>, 294 A.3d at 115; <u>Battle v. Master Sec. Co.</u>, 298 F. Supp. 3d 250, 253 (D.D.C. 2018) (same in Title VII context).  So too here.

Donner points out that his complaints did not need to allege an actual DCHRA violation so long as he had a reasonable and good faith belief that "Fox News was violating the [DCHRA] by discriminating against its employees based on their political affiliation and views."  FAC ¶ 49.  That is no doubt true, but it does not save Donner's retaliation claim.  Given the nature of his complaints, which centered on issues with Fox's editorial decisions, it is doubtful that Donner himself believed he was lodging a complaint about any unlawful employment practice—especially in light of the fact that he never mentioned his supposed protected characteristics in the correspondence he highlights.  Regardless, "'[g]ood faith' and 'reasonableness' are separate requirements."  <u>Savignac v. Jones Day</u>, 586 F. Supp. 3d 16, 20 (D.D.C. 2022).  And there is no way to read Donner's complaints as reasonably raising concerns about a violation of the DCHRA.  Nor did these communications apprise Fox that Donner was flagging a supposed unlawful employment practice.  That's because they were something else entirely: expressions of disagreement about the accuracy of Fox's news coverage.  Complaining about a network's

programming, even if justified, is not protected activity that can support a DCHRA retaliation claim.

### 3. Aiding and Abetting

Even if Fox News did not itself violate the DCHRA, Donner contends that it should still be held liable because it "aided and abetted the discriminatory and retaliatory conduct" of three Fox employees: Boughton, Rohrbeck, and Japaridze.  FAC ¶ 55.  This argument makes little sense.  Under D.C. Code § 2-1402.62, it is "an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter or to attempt to do so."  This "aiding and abetting" provision "'is meant to prohibit an individual *from assisting another* person in discriminating,' and thus, the actors who performed the discriminatory acts cannot also aid and abet the alleged discrimination."  Gatling v. Jubilee Hous., Inc., No. 20-cv-3770, 2022 WL 227070, at *6 (D.D.C. Jan. 26, 2022) (quoting McCaskill, 36 F. Supp. 3d at 156).  Here, Boughton, Rohrbeck, and Japaridze performed all the contested actions as employees of Fox News.  There is accordingly no separately cognizable aiding and abetting claim against the employer for the actions of its agents within the scope of their employment.  Because the DCHRA allegations against Fox fail to state a viable claim, this ancillary claim of aiding and abetting necessarily fails as well.  See Gaujacq v. EDF, Inc., 601 F.3d 565, 576, 578 (D.C. Cir. 2010) (dismissing an aiding and abetting claim where there was no underlying violation of the DCHRA).

### B.  Wrongful Termination

Donner next alleges wrongful termination.  This claim also fizzles, though, because Donner was an at-will employee and has not identified a public policy that precluded Fox from firing him over his ardent objections to the network's programming, no matter their validity.

In the District of Columbia, "[t]here is a presumption that a hiring not accompanied by an expression of a specific term of duration creates an employment relationship terminable at will by either party at any time." Perkins v. Dist. Gov't Emps. Fed. Credit Union, 653 A.2d 842, 842 (D.C. 1995) (citation omitted). "In a relationship governed by the at-will doctrine, an employee can be fired for any reason or no reason." LeFande v. District of Columbia, 864 F. Supp. 2d 44, 48 (D.D.C. 2012). There is a "public-policy exception" to this general rule, but that exception is "very narrow" and applies only in two situations. Carl v. Children's Hosp., 702 A.2d 159, 162 (D.C. 1997) (Terry, J., concurring). First, an at-will employee may have a claim for wrongful termination if "the sole reason for the discharge is the employee's refusal to violate the law." Adams v. George W. Cochran & Co., 597 A.2d 28, 34 (D.C. 1991). Second, under the so-called Carl exception, a plaintiff may recover by showing he "was fired after acting in furtherance of a public policy 'solidly based on a statute or regulation that reflects the particular public policy.'" Leyden v. Am. Accreditation Healthcare Comm'n, 83 F. Supp. 3d 241, 248 (D.D.C. 2015) (quoting Carl, 702 A.2d at 163 (Terry, J., concurring)). Donner does not maintain that he refused to violate any law and instead pleads his case via the latter route.

Under the Carl exception, a plaintiff must "point to some identifiable policy that has been officially declared in a statute or municipal regulation, or in the Constitution, and a close fit between the policy and the conduct at issue in the allegedly wrongful termination." Harris v. D.C. Water & Sewer Auth., 195 F. Supp. 3d 100, 106 (D.D.C. 2016) (citation omitted). Though courts applying Carl have "painted a somewhat confusing picture" of what kind of public policy suffices, Perkins v. WCS Constr., LLC, No. 18-cv-751 (RC), 2018 WL 5792828, at *4 (D.D.C. Nov. 5, 2018), this Court has noted that one "common denominator" has been "the existence of specific laws or regulations that clearly reflect a policy prohibiting the activity about which the

employee complained," <u>Leyden</u>, 83 F. Supp. 3d at 249.  In particular, cases alleging viable <u>Carl</u>

claims generally "have fallen into two categories: where an employee is terminated (1) 'for

engaging in an activity when the employee points to a law that reflects a policy prohibiting

retaliation against an individual for engaging in the type of activity the employee was engaged

in' and (2) 'for reporting illegal conduct when the employee points to specific laws or

regulations that clearly reflect a policy prohibiting the activity about which the employee

complained, whether or not the employer actually violated the law or regulation." <u>Sichani v.</u>

<u>Washington Metro. Area Transit Auth.</u>, No. 22-cv-1584 (CRC), 2023 WL 7279254, at *6

(D.D.C. Nov. 3, 2023) (quoting <u>Perkins</u>, 2018 WL 5792828, at *4).  The constant requirement

for a close fit to a specific statute or regulation is essential to retain the limited scope of this

"very narrow" exception to at-will employment and to guard against the sort of free-floating,

anything-goes public-policy exception that the D.C. courts expressly rejected when crafting the

<u>Carl</u> exception.  <u>See</u> <u>Bereston v. UHS of Del., Inc.</u>, 180 A.3d 95, 110 (D.C. 2018) ("When this

court formulated the <u>Adams</u>-<u>Carl</u> exception . . . we took pains to emphasize that the tort of

wrongful discharge in contravention of public policy is a very narrow one.").  Donner's

allegations do not squeeze through this small window.

At core, Donner claims he was fired because he voiced vehement disagreement with Fox

News broadcasting lies about election fraud in the 2020 presidential election, the violent riot at

the Capitol on January 6, and the COVID-19 epidemic.  As Fox rightly notes, that boils down to

a dispute over the network's programming and editorial decisions.  But there is no established

public policy under D.C. law governing disputes between reporters and their networks over these

sorts of editorial choices—and it is doubtful there could be one given the free speech concerns

such a policy would implicate.  See Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241, 258

(1974) (holding news organizations' editorial decisions are protected by the First Amendment).

Donner scours the lawbooks in search of some on-point provision, but he comes up

empty handed.  His amended complaint contains a laundry list of 30 statutory and constitutional

provisions that have been deployed in relation to efforts to subvert the 2020 presidential election.

See FAC ¶¶ 62–65.  For example, he cites the criminal provisions under which the perpetrators

of the January 6 riot have been charged in this jurisdiction, see id. ¶ 62, and rattles off the litany

of charges that Georgia prosecutors have filed against President Trump, Giuliani, and others, see

id. ¶ 65.  But each of those statutes governs the conduct of the subjects of Fox's reporting.  They

do not concern the media's coverage of these events.  As Fox notes, "complaining about news

coverage of the allegedly illegal actions of others"—even if that coverage is slanted towards

those who violated vital laws designed to safeguard the integrity of our democratic system—"is a

far cry from complaining about an employer's own unlawful conduct, as is necessary to invoke

the Carl exception."  Mot. Dismiss at 25.  There is, in other words, no "close fit" between Fox's

alleged conduct that Donner critiqued and the criminal provisions he now cites.  Carl, 702 A.2d

at 165 (Terry, J., concurring).  The connection is instead derivative, as Donner claims he "spoke

out against Fox News' aid and support of this illegal conduct."  FAC ¶ 63.  That attenuation

proves the problem.  None of these provisions are "concretely applicable" to Fox's conduct.

Carl, 702 A.2d at 163 (Terry, J., concurring).  Nor do they "clearly reflect" any public policy

about press coverage of political events.  Leyden, 83 F. Supp. 3d at 249.  "Because none of the

laws clearly reflects a policy prohibiting [Fox's] conduct," as opposed to the conduct of the

subjects of its reporting, Donner "has failed to state a claim for wrongful termination in violation

of public policy."  Sichani, 2023 WL 7279254, at *8.

The one legal rule Donner identifies that is aimed at the media emerges through his allusions to the profitable defamation suit that Dominion Voting Systems waged against Fox for publishing conspiracy theories that Dominion had tampered with the 2020 election results to help elect President Biden.  See FAC ¶¶ 16–17; Opp'n at 4, 28–29.  Yet, even then, Donner does not cite any "statute," "regulation," or "constitutional provision" that "reflects the particular public policy to be applied" here, as Carl requires.  702 A.2d at 163 (Terry, J., concurring).  Moreover, Donner does not plausibly allege that he was fired for complaining that Fox was engaging in the common-law tort of defamation.  His only allegation that generally relates to defamation, and the Dominion suit in particular, is his claim that he was reprimanded in November 2020 for posting about Giuliani and Powell's press conference.  FAC ¶ 17.  But it is implausible that Donner was terminated in September 2022 for this minor incident two years prior.  See Bereston, 180 A.3d at 104 (requiring the alleged illicit motive be the "sole" or "predominant" reason for a wrongful termination).  Instead, the amended complaint suggests Fox fired Donner because he complained broadly about various stories that, in his view, were patently false.  Outside the limited category of defamation, however, there is no established public policy prohibiting news outlets from publishing false stories—even when promulgating known lies has a plainly pernicious effect on our democratic institutions.  See United States v. Alvarez, 567 U.S. 709, 722 (2012) (rejecting argument that "false statements generally should constitute a new category of unprotected speech" under the First Amendment).

Donner disagrees, of course.  From his vantage, he should be protected for standing up and speaking out about matters "of public concern because they involved conduct that directly endangered the public and members of Congress on January 6th, undermined the U.S. electoral system based on false claims of election fraud, and supported insurrectionists that imperiled the

U.S. government and democracy."  FAC ¶ 61.  No matter how laudable his conduct was, however, the Court lacks the power to create a new public policy where none exists.

Donner's search for some analog in the caselaw also falls short.  He looks to Perkins v. WCS Construction, LLC, where an employee had complained of workplace threats, including shooting a coworker, made in her presence.  2020 WL 3128950, at *4.  There, the court found the employee had alleged a wrongful termination claim because "the District of Columbia laws criminalizing threatened assault and threatened injury (at a minimum) clearly reflect a policy prohibiting the activity about which the employee complained."  Id. (cleaned up).  But no D.C. statute evinces a similar public policy against false news coverage and statements that threaten our democratic institutions.  That's not to diminish the perils of such deceit or discount the danger that Donner faced inside the Capitol on January 6.  Still, any role Fox News played in contributing to those events or in spreading misinformation about the riot afterward are far removed from the allegations in Perkins and too remote from any established public policy to trigger the limited Carl exception.

In the end, without a clear provision on point, Donner effectively argues that he should receive protection from termination because he performed a valuable public service by raising concerns about false reporting by one of the nation's largest news organizations.  But regardless of whether his actions are deserving of applause, they do not warrant deviating from the default rule of at-will employment in D.C.  Carl and its progeny are clear:  The public policy exception to at-will employment is sharply limited to instances where the plaintiff can identify a codified public policy that concretely applies to the employer's conduct.  That requirement for a statutory anchor is meant to restrain courts' power to carve out exceptions to at-will employment based on their own intuitions about what's in the public interest.  See Carl, 702 A.2d at 163 (Terry, J.,

23

concurring); <u>Herron v. Fannie Mae</u>, 861 F.3d 160, 170 (D.C. Cir. 2017)  ("'By tying new causes of action to statutory and constitutional provisions,' courts are prevented from 'defining nebulous concepts of public policy' and creating exceptions based on conduct that 'simply tends to be injurious to the public or against the public good.'" (quoting <u>Rosella v. Long Rap, Inc.</u>, 121 A.3d 775, 778 (D.C. 2015)).  Without this anchor, the doctrine would be at sea.

The Court finds, accordingly, that Donner has not rebutted the presumption of at-will employment.  Though his amended complaint suggests that he may have been terminated for speaking out against Fox's reporting, no established public policy prevents Fox from cutting ties with an employee who objects to its editorial decisions.  District of Columbia courts have made clear that the "narrow exceptions to the 'employment at-will' doctrine . . . recognized in <u>Adams</u> and <u>Carl</u> were not designed to prevent an employer from terminating an at-will employee in order to eliminate unacceptable internal conflict and turmoil."  <u>Wallace v. Skadden, Arps, Slate, Meagher & Flom</u>, 715 A.2d 873, 886 (D.C. 1998).  That guidance controls here.

C.  <u>Sick Leave Act</u>

Shifting gears from what he suspects are the true reasons for his dismissal, Donner also claims that the rationale that Fox News provided for his termination—that he failed to show up for work—violates the Sick Leave Act.  Though Donner may view this charge as less central than those discussed above, it is the only one of his claims with legs.

Under the Sick Leave Act, an employer may "not interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided by [the Act]," nor may it "discharge or discriminate in any manner against an employee because the employee . . . . uses paid leave provided under [the Act]."  D.C. Code § 32-531.08(a), (b)(4).  Donner advances claims under both the "interference" and the "retaliation" provisions of the Act.  <u>See</u> Opp'n at 30–34.  But

because he does not contend that Fox ever denied him access to paid leave that he had accrued, the Court will focus on Donner's retaliation claim.

To state a claim of retaliation under the Act, a plaintiff must allege that (1) he engaged in statutorily protected activity, (2) his employer took an adverse personnel action against him, and (3) a causal connection between the two exists. See Harbour v. Univ. Club of Wash., 610 F. Supp. 3d 123, 135 (D.D.C. 2022). Donner checks all three boxes. First, he allegedly engaged in protected activity when he "requested sick leave on September 26, 2022, in accordance with Fox News policy, prior to the start of his workday, and the request was within 24 hours of the onset of his unexpected, emergent illness." FAC ¶ 74. Second, Fox plainly took adverse action against Donner by firing him. See Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009) (defining an "adverse employment action" as any "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits" (citation omitted)). Third, the amended complaint showcases a close causal connection between the two events. Donner was allegedly fired on September 28, 2022, just two days after he stayed home while recovering from side-effects of the COVID vaccine. This "close temporal connection between the protected activity and the adverse action" can give rise to a reasonable inference of causality. Alston v. District of Columbia, 561 F. Supp. 2d 29, 43 (D.D.C. 2008). But Donner does not hang his hat on temporal proximity alone. He also alleges that Boughton expressly told him that he was being fired because he had been "late for work and did not show up for work." FAC ¶ 35. Although Boughton refused to provide specifics, id., the reasonable inference is that he was referring to Donner calling in sick that Monday—an inference bolstered by the allegation that his direct

supervisor, Ms. Japaridze, had berated him the day before for taking leave. FAC ¶ 34. These allegations are surely sufficient to survive a motion to dismiss.

Fox's efforts to avoid this outcome are unconvincing. It first argues that the Sick Leave Act claim fails because, in Donner's own telling, Boughton's explanation was simply "an effort to create pretext for firing" him for complaining about Fox's editorial decisions. FAC ¶ 35; see Mot. Dismiss at 29. Yet Donner's speculation about the actual motives behind his dismissal do not necessarily vitiate his Sick Leave Act claim because a jury would be free to take Fox at its word for why it was firing Donner. Moreover, even if it's true that Fox was looking for a reason to axe Donner, the fact that it decided to latch onto an impermissible reason can still support a retaliation claim. Otherwise, those who suspect they may be skating on thin ice would be well advised to avoid taking leave lest their employer—who, for whatever reason, wishes to hide its true intentions—use their temporary absence as cover to cut ties.

Fox next attempts to argue that Donner did not follow proper protocols when requesting time off. Once again, this defense is unpersuasive. Under the Sick Leave Act, "[p]aid leave shall be provided upon the written request of an employee," which "shall include a reason for the absence involved and the expected duration of the paid leave." D.C. Code § 32-531.03. "If the paid leave is foreseeable, the request shall be provided at least 10 days, or as early as possible, in advance of the paid leave." Id. Otherwise, "[i]f the paid leave is unforeseeable, an oral request for paid leave shall be provided prior to the start of the work shift for which the paid leave is requested." Id. The Sick Leave Act also permits employers to maintain their own paid-leave policies, so long as they are at least as favorable to employees as the default provisions. See D.C. Code §§ 32-531.05, 32-531.07. Fox has done just that, directing employees to notify their

supervisors that they are taking sick leave "as soon as possible" and at least two hours before the start of a shift.  See Mot. Dismiss, Ex. A at 22 (Fox's Sick Leave Policy).

Fox contends that Donner's alleged request for leave on September 26 was deficient in two respects.  First, it says Donner did not inform his supervisor, Ms. Japaridze, that he was too ill to work that day "as soon as possible" because he first "texted his coworker to let her know that he would be out sick" before speaking with Japaridze.  FAC ¶ 33.  Yet this effort to rigidly enforce Fox News' protocols is unavailing because Donner alleges he called in sick "prior to the start of his workday, and the request was within 24 hours of the onset of his unexpected, emergent illness."  Id.  That is enough to satisfy the Sick Leave Act's statutory requirements, and, by the Act's own terms, Fox's internal rules cannot be more demanding.  (The Court also does not read Fox's own rules to be so punitive that an employee sacrifices his legal entitlement to leave if he first texts a coworker to tell her he will be out for the day right before calling his supervisor.)  Second, Fox argues that Donner failed to inform Fox of the "duration" of his sick leave, as required by D.C. Code § 32-531.03.  See Mot. Dismiss at 28; Reply at 24.  Again, Fox is attempting to enforce the Sick Leave Act in an overly wooden manner.  Donner alleges that he was feeling ill one morning so he "called in sick for the remote workday" by dialing "his supervisor, Japaridze, to inform her that he would be out sick."  FAC ¶ 33.  Put differently, Donner did what millions of Americans do when they are feeling under the whether one morning: speak with his supervisor to let her know he could not make it to work that day. Nothing could be more common, and it is hard to fathom that this standard practice would somehow fall outside the scope of the Sick Leave Act.  But if there was any doubt, a fair reading of Donner's amended complaint shows that he informed Japaridze that he would be out that workday but intended to return the following day, just as he ultimately did.  See id.  Donner

therefore adequately alleged that he engaged in "protected activity" when he called in sick the morning of September 26.

Finding Donner plausibly alleged that he was retaliated against for engaging in protected activity under the Sick Leave Act, the Court will deny Fox's motion to dismiss as to this claim.

**IV.   Conclusion**

For the foregoing reasons, it is hereby

**ORDERED** that [Dkt. No. 15] Fox News' Motion to Dismiss the First Amended Complaint is GRANTED in part and DENIED in part; it is further

**ORDERED** that Fox News answer the First Amended Complaint by May 24, 2024.

**SO ORDERED**.

 

 

_____

CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>April 24, 2024</u>