**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JASON DONNER,

               Plaintiff,

     v.

FOX NEWS NETWORK, LLC, a Delaware
Limited Liability Company,

               Defendant.

1:23-cv-03401-AHA

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF FOX NEWS NETWORK, LLC'S**
**MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    A.     Factual Background ................................................................................... 3

            1.    FNN Maintains Several Employment Policies Relevant  to Plaintiff's Employment and Termination ..................................................... 4

            2.    Plaintiff Jason Donner Worked for FNN's Washington  Bureau as News Producer Covering Capitol Hill ......................................... 5

            3.    By Early-2022, Several of Plaintiff's Colleagues Separately Informed FNN Management and Human Resources that Plaintiff's Workplace Conduct Had Been Disruptive and Unprofessional ................................... 6

            4.    In April 2022, FNN Addressed Plaintiff's Performance Issues by Referring Him to Its Employee Assistance Program and Providing Approximately Six Weeks of Paid Leave ......................................................................... 7

            5.    Plaintiff's Inability to Temper the Tone of Communications with Coworkers Is Addressed (and Reflected) in His 2022 Performance Review ................................................................................................................ 8

            6.    Plaintiff Missed Work on Monday, September 26, 2022, Without Timely Notifying His Supervisor ............................................................................ 9

            7.    On Tuesday, September 27, 2022, Plaintiff Calls His Supervisor a "Lousy Manager" in a "Verbal Rage" When She Attempted to Address with Him the Need for More Notice in the Future .................................................... 12

            8.    FNN Promptly Terminated Plaintiff For His Insubordinate and Unprofessional Conduct ........................................................................... 14

            9.    FNN Paid Plaintiff at His Standard Rate of Pay for  All Wages Due to Him Through His Termination ...................................................................... 18

    B.     Procedural Background ........................................................................... 19

LEGAL STANDARDS ...................................................................................................... 20

    A.     Summary Judgment Standard .................................................................. 20

    B.     Retaliation Claim Standard of Review .................................................... 21

ARGUMENT ..................................................................................................................... 23

I.     THE RECORD CONCLUSIVELY ESTABLISHES THAT PLAINTIFF'S REMAINING SICK LEAVE ACT CLAIM FAILS BECAUSE FNN DID NOT RETALIATE AGAINST PLAINTIFF ......................................................................................................... 23

    A.     Plaintiff's Unannounced Failure to Show Up for Work, Without Notifying FNN Until Hours into the Workday, Is Not Statutorily Protected Conduct ................... 23

i

B.      Plaintiff Cannot Establish "But For" Causation Because the Indisputable
Evidence Demonstrates That Plaintiff Was Terminated for Insubordinate and
Unprofessional Conduct Toward His Supervisor After His Absence and There Is
No Evidence to The Contrary ................................................................. 25

C.      Plaintiff Has Adduced No Evidence Establishing That FNN's Asserted Basis for
Terminating Him Is Pretextual ............................................................... 32

II.     AT THE VERY LEAST, FNN IS ENTITLED TO SUMMARY JUDGMENT ON
PLAINTIFF'S CLAIMS FOR LIQUIDATED AND PUNITIVE DAMAGES .............. 35

A.      Plaintiff Is Not Entitled to Liquidated Damages Under District of Columbia Law
................................................................................................. 35

B.      Plaintiff Cannot Recover Punitive Damages Because There Is No Evidence FNN
Acted With Malice When It Fired Him for Misconduct ...................................... 37

CONCLUSION ................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguirre v. Schomac Grp., Inc.*,
2005 WL 8160552 (D. Ariz. July 6, 2005) ...........................................................40

*Anderson v. BDO USA, P.C.*,
2024 WL 4753761 (D.D.C. Nov. 12, 2024) ...........................................................22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...............................................................................................21

*Ball v. George Wash. Univ.*,
798 Fed. Appx. 654 (D.C. Cir. 2020) ....................................................................33

*Barnette v. Chertoff*,
453 F.3d 513 516 (D.C. Cir. 2006) ........................................................................22

*Bartolo v. Whole Foods Mkt. Grp.*,
412 F. Supp. 3d 35 (D.D.C. 2019)....................................................................21, 22

*Blincow v. MillerCoors, LLC*,
2018 WL 3869162 (E.D. Cal. Aug. 15, 2018)........................................................40

*Brady v. Off. of Sergeant at Arms*,
520 F.3d 490 (D.C. Cir. 2008)...............................................................................23

*Destefano v. Children's Nat'l Med. Ctr.*,
121 A.3d 59 (D.C. 2015) .......................................................................................38

*Donner v. Fox News Network, LLC*,
2024 WL 1758689 (D.D.C. Apr. 24, 2024)...........................................19, 20, 24

*Feldman v. L. Enf't Assocs. Corp.*,
752 F.3d 339 (4th Cir. 2014) ................................................................................31

*George v. Molson Coors Beverage Co. USA, LLC*,
2023 WL 2661588 (D.C. Cir. Mar. 28, 2023) .................................................32, 35

*Gross v. FBL Fin. Services, Inc.*,
557 U.S. 167 (2009).........................................................................................21, 32

*Hampton v. Vilsack*,
685 F.3d 1096 (D.C. Cir. 2012) .............................................................................21

*Haynes v. Williams*,
    392 F.3d 478 (D.C. Cir. 2004) ........................................................................21

*Hazen Paper Co. v. Biggins*,
    507 U.S. 604 (1993) ...............................................................................22, 32

*Ho v. Garland*,
    106 F.4th 47 (D.C. Cir. 2024) ........................................................................22

*Joseph v. Marco Polo Network, Inc.*,
    2010 WL 4513298 (S.D.N.Y. Nov. 10, 2010) ...............................................28, 31

*Karaahmetoglu v. Res-Care, Inc.*,
    480 F. Supp. 2d 183 (D.D.C. 2007) ................................................................38

*Kiel v. Select Artificials, Inc.*,
    169 F.3d 1131 (8th Cir. 1999) ........................................................................31

*Kolstad v. Am. Dental Ass'n*,
    527 U.S. 526 (1999) ......................................................................................38

*Kuduk v. BNSF Ry. Co.*,
    768 F.3d 786 (8th Cir. 2014) ........................................................................31

*Library Tavern v. Cox*,
    No. 2019-OWH-00020, 2021 WL 7908631 (D.C.O.A.H. Aug. 31, 2021) ...........35

*NAACP Legal Def. & Educ. Fund, Inc. v. Barr*,
    496 F. Supp. 3d 116 (D.D.C. 2020) ................................................................37

*Raynor v. Richardson-Merrell, Inc.*,
    643 F. Supp. 238 (D.D.C. 1986) ....................................................................38

*Robinson v. Ergo Sols., LLC*,
    4 F. Supp. 3d 171 (D.D.C. 2014) ....................................................................40

*Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    507 F. Supp. 2d 93 (D.D.C. 2007) ..................................................................28

*Russ v. Van Scoyoc Assocs., Inc.*,
    122 F. Supp. 2d 29 (D.D.C. 2000) ..................................................................38

*Seed v. Envtl. Prot. Agency*,
    100 F.4th 257 (D.C. Cir. 2024) ......................................................................35

*Sobot v. Clean the World Found. Inc.*,
    2024 WL 4119389 (D.D.C. Sept. 9, 2024) ...............................................21, 22

*Sparrow v. C.I.R.*,
    949 F.2d 434 (D.C. Cir. 1991) ........................................................................35

*Sussberg v. K-Mart Holding Corp.*,
    463 F. Supp. 2d 704 (E.D. Mich. 2006) ..........................................................31

*Thomas v. Dist. of Columbia*,
    227 F. Supp. 3d 88 (D.D.C. 2016) ....................................................32, 34, 35

*Tx. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981) .........................................................................................22

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) .........................................................................................22

*Wis. Central Ltd. v. United States*,
    585 U.S. 274 (2018) .........................................................................................37

*Wright v. Office of Wage Hour*,
    301 A.3d 660 (D.C. 2023) ...............................................................................35

*Yarde v. Good Samaritan Hosp.*,
    360 F. Supp. 2d 552 (S.D.N.Y. 2005) ............................................................31

**Statutes and Rules**

D.C. Code § 32-531.03 ...............................................................................1, 24, 25

D.C. Code § 32-531.08 .................................................................19, 21, 22, 26

D.C. Code § 32-1303 ..........................................................................................36

D.C. Code § 32-1306 ..........................................................................................36

D.C. Code § 32-1308 ...................................................................3, 35, 36, 37

Fed. R. Civ. P. 56(a) .........................................................................................21

## INTRODUCTION

Plaintiff Jason Donner's sole remaining claim is that Fox News fired him in retaliation for taking sick leave on Monday, September 26, 2022, in violation of D.C. Sick and Safe Leave Act (the "Sick Leave Act"). The undisputed evidence, however, demonstrates that Plaintiff was fired for a different, legitimate, and non-retaliatory reason: the day after his absence, Plaintiff unprofessionally and inexcusably raised his voice at his supervisor, calling her a "lousy manager," and this outburst followed earlier reports from Plaintiff's colleagues to FNN management that he had likewise treated them unprofessionally and was a "toxic" colleague. FNN is entitled to summary judgment because Plaintiff cannot establish a prima facie case of retaliation or that the actual reason FNN fired him is pretextual.

*First*, at the threshold, Plaintiff's claim fails because his unannounced absence on Monday, September 26, was not statutorily protected at all. To fall within the Sick Leave Act's protections, a request for foreseeable leave must be made "as early as possible, in advance of the paid leave." D.C. Code § 32-531.03. FNN's policy similarly requires that the request be made "as soon as possible." (Ex. 3, FNN_0000185-279 at 209.)[1] Here, it is undisputed that Plaintiff's absence was foreseeable because Plaintiff's own father testified that, the day before Plaintiff missed work, Plaintiff had told his father that he was not going to go to work the next day (i.e., Monday, September 26). Even though he told his father of his supposed illness the day before his absence, Plaintiff did not bother to notify his supervisor until around noon the following day—at which point he had missed nearly half of the workday.

*Second*, even if the Sick Leave Act applies here, there is zero evidence that FNN fired Plaintiff for taking sick leave, and no reasonable jury could conclude otherwise. To the contrary,

---

[1] All citations to "Ex." refer to exhibits attached to the Declaration of D. Brett Kohlhofer in support of this Motion.

the evidence demonstrates overwhelmingly that FNN fired Plaintiff for an insubordinate and unprofessional outburst toward his supervisor the evening before his termination, when Plaintiff himself admits that he became defensive and frustrated, raised his voice, and told his supervisor she was a "lousy manager."   Indeed, the events of that evening are documented in the contemporaneous written record among colleagues expressing concern and dismay with Plaintiff's outburst.  And the confrontation is further documented in an email exchange between Plaintiff and his supervisor in a which Plaintiff acknowledged his "emotional reaction" and "apologize[d]." (Ex. 22, FNN_0000417-18 at 417.)   The supervisor forwarded Plaintiff's reply to FNN's Washington Bureau Chief who immediately remarked that the conduct was "unacceptable," and shortly thereafter, in consultation with Human Resources and Plaintiff's supervisor, decided to terminate Plaintiff.

Plaintiff cannot satisfy his burden to show his own rank insubordination towards his supervisor was a pretextual reason for his termination.  There is no contrary evidence.  Indeed, there is no evidence of meetings, plans, or discussions regarding terminating Plaintiff before he verbally attacked his supervisor on the evening of Tuesday, September 27.  ***In fact, it is undisputed that, on Monday, September 26, Plaintiff's supervisor followed up with him to see how he was doing, and offered to let him take an additional day off if he needed more time to recover***.  Even Plaintiff concedes that it seems "crazy" that his supervisor would offer him a second day of sick leave to recover, and, 24 hours later, terminate him for having taken sick leave on the first day. (Ex. 1, J. Donner Tr. 269:15-18.)   No reasonable jury could find that FNN's stated reason for terminating Plaintiff was pretextual, and the reason for his termination was taking sick leave.

*Finally*, at the very least, even if Plaintiff's sole remaining claim could survive summary judgment (it cannot), he cannot recover liquidated or punitive damages.  He cannot recover

liquidated damages because they are only permitted in a civil action like this one for "unpaid wages," D.C. Code § 32-1308(a)(1)(A), and Plaintiff admits that "FNN paid [him] wages at [his] standard rate of pay for every day that [he] w[as] employed by FNN in 2022." (Ex. 21, Pl.'s Answer to FNN RFA 13.)

Plaintiff also cannot recover punitive damages because there is no evidence that FNN acted with evil motive or malice. To the contrary, the evidence conclusively shows that, before the termination, FNN made significant efforts to help Plaintiff address his behaviors that were creating an unprofessional and difficult work environment for his colleagues. This included paying him to take off from work for approximately six weeks through FNN's Employee Assistance Program ("EAP") to get help. Moreover, the evidence shows that when Plaintiff was absent from work, without notice, on Monday, September 26, his supervisor's first reaction was concern for his wellbeing—*even going so far as to offer Plaintiff an additional day of leave*. Contemporaneous records from Plaintiff's supervisor also show that, even after the outburst, Plaintiff's supervisor continued to express concern about his wellbeing and that she simply felt that she could not subject other employees to the type of behavior she had just experienced.

Because there is no genuine dispute about any material facts, the Court should grant summary judgment to FNN on Plaintiff's sole remaining Sick Leave Act claim. Alternatively, at the very least, the Court should grant summary judgment in FNN's favor on the issue of liquidated and punitive damages.

## **BACKGROUND**

### A.    **Factual Background**

The undisputed material facts are set forth in Fox News Network, LLC's ("FNN") Statement of Material Facts ("SUMF"), which is fully incorporated herein. The following briefly summarizes the record.

      1.     ***FNN Maintains Several Employment Policies Relevant to Plaintiff's Employment and Termination***

FNN has long maintained several policies that inform, and set expectations, for its employees' conduct. Similarly, FNN maintains policies that provide for several forms of employee benefits.

Relevant here, Plaintiff was subject to and received copies of several documents containing company policies, including an Employee Handbook, a set of supplemental policies, and the Standards of Business Conduct. (SUMF ¶ 2.) Plaintiff acknowledged receipt of the policies most recently on July 25, 2022, two months before his termination. (*Id.*) Among them, a policy titled Supplemental Policies contains a section on "Regular work hours," which provides that "some employees will be regularly scheduled to work an eight-hour shift, though some may be regularly scheduled to work a longer shift." (SUMF ¶ 3 (quoting Ex. 2, FNN_0000280-288 at 281).) That policy provides that "because news is a 24-hours-a-day, 365-days-a-year business, the staff must be flexible to be able to handle breaking stories," and that "as part of the business, the hours may vary from the regular schedule." (*Id.* (quoting Ex. 2, FNN_0000280-288 at 281).)

Separately, under the heading "Sick and Safe Time," the Employee Handbook provides that "if you are unable to work due to illness or injury, you should contact your supervisor as soon as possible and no later than two hours after your normal starting time." (SUMF ¶ 4 (quoting Ex. 3, FNN_0000185-279, at 209).) Plaintiff acknowledges that, as of July 2022, he understood this was FNN's formal, written policy. (*Id.*)

Moreover, the Employee Handbook includes a section titled "Standards of Conduct and Work Rules" that exists "to help ensure a safe, healthy, and professional work environment." (SUMF ¶ 5 (quoting Ex. 3, FNN_0000185-279, at 229).) These Standards of Conduct and Work Rules provide examples of conduct that, at FNN, "is impermissible and may lead to disciplinary

4

action up to and including immediate termination," including "unauthorized or unprotected absenteeism or tardiness," "unprofessional conduct," "poor attitude," "improper conduct toward a supervisor," and "insubordination." (SUMF ¶ 5 (quoting Ex. 3, FNN_0000185-279 at 229-32).)

### 2. Plaintiff Jason Donner Worked for FNN's Washington Bureau as News Producer Covering Capitol Hill

Plaintiff began working at FNN in June 2010 and held different positions during his tenure there. (SUMF ¶ 1.) He was last promoted in 2018 to a Capitol Hill producer role. (*Id.*) From the time he assumed that role in 2018, through the time he was terminated in 2022, Plaintiff worked on a "small," "leanly staffed" Capitol Hill producer team. (SUMF ¶ 7 (quoting Ex. 1, J. Donner Tr. 49:20-50:5, 114:6).)

In his Capitol Hill producer role, Plaintiff's duties included maintaining a presence in the field to cultivate sources and pitch content, coordinating with news crews for best coverage, and working with FNN correspondents to help fact-check stories and conduct research. (SUMF ¶ 6.) To accomplish these tasks, Plaintiff's workdays sometimes began as early as 7:00 a.m. (SUMF ¶ 39.) Plaintiff did not see himself as having an "official schedule," "because [in his role] you were always working and always expected to be up and around." (SUMF ¶ 40 (quoting Ex. 1, J. Donner Tr. 59:1-5).) On most days, Plaintiff had standing 9:30 a.m. telephone calls with colleagues. (SUMF ¶ 41.) Separate from these calls, "to make sure [the various newsworthy events] were covered" throughout the news day, Plaintiff and his fellow Capitol Hill producers would communicate amongst themselves to "br[ea]k it down" and "figure [] out sort of like on our own" how to split things up, and then would "let the assignment desk or [others at FNN] know" if the team "needed assistance." (SUMF ¶ 43 (quoting Ex. 1, J. Donner Tr. 59:6-22).)

From January 2018 to early 2022, Anita Siegfriedt supervised Plaintiff at FNN. (SUMF ¶ 8.) Then, after Ms. Siegfriedt left in early 2022, NuNu Japaridze was promoted to director of news

development and became Plaintiff's supervisor.   (SUMF ¶ 9.)   As the director of news development, Ms. Japaridze "supervise[d] the newsroom producers, associate producers, field producers, package producers," and multiple departments or "beats" including Capitol Hill. (SUMF ¶ 10 (quoting Ex. 6, Japaridze Tr. 10:6-14).)  Ms. Japaridze reported to Bryan Boughton, the Washington Bureau Chief, who oversaw the larger bureau operation, from "the news-gathering portion of it" to the "physical plant itself."  (*Id.* (quoting Ex. 7, Boughton Tr. 6:21-7:13).)

### 3.    *By Early-2022, Several of Plaintiff's Colleagues Separately Informed FNN Management and Human Resources that Plaintiff's Workplace Conduct Had Been Disruptive and Unprofessional*

In early 2022, around the time she assumed her new role, Ms. Japaridze received multiple complaints from Plaintiff's colleagues that he was creating what they referred to as a "toxic" work environment at the Bureau.  (SUMF ¶ 11.)  In response, Ms. Japaridze alerted her supervisor, Mr. Boughton, of the reports, and Mr. Boughton spoke directly with two of Plaintiff's colleagues who had made these reports.  (SUMF ¶ 12.)  These employees informed Mr. Boughton that "at times [Plaintiff] could be dismissive," "was rude," "was unreliable in showing up for events [and] that [his team] would scramble to have to cover" for him, and that Plaintiff created a "toxic" work environment through those and similarly disruptive and unprofessional attitudes toward and treatment of his work responsibilities and colleagues.  (SUMF ¶ 13 (quoting Ex. 7, Boughton Tr. 80:15-81:18, 85:22-88:9).)  In fact, "*one of them wanted to leave the unit because she was not willing to work with him anymore.*"   (SUMF ¶ 14 (quoting Ex. 7, Boughton Tr. 80:15-81:18, 87:11-88:3).)

During a lunch meeting in March 2022, Ms. Japaridze addressed these complaints with Plaintiff.  (SUMF ¶ 15.)  Shortly thereafter, Ms. Japaridze sent a follow-up email to Plaintiff "to summarize some of the topics" they had "discussed . . . during lunch," including:  "Coworkers complaining about the 'toxic' environment on the Hill because of your approach to them"; "More

self-awareness when talking during zoom meetings"; "Concerns expressed about you being reachable"; and "Giving me heads up when you need to arrive late or have events in the middle of the work day," which Ms. Japaridze said she "will approve but need[s] to be aware." (SUMF ¶ 16 (quoting Ex. 9, FNN_0000511-13 at 513).)   In response to her email (which Ms. Japaridze forwarded to Mr. Boughton), Plaintiff disagreed with some (but not all) of the characterizations that had been made of his conduct thus far, but never disputed that Ms. Japaridze raised these issues with him during that lunch meeting. (SUMF ¶ 17.)   In his response, Plaintiff added the following acknowledgment: "I should have been more diplomatic.   Totally on me in writing, I accept that.   I'm going to be positive and keep moving forward." (*Id.* (quoting Ex. 9, FNN_0000511-13 at 512).)

Only a few weeks later, however, Ms. Japaridze reported to Nicolle Campa, the Human Resources officer for FNN's Washington Bureau, that in early-April 2022, when Ms. Japaridze had been away on vacation, Plaintiff had *again* been very "disruptive," including that he had been "late everyday" and that "others had to pick up" the slack. (SUMF ¶ 18 (quoting Ex. 10, Campa Tr. 97:3-98:8).)   Ms. Japaridze also reported to Ms. Campa that "this was not the first time that had happened," and passed along names of other FNN employees who had reported similar concerns. (*Id.* (quoting Ex. 10, Campa Tr. 99:2-13).)   When Ms. Campa spoke with one of these FNN employees—a producer who sometimes filled in with the Capitol Hill team—"she indicated she did not want to do that anymore because she was uncomfortable working with [Plaintiff]" based on his conduct, including "the way in which he was treating colleagues." (SUMF ¶ 19 (quoting Ex. 10, Campa Tr. 99:2-21).)

### 4.   *In April 2022, FNN Addressed Plaintiff's Performance Issues by Referring Him to Its Employee Assistance Program and Providing Approximately Six Weeks of Paid Leave*

Shortly thereafter, in mid-April 2022, FNN required Plaintiff to take leave through a formal

referral to its Employee Assistance Program ("EAP").  (SUMF ¶ 20.)  The EAP is free to FNN employees.  (SUMF ¶ 21.)  The EAP exists "[t]o help employees through difficult periods," stemming from a variety of issues, including mental health concerns and the "abuse of alcohol and illegal or legally obtained drugs."  (SUMF ¶ 22 (quoting Ex. 3, FNN_0000185-279 at 261).)  As the Employee Handbook states, "if the Company determines that an employee's personal issues are interfering with their job performance, the Company may formally refer [an] employee to the EAP, with the goal of assisting them to improving [sic] their job performance to a satisfactory level."  (SUMF ¶ 23 (quoting Ex. 3, FNN_0000185-279 at 261).)  Plaintiff admits that "between April and May 2022," he took "approximately 5-6 weeks of paid leave."  (SUMF ¶ 97 (quoting Ex. 21, Pl.'s Answer to FNN RFA 16).)  FNN provided these five to six weeks of paid leave to Plaintiff as a benefit through its EAP.  (SUMF ¶ 98.)

### 5. *Plaintiff's Inability to Temper the Tone of Communications with Coworkers Is Addressed (and Reflected) in His 2022 Performance Review*

FNN provided annual performance reviews for its employees that include, among other things, employee accomplishments, career aspirations, and performance deficiencies.  (SUMF ¶ 24.)  During the relevant time, these FNN performance reviews include narrative evaluations as well as category-specific rating scores on a scale from one through five—where '1' meant did not meet expectations; '2' meant needs improvement; '3' meant meets expectations; '4' meant exceeds expectations; and '5' meant outstanding.  (SUMF ¶ 25.)

In the summer of 2022, FNN completed Plaintiff's annual Performance Review.  (SUMF ¶ 27.)  Ms. Japaridze based her assessment of Plaintiff on her own experiences as well as feedback that she collected from others.  (*Id.*)  In the narrative section of Plaintiff's 2022 performance review, Ms. Japaridze memorialized the above-referenced March 2022 discussion, during which she and Plaintiff "discussed the importance of treating coworkers professionally even when he is

8

extremely frustrated." (SUMF ¶ 28 (quoting Ex. 12, FNN_0000343-347 at 346.) Elsewhere in

Plaintiff's review, Ms. Japaridze noted the following:

- "Based on received feedback and my own observations, I have come to the conclusion that Jason's personal goals and organization goals are not aligned. Whether it is an awareness problem or a communication problem, it needs to be addressed." (SUMF ¶ 29 (quoting Ex. 12, FNN_0000343-347 at 345).)

- "Letting problems fester can create negative undercurrents among Hill team members. I encourage Jason to take more positive approach to the challenges that accompany his assignments." (SUMF ¶ 30 (quoting Ex. 12, FNN_0000343-347 at 347).)

- "Focusing solely on problems can come across as complaining. . . . People won't be encouraged to seek out Jason's guidance if they are only met with complaints." (SUMF ¶ 31 (quoting Ex. 12, FNN_0000343-347 at 347).)

In the scoring section, Ms. Japaridze rated Plaintiff's "Professionalism" as "2 – Below

Expectations." (SUMF ¶ 32.) Meanwhile, Plaintiff rated his own "Professionalism" as "4 –

Exceeds Expectations." (*Id.*)[2]

In his written response to the review, Plaintiff stated that he "fe[lt] nothing but a lack of

respect for a lack of title and lack of being paid fairly." (SUMF ¶ 33 (quoting Ex. 12,

FNN_0000343-347 at 346).) Plaintiff also added: "There is no incentive to work hard and go

above and beyond when management doesn't listen to your reporting and doesn't give you

respect." (*Id.* (quoting Ex. 12, FNN_0000343-347 at 347).)

### 6. *Plaintiff Missed Work on Monday, September 26, 2022, Without Timely Notifying His Supervisor*

Plaintiff received the COVID vaccine on Monday, September 19, 2022, before he went

into work. (SUMF ¶ 34.) He continued to work for the remainder of that week, through Friday,

September 23. (SUMF ¶ 35.) On the night of Saturday, September 24, Plaintiff attended an Elton

---

[2] At the relevant time, FNN's performance reviews were completed in stages, which allowed for employees to self-evaluate their own performance, and for supervisors to create their own evaluations, which would later appear alongside employee self-evaluations in the final report. (SUMF ¶ 26.)

John concert at Nationals Park.  (SUMF ¶ 36.)  The next day—Sunday, September 25—Plaintiff

told his father that he "was going to have to call in sick the next day"; he "just can't go into work

tomorrow"; and he "was going to report that he couldn't make it."  (SUMF ¶ 37 (quoting Ex. 14,

A. Donner Tr. 11:13-17, 103:3-104:17).)  Plaintiff was scheduled to work on Monday, September

26, 2022.  (SUMF ¶ 38.)  Although he told his father on Sunday, September 25, that he planned to

call in sick the next day, Plaintiff did not likewise inform his supervisor, or anyone else at Fox

News, on Sunday, September 25, that he would not be at work for his scheduled shift the next day.

Nor did he do so the next morning.[3]

Unaware that Donner did not intend to work that day, on the morning of Monday,

September 26, before a standing, daily, 9:30 a.m. call with his team relating to upcoming news,

Plaintiff's fellow Capitol Hill producers, exchanged text messages at 9:25 a.m. to coordinate news

coverage.  (SUMF ¶ 44.)[4]  In that thread, one of Plaintiff's fellow producers asked Plaintiff to

cover an event at 10:00 a.m. involving Senator Mitch McConnell.  (SUMF ¶ 45.)  Plaintiff neither

responded before the standing 9:30 a.m. call, nor joined the call.[5]  When Ms. Japaridze then "asked

about [him]," (SUMF ¶ 46 (quoting Ex. 1, J. Donner Tr. 238:3-8)), that same fellow producer told

Ms. Japaridze that she "couldn't get a hold of [Plaintiff]," (id. (quoting Ex. 17, Plaintiff000203-

07).)

Plaintiff responded to that same producer at 9:48 a.m.  (SUMF ¶ 47), indicating simply that

---

[3] Plaintiff does not contend that he requested sick leave from Ms. Japaridze before at the earliest
11:39 a.m. on Monday, September 26, 2022.  (See SUMF ¶ 52.)

[4] The time stamps that appear on certain FNN text messages show Eastern Standard Time ("EST")
despite the fact that the messages' dates fall within the time of the year when Eastern Daylight
Time ("EDT") was in effect. Because EST is one hour behind EDT, (see Ex. 1, J. Donner Tr.
243:2-21; Ex. 10, Campa Tr. 55:13), all times included in this brief and the statement of facts are
converted to EDT, so the timeline is clear.

[5] Plaintiff's team is "used to everybody getting on the call."  (SUMF ¶ 42 (quoting Ex. 1, J.
Donner Tr. 245:18-22).)

he "d[id not] feel like talking [on] the phone" and that his "depression came back *yesterday*," i.e., Sunday, September 25.  (*Id.* (quoting Ex. 17, Plaintiff000203-07 (emphasis added)).)  Plaintiff's fellow producer advised Plaintiff to tell Ms. Japaridze about his status, (SUMF ¶ 48), consistent with prior discussions with Ms. Japaridze where she asked Plaintiff to make sure he "told [her] if [he] w[as] going to be late or out," (*id.* (quoting Ex. 1, J. Donner Tr. 256:13-19)).  Although Plaintiff knew at this point that his supervisor was looking for him, Plaintiff went back to sleep rather than message or call her.  (SUMF ¶ 49.)

As a result of Plaintiff's absence, the team had to "scramble" for another producer to cover the 10:00 a.m. event.  (SUMF ¶ 50 (quoting Ex. 27, FNN_0000469).)  When Ms. Japaridze *still had not heard from Plaintiff by 10:50 a.m.*, she emailed to check in on him—stating that she had been "worried" because "no one could get in touch with [Plaintiff]" and that she and "want[ed] to make sure [Plaintiff] was doing ok."  (SUMF ¶ 51 (quoting Ex. 19, FNN_0000353-54, at 354).)  Ms. Japaridze asked Plaintiff to "call me as soon as you can."  (*Id.*)

Plaintiff did not respond to anyone until 11:39 a.m.  At that point, Plaintiff again messaged the same colleague with whom he had spoken previously rather than his supervisor, Ms. Japaridze.  In that message, Plaintiff, for the first time, stated: "I'll call out sick and let [Ms. Japaridze] know."  (SUMF ¶ 52 (quoting Ex. 17, Plaintiff000203-07).)  When Plaintiff finally spoke with his supervisor, Ms. Japaridze "offered [Plaintiff] to take the [following] day off," i.e., Tuesday, September 27—but Plaintiff declined.  (SUMF ¶ 53 (quoting Ex. 1, J. Donner Tr. 263:9-14).)  Later in the afternoon, Ms. Japaridze again reached out to Plaintiff to check on his wellbeing and reiterated that Plaintiff could take the following day off of work, if he thought it would help.  (SUMF ¶ 54.)  As Ms. Japaridze explained, she "would rather [Plaintiff] come back to work when he is in a better place."  (SUMF ¶ 55 (quoting Ex. 20, FNN_0000351-52 at 351).)  Ms. Japaridze

also attached EAP information for Plaintiff's review and told him: "Please let me know if there is anything I can do to help." (*Id.* (quoting Ex. 19, FNN_0000353-54, at 354).)

Plaintiff declined Ms. Japaridze's offer to take a second day off from work on Tuesday, September 27, explaining that he would "rather come to work." (SUMF ¶ 53 (quoting Ex. 19, FNN_0000353-54, at 353).)

### 7.    *On Tuesday, September 27, 2022, Plaintiff Calls His Supervisor a "Lousy Manager" in a "Verbal Rage" When She Attempted to Address with Him the Need for More Notice in the Future*

On Tuesday, September 27, 2022, Plaintiff came to work. In the later part of the day, Ms. Japaridze called Plaintiff and discussed with him, among other topics, that Plaintiff had not given notice of his absence the day before. (SUMF ¶ 58.) During that call, Plaintiff himself concedes that he "got very emotional and hurt and defensive." (SUMF ¶ 59 (quoting Ex. 1, J. Donner Tr. 298:13-17, 299:2-5).) Plaintiff also concedes that he "raised [his] voice at [his] supervisor" to "express[] his frustration" when Ms. Japaridze tried to discuss his lack of communication about his absence the day before. (SUMF ¶ 60 (quoting Ex. 21, Pl.'s Answer to FNN RFA 6.).) It was during this call that Plaintiff "called her a 'lousy manager.'" (SUMF ¶ 61 (quoting Ex. 21, Pl.'s Answer to FNN RFA 4.).)

When that call abruptly ended, at 7:04 pm, Ms. Japaridze sent an email to Plaintiff stating that it was unacceptable for him to yell at her and that she did not deserve to be called a lousy manager:

> Jason, It is absolutely unacceptable to raise your voice and keep yelling at your manager when I am trying to have a civilized, professional phone conversation with you. I definitely don't deserve being called a "lousy manager", being screamed at and being hang up on. If you don't understand why you need to give your coworkers and your manager heads up when you don't show up for work, I honestly don't know how to make you understand it. You can NEVER talk to me or as a matter of fact to anyone at FOX like this. We will have another meeting to follow up on this unacceptable behavior.

(SUMF ¶ 62 (quoting Ex. 22, FNN_0000417-18 at 417.)

Plaintiff replied at 7:47 p.m. and did not dispute Ms. Japaridze's account of the telephone call—including that he had called Ms. Japaridze a "lousy manager." (SUMF ¶ 64.) Instead, Plaintiff apologized. (SUMF ¶ 64.) Plaintiff explained that his "emotional reaction" and "defensive[ness]" came in response to what he perceived as Ms. Japaridze's criticism of his work. As Plaintiff explained: "*when my work product was criticized without any examples to back it up*, I got very emotional and hurt and defensive." (*Id.* (quoting Ex. 23, FNN_0000411-412 at 411 (emphasis added)).)

Ms. Japaridze alerted Mr. Boughton and Ms. Campa about the testy telephone call shortly after it took place. (SUMF ¶ 65.) Ms. Japaridze also forwarded the entire email thread with Plaintiff, containing both her 7:04 p.m. email and Plaintiff's 7:47 p.m. response, to Mr. Boughton at 7:49 p.m. (SUMF ¶ 66.)

Separately, Ms. Japaridze texted Ms. Campa the following contemporaneous description of the phone call: "When I mentioned about the need to be on time or give us heads up he starting yelling[.] Got triggered and started yelling. I told him to calm down, that he was actually screaming. He called me a lousy manager." Ms. Japaridze described the interaction as "actually scary because he went on this verbal rage," and observed that Plaintiff "is in a really bad place." (SUMF ¶ 67 (quoting Ex. 26, FNN_0000553-54).)

There is no dispute about any of these facts. The immediate, contemporaneous emails and text messages exchanged between Ms. Japaridze and Plaintiff, and Ms. Japaridze and Mr. Boughton and Ms. Campa, document it all. Equally important, Plaintiff admits that he called Ms. Japaridze a "lousy manager" during their September 27 call. (SUMF ¶ 68.) He also admits that he was "defensive" because he perceived Ms. Japaridze as "accusing [him] *again* of not doing

13

[his] work." (SUMF ¶ 69 (quoting Ex. 1, J. Donner Tr. 298:13-300:7 (emphasis added)).)  Plaintiff also concedes that he "raised [his] voice in the conversation with" Ms. Japaridze.  (SUMF ¶ 70 (quoting Ex. 1, J. Donner Tr. 315:18-316:14).)

Plaintiff himself also documented this insubordinate behavior.  The morning after his outburst, he texted a colleague the following:  "Make sure NuNu . . . doesn't accuse you of being late to work and not doing your job . . . NuNu and I got into it last night she accused me of not doing my job without any evidence when asked for it and I told her I won't speak with her without HR present anymore."  (SUMF ¶ 71 (quoting Ex. 17, Plaintiff000203-207 at 206).)  Plaintiff then *admitted* in the same text thread he "kn[e]w" he had "screwed up on Monday [September 26] and overslept," and that Ms. Japaridze's criticism for his failure to call in sick "was fair."  (SUMF ¶ 72 (quoting Ex. 17, Plaintiff000203-207 at 206).)

### 8.    *FNN Promptly Terminated Plaintiff For His Insubordinate and Unprofessional Conduct*

FNN's decision to fire Plaintiff followed Plaintiff's plainly insubordinate and unprofessional conduct.  Mr. Boughton had the ultimate authority to decide whether to terminate Plaintiff.  (SUMF ¶ 73.)  Before Plaintiff's September 27 outburst, neither Ms. Japaridze nor Mr. Boughton had any plan or intention to terminate Plaintiff.  (SUMF ¶ 74.)

Mr. Boughton communicated his view of Plaintiff's conduct immediately upon learning of it.  Approximately three minutes after Ms. Japaridze emailed Mr. Boughton about the incident, Mr. Boughton responded: "This is unacceptable."  (SUMF ¶ 75 (quoting Ex. 24, FNN_0000557).)

Mr. Boughton then spoke with Ms. Japaridze and Ms. Campa.  During that call, Ms. Japaridze stated that Plaintiff "blew up at her [and] was insubordinate to her."  (SUMF ¶ 76 (quoting Ex. 7, Boughton Tr. 45:19-24).)  Mr. Boughton understood that Ms. Japaridze was "very upset by how [Plaintiff had] treated her."  (*Id.*)

14

After hearing Ms. Japaridze's description of her interaction with Plaintiff, reading their follow-up email exchange, and further consulting with Ms. Campa and Ms. Japaridze by telephone, Mr. Boughton made the decision to terminate Plaintiff "fairly quickly." (SUMF ¶ 77 (quoting Ex. 7, Boughton Tr. 67:2-5).) Mr. Boughton decided termination was the appropriate course because Plaintiff "was insubordinate to his manager," and the behavior that was described to him mirrored earlier complaints Mr. Boughton had heard from Plaintiff's colleagues who had reported that his similarly unprofessional behavior toward them was creating "a toxic work environment." (SUMF ¶ 78 (quoting Ex. 7, Boughton Tr. 75:8-76:1).) Indeed, Mr. Boughton believed that Plaintiff was perpetuating a pattern of "similar behavior" to what others at FNN had reported about Plaintiff's workplace behavior (*see* Section A.3, *supra*), and concluded that Plaintiff's lack of professionalism "was going to continue to be a bad problem" for FNN. (SUMF ¶ 79 (quoting Ex. 7, Boughton Tr. 45:21-46:2).)

It is the practice of Ms. Campa, the Human Resources officer, to inform her supervisor, the seniormost human resources executive for Fox News, when an employee is going to be terminated. (SUMF ¶ 80.) At 8:11 p.m. on September 27, after her call with Mr. Boughton and Ms. Japaridze, she memorialized several of the issues leading to the termination decision to her supervisor. (*Id.*) Ms. Campa explained that one of Plaintiff's colleagues—a "high performing producer"—had reported that Plaintiff "is unreliable, not dependable, and creates an uncomfortable environment as he has 'blow ups' and treats [his] Capitol Hill colleagues rudely and disrespectfully"; that Plaintiff "comes in late and leaves early quite often"; and that she had "applied to other FOX News jobs in hopes to get out of this uncomfortable environment." (*Id.* (quoting Ex. 10, Campa Tr. 87:16-18).) After providing that background, Ms. Campa described Plaintiff's outburst at Ms. Japaridze and stated that FNN was "moving forward with a termination tomorrow [Wednesday,

September 28] around 11am."  (*Id.* (quoting Ex. 27, FNN_0000469).)

Then, at 8:25 p.m., Ms. Campa emailed Mr. Boughton and Ms. Japaridze proposed "[t]alking points" for the termination meeting with Plaintiff.  (SUMF ¶ 81.)  Ms. Campa prepared these talking points based on her discussions with Mr. Boughton and Ms. Japaridze, as well as other information she had received about Plaintiff's conduct.  (*Id.*)  For example, Ms. Campa recalls that, at some point in 2022, she had spoken with a colleague of Plaintiff's from the Capitol Hill news team, who indicated "that working with Jason . . . was . . . quite challenging" because of "the way in which he was interacting with the team at the Hill . . . meaning the interactions that they had weren't necessarily pleasant."  (SUMF ¶ 82 (quoting Ex. 10, Campa Tr. 93:4-11).)  In addition, this same colleague had reported to Ms. Campa that "she and others had to pick up the workload because he was not coming into work in a timely fashion," and "there were also instances where he will leave when there was still plenty to do," and "they had to scramble" and "figure out how to cover the Hill when he was not present."  (*Id.* (quoting Ex. 10, Campa Tr. 94:5-11).)

FNN terminated Plaintiff the next day—Wednesday, September 28.  (SUMF ¶ 85.)  That morning, Mr. Boughton sent an email to Plaintiff stating that he "want[ed] to discuss the issues from yesterday" (the day of his verbal rage) and asking Plaintiff to "come meet me at 11am here in bureau."  (SUMF ¶ 83 (quoting Ex. 29, FNN_0000565 (emphasis added)).)  Plaintiff, Mr. Boughton, and Ms. Campa attended the 11:00 a.m. meeting in person, and Ms. Japaridze joined by telephone.  (SUMF ¶ 84.)  FNN terminated Plaintiff at that meeting.  (SUMF ¶ 85.)

Mr. Boughton delivered the termination decision to Plaintiff and recalls telling Plaintiff that he "could not speak to NuNu [Japaridze] or any supervisor in that fashion and that's why we had to terminate [Plaintiff]."  (SUMF ¶ 86 (quoting Ex. 7, Boughton Tr. 70:1-11).)

Plaintiff testified that he does not completely remember what he was told during the

meeting.  (SUMF ¶ 87.)  But what Plaintiff testified under oath that he does remember about the meeting bears little resemblance to the allegations he selectively pleaded in the Amended Complaint.  (*Cf.* Am. Compl. ¶ 35 (alleging that Mr. Boughton told him he was fired "because he was late for work and did not show up for work").)

Under oath, Plaintiff admits that there were "a number of reasons that Mr. Boughton gave me for termination."  (SUMF ¶ 88 (quoting Ex. 1, J. Donner Tr. 306:10-14).)  Plaintiff admits that he recalls hearing that he "was irresponsible," that he "was late," that he "missed work," that FNN had "received feedback [that he] do[esn't] always join calls and that [he was] unreachable sometimes," that he "let [his] coworkers down," and that his "colleagues and others ha[d] expressed concerns about [his] outbursts, including yelling at them."  (SUMF ¶ 89 (quoting Ex. 1, J. Donner Tr. 302:12-17, 307:10-308:13, 309:21-310:12).)[6]

Under oath, Plaintiff also admits that he "could have" been given other reasons for the decision including: (i) "being disrespectful and [in]subordinate to [his] supervisor" and "how [Plaintiff] had acted towards [Ms. Japaridze] in [their earlier] conversation," and (ii) that "[Plaintiff] w[as] contributing to a toxic work environment."  (SUMF ¶ 90 (quoting Ex. 1, J. Donner Tr. 306:15-309:18).)  And, finally, under oath, Plaintiff admits that no one from FNN ever told him he was "being terminated because [he] took sick leave" or "because [he] missed work on Monday, September 26, 2022."  (SUMF ¶ 93 (quoting Ex. 1, J. Donner Tr. 304:18-305:6, 305:20-306:6).)  In fact, Plaintiff admits that, during his entire 12-year period of employment with FNN,

---

[6] At his deposition, when asked whether Mr. Boughton mentioned that Plaintiff's "colleagues and others have expressed concern about your outbursts, including yelling at them," Plaintiff testified: "I would say he did.  And I asked for examples.  And there was no examples."  (SUMF ¶ 89 n.2 (quoting Ex. 1, J. Donner Tr. 307:10-16).)  Plaintiff then sought to undo that testimony by saying he "disagreed" with the same statement.  But, even then, he clarified that he was doing so "because there's no examples" and added: "it was just one of the long lines of things that were sort of just made up without examples given to me."  (*Id.* (quoting Ex. 1, J. Donner Tr. 308:10-16).)

there was never a time that he "asked for a sick day and [was] refused by Fox News management to take a sick day." (SUMF ¶ 94 (quoting Ex. 1, J. Donner Tr. 266:2-7.) Plaintiff likewise "admit[s] that none of [his] supervisors at FNN ever told [him] that [he was] not permitted to take sick leave." (SUMF ¶ 96 (quoting Ex. 21, Pl.'s Answer to FNN RFA 10).)

There is no evidence to support Plaintiff's allegation in his Amended Complaint that Mr. Boughton mentioned only two reasons for his termination during the meeting—i.e., that he was "late" and "did not show up" for work. But even with respect to those two reasons, the undisputed record confirms that those reasons were not tied solely to Monday, September 26. To the contrary, the record establishes that FNN management had, in the months preceding Plaintiff's termination, received reports that Plaintiff was not reliably at work, on time, and reachable. (*See, e.g.*, Ex. 7, Boughton Tr. 80:18-81:18 (separate reports to Mr. Boughton by two of Plaintiff's colleagues that Plaintiff "was unreliable in showing up for events" and they would have to "scramble to have to cover" for his absences); Ex. 9, FNN_0000511-13 at 512 (Mar. 14, 2022 email from N. Japaridze to Plaintiff describing their discussion about the need for a "heads up when you . . . arrive late or have events in the middle of the work day"); Ex. 11, FNN_0000515 (Apr. 14, 2022 notes from N. Campa describing Plaintiff as "late everyday" of a preceding week); Ex. 27, FNN_0000469 (September 2022 email summarizing a report from Plaintiff's colleague that Plaintiff "comes in late and leaves early quite often" including "last week" when he was "late to the Capitol twice").) Even Plaintiff admits that "there may have been instances where Plaintiff was late for a 'beat call' or a work-related event" because he was "reporting" elsewhere. (SUMF ¶ 92 (quoting Ex. 21, Pl.'s Answer to FNN RFA 19).)

### 9.   *FNN Paid Plaintiff at His Standard Rate of Pay for All Wages Due to Him Through His Termination*

FNN paid Plaintiff his wages, at his standard rate of pay, for every day that he was

employed by FNN in 2022. (SUMF ¶ 99.) That is, Plaintiff does not contend that he is owed any unpaid wages. (*Id.*)

### B. Procedural Background

One year to the day after his termination from FNN, Plaintiff filed this lawsuit against Fox in the D.C. Superior Court, alleging discrimination on the basis of his political affiliation because "he was fired for opposing Fox's false reports of voter fraud in the 2020 election and inaccurate coverage of the riot at the Capitol on January 6, 2021." *Donner v. Fox News Network, LLC*, 2024 WL 1758689, at *1 (D.D.C. Apr. 24, 2024). Plaintiff further alleged that the reason FNN gave him for his termination was that he called in sick one day in September 2022, and that this reason was a pretext for FNN's political affiliation discrimination. *Id.* Plaintiff claimed that this allegedly pretextual reason for his termination (i.e., taking a sick day) is a "*per se* violation" of the Sick Leave Act. *Id.* Specifically, in Count V of the Amended Complaint, Plaintiff alleges that FNN "violated D.C. Code § 32-531.08(a) by interfering with, and denying . . . his right to use his accrued sick leave," (Am. Compl. ¶ 72 (interference claim)), and, likewise, that FNN "violated D.C. Code § 32-531.08(b)(4) by terminating Plaintiff for using paid sick leave on September 26, 2022, as he recovered from his COVID-19 vaccine," (*id.* 73 (retaliation claim)).

The Honorable Judge Cooper dismissed Plaintiff's political affiliation claims and, because Plaintiff did not allege that he was unable to use sick leave, dismissed his claim that FNN violated the Sick Leave Act by interfering with his right to take sick leave. *Donner v. Fox News Network, LLC*, 23-CV-3401 (CRC), 2024 WL 1758689, at *12 (D.D.C. Apr. 24, 2024). However, Judge Cooper allowed Plaintiff's retaliation claim under the Sick Leave Act to proceed, holding that Plaintiff "plausibly alleged that he was retaliated against for engaging in protected activity under the Sick Leave Act[.]" *Id.* *14. In so holding at the motion to dismiss stage, Judge Cooper accepted as true Plaintiff's allegations that Mr. Boughton "expressly told [Plaintiff] that he was

being fired because he had been 'late for work and did not show up for work'" and that Ms. Japaridze had "berated [Plaintiff]" the day before his termination "for taking leave." *Id.* *12. Judge Cooper concluded that these allegations "are surely enough to survive a motion to dismiss." *Id.* *13. Judge Cooper also accepted as true Plaintiff's allegations that he notified FNN "as soon as possible" of his absence when he "texted his coworker to let her know that he would be out sick," "right before calling his supervisor," which Plaintiff alleged had occurred "prior to the start of his workday'." *Id.* (quoting Am. Compl. ¶ 33). Based on these allegations accepted as true, Judge Cooper concluded that Plaintiff had alleged that he "was feeling ill one morning so he 'called in sick for the remote workday' by dialing 'his supervisor, Japaridze, to inform her that he would be out sick'" and that in doing so he "did what millions of Americans do when they are feeling under the weather one morning: speak with his supervisor to let her know he could not make it to work that day." *Id.*[7]

Thus, the sole remaining claim is that FNN allegedly terminated Plaintiff in retaliation for taking sick leave on September 26, 2022, in violation of D.C. Code § 32-531.08(b)(4) ("An employer shall not discharge . . . an employee because the employee . . . uses paid leave provided under this subchapter.").

## LEGAL STANDARDS

### A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[7] Judge Cooper also rejected FNN's argument that Plaintiff's Sick Leave Act claim is inconsistent with his allegations that what FNN told him was the reason for his termination was a pretext for firing him because of his political affiliation. Accepting as true Plaintiff's allegations about the reason he was given for his termination, Judge Cooper reasoned that "even if it's true that Fox was looking for a reason to axe Donner, the fact that it decided to latch onto an impermissible reason can still support a retaliation claim." 2024 WL 1758689, at *13.

judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only "if the evidence, viewed in a light most favorable to the non-moving party, could support a reasonable jury's verdict for the non-moving party." *Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "The possibility that a jury might speculate in the plaintiff's favor is insufficient to defeat summary judgment." *Haynes v. Williams*, 392 F.3d 478, 485 (D.C. Cir. 2004).

### B.    Retaliation Claim Standard of Review

The D.C. Sick Leave Act, D.C. Code § 32-531.08(b)(4), prohibits employers from discharging an employee for taking statutorily protected sick time: "An employer shall not discharge or discriminate in any manner against an employee *because* the employee . . . [u]ses paid leave provided under this subchapter." Courts analyze Sick Leave Act retaliation claims under the *McDonnell Douglas* burden-shifting framework. *Sobot v. Clean the World Found. Inc.*, 2024 WL 4119389, at *6 (D.D.C. Sept. 9, 2024).

"Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation[,] which requires that he show: (1) he engaged in statutorily protected activity; (2) his employer took an adverse personnel action against him; and (3) a causal connection exists between the two." *Bartolo v. Whole Foods Mkt. Grp.*, 412 F. Supp. 3d 35, 44 (D.D.C. 2019) (collecting authorities). Under the D.C. Sick Leave Act, "a causal connection exists" only if the adverse employment action occurred "*because* the employee . . . [u]se[d] paid leave provided under the Act." D.C. Code § 32-531.08(b)(4) (emphasis added). "The words 'because of' mean 'by reason of: on account of.'" *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 176 (2009). Indeed, particularly in connection with retaliation claims under employment statutes, "[t]he phrase

'because of' [h]as [been] interpreted as synonymous with classic 'but-for' causation." *Anderson v. BDO USA, P.C.*, 2024 WL 4753761, at *3 (D.D.C. Nov. 12, 2024); *see also Ho v. Garland*, 106 F.4th 47, 51 (D.C. Cir. 2024) ("To prove unlawful retaliation, [Plaintiff] must show that . . . his protected activity was a but-for cause of that adverse action."). And "but-for" causation in turn "requires proof that the unlawful retaliation would not have occurred in the absence of the [event allegedly giving rise to the retaliation]." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Under the plain meaning of the "because of" language in the D.C. Sick Leave Act, then, a plaintiff "cannot succeed unless [he proves the] protected [conduct] actually played a role in [the decision making] process *and had a determinative influence on the outcome*." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (emphasis added).

If the plaintiff makes out a prima face case by a preponderance of the evidence, then under *McDonnell Douglas*, "the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the termination decision." *Bartolo*, 412 F. Supp. 3d at 44. The defendant's burden of production is "minimal," *Barnette v. Chertoff*, 453 F.3d 513 516 (D.C. Cir. 2006), and "need not persuade the court that it was actually motivated by the proffered reasons," *Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the employer proffers a non-retaliatory reason for the termination, "the prima facie case falls away, and '[t]he 'one central inquiry' that remains is whether a reasonable jury could infer retaliation [based on the protected conduct] . . . from all the evidence." *Bartolo*, 412 F. Supp. 3d at 45 (quoting *Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016)); *Sobot*, 2024 WL 4119389, at *6. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

**ARGUMENT**

I.    **THE RECORD CONCLUSIVELY ESTABLISHES THAT PLAINTIFF'S REMAINING SICK LEAVE ACT CLAIM FAILS BECAUSE FNN DID NOT RETALIATE AGAINST PLAINTIFF**

FNN is entitled to summary judgment on Plaintiff's claim that he was terminated in retaliation for taking sick leave on September 26, 2022, in violation of the D.C. Sick Leave Act. To avoid summary judgment, Plaintiff *first must establish a dispute of material fact concerning whether his* absence from work on September 26, 2022, is protected conduct under the Sick Leave Act. He cannot do so. (Section I.A, *infra.*) Plaintiff also must establish that FNN would not have terminated Plaintiff's employment but for that protected conduct. Even if he could satisfy that burden, which he cannot, (Section I.B, *infra.*), FNN asserts a legitimate, non-retaliatory basis for terminating Plaintiff. Accordingly, Plaintiff bears the ultimate burden of establishing that FNN's asserted basis for terminating him was pretextual. *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 497 (D.C. Cir. 2008) (affirming summary judgment where plaintiff "failed to put forward sufficient evidence for a reasonable jury to find" that employer's proffered explanation for adverse action was pretext). Plaintiff cannot meet this standard on the factual record in this case. Indeed, he does not come close to offering sufficient evidence from which a reasonable jury could find pretext. (Section I.C, *infra*.)

A.    **Plaintiff's Unannounced Failure to Show Up for Work, Without Notifying FNN Until Hours into the Workday, Is Not Statutorily Protected Conduct**

FNN is entitled to summary judgment on Plaintiff's Sick Leave Act claim out of the gate because Plaintiff cannot establish that the asserted basis of unlawful retaliation—i.e., his failure to show up for work on September 26, 2022—was protected activity under the Sick Leave Act.

The Sick Leave Act does not give employees the right to disrupt business operations by taking paid leave whenever they wish and letting their employers know about the absence

whenever they get around to it.  The law instead includes common sense notification requirements that employees must satisfy to trigger the law's protections.  As Judge Cooper acknowledged earlier in this case, the Sick Leave Act requires that, "[i]f the paid leave is foreseeable, the request shall be provided at least 10 days, or as early as possible, in advance of the paid leave." *Donner*, 2024 WL 1758689, at *13 (quoting D.C. Code § 32-531.03).  "Otherwise, '[i]f the paid leave is unforeseeable, an oral request for paid leave shall be provided prior to the start of the work shift for which the paid leave is requested.'" *Id.*  In addition, "[t]he Sick Leave Act also permits employers to maintain their own paid-leave policies, so long as they are at least as favorable to employees as the default provisions." *Id.*  FNN's policy does just that, directing employees to notify their supervisors that they are taking sick leave "as soon as possible" and at least two hours before the start of a shift.  (Ex. 3, FNN_0000185-279 at 209.)

Here, the undisputed facts establish that Plaintiff failed to comply either with D.C. law or FNN's internal policy with respect to his absence from work on September 26, 2022.  It is undisputed that Plaintiff's absence was foreseeable because Plaintiff's own father testified that Plaintiff called him "the day before" his absence and stated that he "was going to have to call in sick the next day." (Ex. 14, A. Donner Tr. 11:13-11:17, 103:7-10).  Specifically, Plaintiff told his father "I just can't go into work tomorrow" and confirmed that he "was going to report that he couldn't make it." (*Id.* 103:8-104:17.)

Yet Plaintiff never informed anyone at FNN that he did not intend to work on Monday, September 26 until well into his shift that day.  Because Plaintiff never initiated contact with anyone at FNN to notify the company of his plan to miss work on September 26, his colleagues made efforts that morning to locate him.  (*See, e.g.*, Ex. 16, FNN_0000537-38 (asking Plaintiff to confirm his coverage of a 10 a.m. event).)  When Plaintiff failed to respond, his colleagues

expressed confusion because he was "supposed to be working."  (Ex. 32, FNN_0000539-543.)

Although Plaintiff finally responded to their inquiries at 9:48 a.m., he simply told them he "d[id

not] feel like talking [on] the phone" and did not clearly state he was taking a sick day.  (Ex. 17,

Plaintiff000203-07, at 203.)  It was not until 11:39 a.m., well after the start of his work shift, that

he responded again and advised he planned to "call out sick and let [Ms. Japaridze] know."  (*Id.*)

Plaintiff waited until nearly noon to notify his manager he would be out sick, even though he

*admitted* to his coworkers that he was "struggling" because his "depression came back *yesterday*."

(Ex. 17, Plaintiff000203-07 at 203 (emphasis added); Ex. 1, J. Donner Tr. 252:8-254:15.)

Because it is undisputed that Plaintiff knew and told his father on Sunday, September 25,

after Plaintiff's night out at an Elton John concert, that he would not attend work the next day—

but delayed notifying his supervisor until the middle of the following workday—Plaintiff did not

request leave "as soon as possible" (as required by FNN's internal policy) or "as early as possible"

(as required by D.C. law).  Indeed, even if the absence from work was unforeseeable—which the

undisputed evidence demonstrates it was not—Plaintiff failed to comply with D.C. law, which

requires that "an oral request for [unforeseeable] paid leave shall be provided prior to the start of

the work shift for which the paid leave is requested."  D.C. Code Ann. § 32-531.03.  Accordingly,

the undisputed facts establish that Plaintiff's absence was not protected conduct under the Sick

Leave Act, and his claim fails as a matter of law.

> **B.    Plaintiff Cannot Establish "But For" Causation Because the Indisputable
> Evidence Demonstrates That Plaintiff Was Terminated for Insubordinate and
> Unprofessional Conduct Toward His Supervisor After His Absence and There
> Is No Evidence to The Contrary**

Even if Plaintiff's absence from work were statutorily protected (and it is not), Plaintiff's

Sick Leave Act claim fails from the complete absence of proof to support it.  There is no evidence

that FNN terminated Plaintiff "because" he took one day of sick leave, and no reasonable jury

could conclude otherwise. D.C. Code § 32-531.08(b)(4). To the contrary, the undisputed evidence makes clear that FNN decided to sever ties with Plaintiff because he was insubordinate to his supervisor, and because that unprofessional outburst followed earlier concerns raised by Plaintiff's coworkers about Plaintiff's treatment of them.

First, Plaintiff's theory of causation would require an inference to be drawn based on temporal proximity, i.e., that FNN terminated Plaintiff on account of his day of sick leave because he was fired two days thereafter. But that inference is not reasonable because it would require a jury to ignore that Plaintiff's supervisor *expressed concern for his wellbeing while he was out* and even *offered to let Plaintiff take a second day of sick leave*—which would have taken place the following day, i.e., Tuesday, September 27—if Plaintiff wanted it. In fact, Ms. Japaridze made this offer *at least twice*. (*See* Ex. 20, FNN_0000351-52 (Plaintiff's supervisor writing to Plaintiff on Monday, September 26, 2022, checking in again to "see how [he] [was] doing" and reiterating that she was "happy to give [him] a day off tomorrow if [he] [thought] it would help").) Even Plaintiff concedes it seems "crazy" to conclude that his supervisor would offer him additional sick leave in one breath and, in the next, 24 hours later, elect to terminate Plaintiff for having taken sick leave on the first day. (Ex. 1, J. Donner Tr. 269:15-18.)

Further undermining any inference that FNN fired Plaintiff because he took a sick day, it is indisputable that FNN did not immediately terminate Plaintiff when he arrived back at work on Tuesday, September 27, 2022. (Ex. 1, J. Donner Tr. 283:17-286:11.) In fact, Plaintiff's supervisor did not even address the previous day's absence with Plaintiff until the evening of September 27, when she called him toward the end of the workday. When Plaintiff and Ms. Japaridze spoke, it was not to terminate him. To the contrary, the evidence shows that Ms. Japaridze called to discuss two items, both of which indicate that she intended to continue working with Plaintiff, not fire

26

him.  Ms. Japaridze's two reasons for making the call were:  (1) "to check on him to see how he was doing," and (2) "to address how he can handle the same kind of situation in a better way *next time*," i.e., "notif[ying] people" "if he ever feels sick or . . . not able to come to work" so that FNN's "coverage doesn't take a hit."  (Ex. 6, Japaridze Tr. 59:9-59:24 (emphasis added).)  The mere fact that Ms. Japaridze was thinking ahead to the "next time" Plaintiff needed to call out sick all but proves she did not intend to terminate him before their phone call.  Even accepting Plaintiff's characterization of the call as one in which Ms. Japaridze criticized him and his "work," that characterization only underscores that Ms. Japaridze intended to continue to work with him. (*See* Ex. 1, J. Donner Tr. 286:10-288:3; Ex. 22, FNN_0000417-18 at 417.)

Second, and equally important, the undisputed record shows that there was a clear intervening reason for Plaintiff's termination between the day he was absent and the decision to terminate:  Plaintiff's own rank insubordination toward his supervisor during the September 27 call, when he became frustrated and defensive and insulted his supervisor—conduct Ms. Japaridze contemporaneously described to Human Resources as a "verbal rage" that was "actually scary." (Ex. 26, FNN_0000553; *see also* Ex. 21, Pl.'s Answer to FNN RFA 4 (admitting to calling Ms. Japaridze a "lousy manager"); Ex. 1, J. Donner Tr. 288:12-289:5 (same); Pl.'s Answer to FNN RFA 7 (admitting to raising his voice); *see also* Ex. 7, Boughton Tr. 45:19-24 (Mr. Boughton testifying that Ms. Japaridze was "very upset" when she reported Plaintiff's outburst).)  Mr. Boughton deemed this conduct "unacceptable," and it plainly violated Fox's Standards of Business Conduct, which cautions that "insubordination, including improper conduct toward a supervisor," may lead to termination.  (Ex. 24, FNN_0000557; Ex. 3, FNN_0000185-279 at 230 (describing conduct that may lead to termination).).  Such evidence of "significant misconduct by a plaintiff that fully justifies the adverse employment action and that occurs after the employee's protected

27

activity extinguishes the probative force that might arise from the proximity in time between the protected activity and the adverse employment action." *Joseph v. Marco Polo Network, Inc.*, 2010 WL 4513298, at *18 (S.D.N.Y. Nov. 10, 2010) (collecting authorities).

Notably, every witness involved in Plaintiff's termination process consistently described the same legitimate, non-retaliatory reason for his termination: insubordinate conduct and an unprofessional outburst directed towards his supervisor:

| Boughton | "[Plaintiff] was insubordinate to his manager and he was terminated for that." (Ex. 7, Boughton Tr. 75:13-14; *see also id.* 44:14-46:5, 62:18-23 (describing making decision to terminate Plaintiff after he "blew up at [Ms. Japaridze]" when she checked in with him the day after his nonattendance).) |
|---|---|
| Japaridze | "My understanding is [FNN decided to terminate Plaintiff] because he conducted himself in a very unprofessional manner with multiple people, including myself." (Ex. 6, Japaridze Tr. 90:11-90:15.) |
| Campa | "Jason Donner was terminated because of the insubordinate behaviors that he exhibited towards his manager, NuNu Japaridze, the day before his separation." (Ex. 10, Campa Tr. 102:7-102:14.) |

Moreover, when Mr. Boughton made the decision to terminate Plaintiff for insubordination, he did so against the backdrop of Plaintiff's history of workplace outbursts and unprofessional conduct. Indeed, Ms. Campa's contemporaneous written correspondence specifically noted that, quite apart from Plaintiff's "extremely disrespectful, insubordinate" call with Ms. Japaridze, Plaintiff's "colleagues ha[d] expressed concerns about [him] contributing to a 'toxic work environment'" and "yelling at them." (Ex. 8, FNN_0000560-61.).[8]  Coworkers also complained that they could not rely on Plaintiff because he "[doesn't] always join calls, [he] [is]

---

[8] Where, as here, "third-party statements concerning the plaintiff's performance are offered . . . as an explanation of why [the employer] believed that terminating the plaintiff's employment . . . was necessary and appropriate," the statements are "not inadmissible hearsay." *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 507 F. Supp. 2d 93, 99 n. 10 (D.D.C. 2007), *aff'd*, 548 F.3d 137 (D.C. Cir. 2008).

often late or leave[s] work early or need[s] to be talked into certain assignments by . . . peers." *Id.* Likewise, when Ms. Campa notified her own supervisor in Human Resources of the termination, she explained that one of Plaintiff's colleagues reported that Plaintiff "is unreliable, not dependable, and creates an uncomfortable environment as he has 'blow ups' and treats [his] Capitol Hill colleagues rudely and disrespectfully"; that Plaintiff "comes in late and leaves early quite often"; and that the individual sharing this information with Ms. Campa—a "high performing producer"—had "applied to other FOX News jobs in hopes to get out of this uncomfortable environment." (Ex. 27, FNN_0000469; Ex. 10, Campa Tr. 87:16-18.)

Mr. Boughton, who made the ultimate termination decision, also specifically testified that Plaintiff having missed work on Monday, September 26, 2022, was "not a factor" in the decision to terminate him. (Ex. 7, Boughton Tr. 75:2-3; *see also id.* 83:18-83:22 (Plaintiff's absence on Monday, September 26, 2022, was not the reason FNN terminated him); Ex. 6, Japaridze Tr. 78:20-78:23 ("[H]e was definitely not fired for taking a sick day.").) The decision was based on how Plaintiff treated his supervisor and others.

At the motion to dismiss stage, Plaintiff's claim survived based on his allegation that Mr. Boughton told Plaintiff that he was being fired because he had been "'late for work and did not show up for work.'" *Donner v. Fox News Network, LLC*, 2024 WL 1758689, at *12 (D.D.C. Apr. 24, 2024) (quoting Am. Compl. ¶ 35). Accepting Plaintiff's allegation as true and drawing all inferences in his favor, Judge Cooper reasoned that Mr. Boughton might have been "referring to Donner calling in sick that Monday" and "latch[ing] onto an impermissible reason." *Id.* at *13. Now, however, after hundreds of pages of discovery exchanged and six depositions taken, the undisputed evidence shows that Plaintiff was not fired because he took sick leave or because he missed work on Monday, September 26, but rather because of what occurred on his Tuesday,

September 27, telephone call with his supervisor coupled with his past treatment of his coworkers.

Notably, Plaintiff's deposition testimony reveals that he exhibited a lack of candor in his complaint concerning the reasons FNN gave for firing him during his termination meeting. That is, once Plaintiff was under oath at his deposition, he testified that he recalls hearing approximately half a dozen reasons for the separation and acknowledged that there may well be others that he cannot specifically remember. For example, Plaintiff now concedes that FNN told him it had received reports that he "wasn't doing [his] job or . . . was late," that he "do[es]n't always join calls," and that his colleagues had "expressed concern" about his "outbursts, including yelling at them." (Ex. 1, J. Donner Tr. 287:8-12, 307:10-308:13, 309:21-310:12.)[9] Plaintiff also testified that FNN "could have" told him that he was being terminated because (i) he was "disrespectful and [in]subordinate to [his] supervisor," specifically with respect to "how [he] had acted towards [Ms. Japaridze] in [their September 27] conversation," and (ii) that Plaintiff was "contributing to a toxic work environment." (Ex. 1, J. Donner Tr. 306:15-309:18.) By contrast, he admitted that no one from FNN ever actually told him that he was "being terminated because [he] took sick leave" or "because [he] missed work on Monday, September 26, 2022." (Ex. 1, J. Donner Tr. 304:18-305:6, 305:20-306:6.) Plaintiff omitted all of that from his complaint, but he cannot ignore it now.

---

[9] Even putting aside the undisputed evidence and accepting Plaintiff's (incomplete) allegation that Mr. Boughton told Plaintiff he was being fired because he had been "late for work and did not show up for work," (Am. Compl. ¶ 35; *see also* Ex. 1, J. Donner Tr. 16:10-19 (testifying that to hearing at least six different reasons in his termination meeting)), Plaintiff admits that "on September 26, 2022, [he] did not show up to work late"—instead, he did not show up for work at all. (Ex. 21, Pl.'s Answer to FNN RFA 18.) By contrast, Plaintiff concedes that "there may have been instances where Plaintiff was late for a 'beat call' or a work-related event." (Ex. 21, Pl.'s Answer to FNN RFA 19.) Thus, even under Plaintiff's theory of the case, ignoring all of the other evidence, he cannot as a matter of logic, establish that his absence on September 26, 2022, was a "but for" cause of his termination.

Despite the close temporal proximity between Plaintiff's sick day and his termination, multiple intervening events do not permit any reasonable inference that FNN let him go *because of* that absence.  Plaintiff's interactions with his supervisor *both* on September 26, when she offered him an extra sick day, and September 27, when he called her a "lousy manager," represent "intervening unprotected conduct [that] erode[] any causal connection that [otherwise could be] suggested by the temporal proximity of his protected conduct and his termination." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (affirming summary judgment).  Indeed, prior to Plaintiff "g[etting] into it" with his supervisor on the evening of Tuesday, September 27, (Ex. 17, Plaintiff000203-207 at 206; Ex. 21, Pl.'s Answer to FNN RFA 4; Ex. 1, J. Donner Tr. 288:12-289:5), it is undisputed that Ms. Japaridze never even thought about terminating Plaintiff.  (Ex. 6, Japaridze Tr. 90:23-91:3.)  Courts routinely hold the inference of retaliation to be unreasonable when intervening conduct is a clear basis for termination.  *See, e.g.*, *Feldman v. L. Enf't Assocs. Corp.*, 752 F.3d 339, 349 (4th Cir. 2014) (plaintiff's "conduct in meetings," including calling directors "basically worthless," "constitute[d] a legitimate intervening event" that severed causal connection); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 792 (8th Cir. 2014) (workplace safety violation between protected activity and disciplinary action qualified as intervening event); *Sussberg v. K-Mart Holding Corp.*, 463 F. Supp. 2d 704, 715 (E.D. Mich. 2006) (plaintiff's "inability to get along with coworkers" qualified as an intervening event between protected activity and termination); *Joseph*, 2010 WL 4513298, at *18 (despite "ten-or-so day interval [between protected conduct and adverse action]," the "intervening security breach [by plaintiffs] breaks that causal connection"); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552 (S.D.N.Y. 2005) (violation of employer's confidentiality policies qualified as a substantial intervening event).

For all of these reasons, Plaintiff cannot show that his absence from work on Monday,

September 26, 2022, had a determinative influence on, i.e., was *the reason* for FNN's decision to terminate him.  *See Gross*, 557 U.S. at 176; *Hazen Paper Co.*, 507 U.S. at 610.

### C.    Plaintiff Has Adduced No Evidence Establishing That FNN's Asserted Basis for Terminating Him Is Pretextual

In light of FNN's legitimate, reasonable, and non-retaliatory reason for Plaintiff's termination—i.e., a verbal attack on his supervisor—the burden shifts back to Plaintiff to show, using "positive evidence beyond mere proximity," that FNN's proffered reason for his termination is pretext for "retaliation."  *George v. Molson Coors Beverage Co. USA, LLC*, 22-7111, 2023 WL 2661588, at *3 (D.C. Cir. Mar. 28, 2023) (quoting *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020)).  Nor can Plaintiff rely on his own criticisms of FNN's purported reason, or otherwise on an attempt to show that his "employer was unfair, vindictive, or otherwise unreasonable in its dealings with the plaintiff."  *Thomas v. Dist. of Columbia*, 227 F. Supp. 3d 88, 101, 104 (D.D.C. 2016).  Instead, Plaintiff "must identify evidence from which a reasonable jury could find[] that her employer's stated reasons were 'phony.'" *Id.* at 101.

Here, Plaintiff has adduced no evidence during discovery with which to meet that burden.  Indeed, aside from Plaintiff's bare, self-serving speculation that that FNN terminated him for taking sick leave (which Plaintiff himself contradicted when he told a colleague that he knew he "screwed up" with respect to how he handled his absence on Monday, September 26 (Ex. 17, Plaintiff000203-207 at 206), the undisputed evidence shows the opposite.

For example, contemporaneous records confirm that, shortly after Plaintiff's telephone call with his supervisor on Tuesday, September 27, Plaintiff's supervisor emailed him stating that his conduct was unacceptable:

> Jason, it is absolutely unacceptable to raise your voice and keep yelling at your manager when I am trying to have a civilized, professional phone conversation with you.  I definitely don't deserve being called a "lousy manager", being screamed at and being hang up on.  If you don't understand why you need to give your

coworkers and your manager heads up when you don't show up for work, I honestly don't know how to make you understand it. You can NEVER talk to me or as a matter of fact to anyone at FOX like this. We will have another meeting to follow up on this unacceptable behavior.

(Ex. 22, FNN_0000417-18 at 417.)

Far from denying that his behavior was as Ms. Japaridze had just described it, Plaintiff "apologize[d] for [his] emotional reaction" and acknowledged getting "very emotional and hurt and defensive" when his supervisor criticized his efforts and work product. (Ex. 22, FNN_0000417-18.) Importantly, that email thread was immediately forwarded to and reviewed by Ms. Japaridze's supervisor, Mr. Boughton, who viewed it as "unacceptable" and made the ultimate termination decision later that evening.

The previous complaints FNN had received from Plaintiff's coworkers are likewise, here, indisputable evidence that FNN's stated reasons for termination are *not pretextual*. *See Ball v. George Wash. Univ.*, 798 Fed. Appx. 654, 656 (D.C. Cir. 2020) (close temporal proximity insufficient to rebut employer's proffered reason for discharge, given independent evidence of employee misconduct).

Moreover, it is also undisputed that: (i) no meetings about terminating Plaintiff occurred before his telephone call with Ms. Japaridze on the evening of September 27; (ii) that the termination decision occurred within an hour or two of Plaintiff's outburst, and that (iii) standard steps that Ms. Campa takes when FNN is going to terminate someone, i.e., notifying her supervisor of the impending termination, *did not occur until after 8:00 p.m. on Tuesday, September 27.*

What is more, the undisputed record demonstrates that, in Plaintiff's 12 years of employment with FNN, the company never once denied him a request to take sick time. (Ex. 1, J. Donner Tr. 266:2-7; Ex. 30, Pl's Resp. to Def's First Set of Interrogs., at 12.) Plaintiff "admit[s] that none of [his] supervisors at FNN ever told [him] that [he was] not permitted to take sick leave."

33

(Ex. 21, Pl.'s Answer to FNN RFA 10.)  Moreover, on at least one occasion earlier in 2022, FNN specifically *required* Plaintiff to take paid leave.  When Plaintiff experienced what appeared to be a mental health issue in April 2022, rather than take adverse action, FNN gave Plaintiff a leave of absence for five to six weeks through its EAP and paid him the entire time.  (Ex. 1, J. Donner Tr. 337:11-337:22, 340:9-340:17; Ex. 11, FNN_0000515.)  On top of that, more recently, in the weeks leading up to Plaintiff's termination, Plaintiff had also planned a vacation.    (Ex. 15, FNN_0000534.)  No reasonable jury could infer retaliation from the evidence in this record.

Tellingly, with the discovery process now concluded, Plaintiff still has no evidence that FNN treated his purported need for a sick day any differently in September 2022.  To the contrary, Plaintiff's supervisor went out of her way to express concern for Plaintiff while he was out and *offered an additional day of leave*.  (*See* Ex. 20, FNN_0000351-52.)  Even Plaintiff acknowledges that it seems "crazy" that FNN would suddenly change its tune the next day and decide to terminate him for taking a single day of sick leave.  (Ex. 1, J. Donner Tr. 269:15-18.)

During his deposition, Plaintiff criticized FNN for offering what he views as a less than complete explanation for terminating him.  For example, when deposed, he testified that FNN gave "no examples" during his termination meeting and that it "just seemed all contrived."  (Ex. 1, J. Donner Tr. 309:6-310:12.)  But it is well settled that employers are not required to explain their reasons for firing at-will employees, and "the fact that [the employer] offered a less than complete explanation for terminating [the employee]" does not "establish pretext."  *Thomas*, 227 F. Supp. 3d at 101.  Indeed, "[u]nder District of Columbia law, at-will employees 'may be discharged at any time and for any reason, or for no reason at all.'"  *Leyden*, 83 F. Supp. 3d at 248 (D.D.C. 2015) (Cooper, J.) (quoting *Liberatore v. Melville Corp.,* 168 F.3d 1326, 1329 (D.C. Cir. 1999)).

On this record, no reasonable jury could conclude that FNN suddenly decided to terminate

Plaintiff for a single day of sick leave after accommodating Plaintiff's other leave throughout the same year without issue. *See George*, 2023 WL 2661588, at *3 (plaintiffs cannot establish pretext with temporal proximity and instead must come forward with "positive evidence"); *Thomas*, 227 F. Supp. 3d at 109 (same).

## II.    AT THE VERY LEAST, FNN IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR LIQUIDATED AND PUNITIVE DAMAGES

### A.    Plaintiff Is Not Entitled to Liquidated Damages Under District of Columbia Law

Plaintiff has claimed that he is entitled to liquidated damages pursuant to D.C. Code § 32-1308(a)(1)(A). (Pl.'s ROG Resp. 5.) But, in a civil action brought by a former employee, that statute provides for liquidated damages only where Plaintiff establishes that his employer owes him "unpaid wages" for time actually worked. *Id.* § 32-1308(a)(1)(A)(ii). Although Plaintiff is seeking "back pay" for the time *after* he was terminated, the statute does not provide liquidated damages for "back" wages.

"Unpaid" wages and "back" wages are not the same. "Back" wages refer to wages an employee "would have received" "had [the employee] remained employed." *Sparrow v. C.I.R.*, 949 F.2d 434, 441 (D.C. Cir. 1991); *Seed v. Envtl. Prot. Agency*, 100 F.4th 257, 264 (D.C. Cir. 2024) ("A backpay award consists of 'the difference between what the employee would have earned but for the wrongful discharge and [her] actual interim earnings.'").

By contrast, "unpaid wages" are what the D.C. Code permits employees to seek "if an employer fails to timely pay *earned wages*." *Library Tavern v. Cox*, No. 2019-OWH-00020, 2021 WL 7908631, at *1 (D.C.O.A.H. Aug. 31, 2021) (Final Order) (emphasis added); *see, e.g.*, *Wright v. Office of Wage Hour*, 301 A.3d 660, 683, 670 (D.C. 2023) (partial remand to administrative court to recalculate "unpaid wages" damages so that they accounted for time petitioner had spent working as employee, where employer "fail[ed] to timely pay [petitioner] for the work . . .

35

performed as an employee"); *see also* D.C. Code § 32-1303 ("If an employer fails to pay an employee wages earned as required [elsewhere in the statute], such employer shall pay . . . as liquidated damages, 10 per centum of the unpaid wages for each working day during which such failure shall continue after the day upon which payment is hereunder required, or an amount equal to treble the unpaid wages, whichever is smaller.").

Tellingly, the enforcement provisions of the D.C. Code that reference liquidated damages in the context of the Sick Leave Act specifically distinguish between "back wages" and unpaid wages." A review of those statutes makes clear that D.C. law restricts the recovery of "liquidated damages" in private civil actions to "unpaid wages." D.C. Code § 32-1308. By contrast, a companion statutory provision to the provision Plaintiff has invoked, which governs public enforcement actions by the Attorney General for violations of the same law, expressly makes liquidated damages available for "back wages":

| D.C. Code § 32-1308. Civil Actions. | D.C. Code § 32-1306. Enforcement, records and subpoenas. |
|---|---|
| "[A] person aggrieved by a violation of . . . the Sick and Safe Leave Act . . . may bring a civil action . . . and, upon prevailing, shall be awarded …<br><br>(i)    The payment of any ***back wages*** unlawfully withheld;<br><br>(ii)    Liquidated damages equal to treble the amount of ***unpaid wages*** …." | "The Attorney General, acting in the public interest, . . . may bring a civil action in a court of competent jurisdiction against an employer or other person violating . . . the Sick and Safe Leave Act . . . . Upon prevailing in the court, the Attorney General shall be entitled to: …<br><br>(iii)    On behalf of an aggrieved employee:<br><br>    (I)    The payment of ***back wages*** unlawfully withheld;<br><br>    (II)    Additional liquidated damages equal to treble the ***back wages*** unlawfully withheld …." |

*Id.* § 32-1308(a)(1)(A)(i)-(ii); *id.* § 32-1306(a)(2)(A)(iii)(I)-(II).

Given this variation in the statutory terminology, making liquidated damages for "back

wages" available in public enforcement actions for violations of the Sick Leave Act (i.e., actions brought by the Attorney General), but not in private actions by employees for the Sick Leave Act, the Court must "presume differences in language like this convey differences in meaning." *Wis. Central Ltd. v. United States*, 585 U.S. 274, 279 (2018) (holding that "money remuneration" must mean something different from "all remuneration" when the term appears in "companion" statutes); *NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, 496 F. Supp. 3d 116, 142 (D.D.C. 2020) ("The fact that Congress used different language in the [Unfunded Mandates Reform Act] exemption suggests 'differences in meaning,' especially because 'Congress passed both statutes to handle much the same task' of excluding some advisory committees from [Federal Advisory Committee Act].").

Here, Plaintiff concedes that "FNN paid [him] wages at [his] standard rate of pay for every day that [he] w[as] employed by FNN in 2022." (Ex. 21, Pl.'s Answer to FNN RFA 13.) And Discovery confirmed that Plaintiff "receive[d] a direct deposit that . . . include[d] the wages for the days worked" through his termination, "the 2 weeks in lieu of notice, and [his] 18 days of accrued and unused vacation." (Ex. 31, FNN_0000370.)

Because has Plaintiff admits he is not claiming that "Fox owes [him] any unpaid wages," and concedes that he "received [his] final check and there's no … outstanding amount" owed, (Ex. 1, J. Donner Tr. 333:12-333:16), as well as that "FNN paid [him] wages at [his] standard rate of pay for every day that [he] [was] employed by FNN in 2022," (Ex. 21, Pl.'s Answer to FNN RFA 13), Plaintiff has no evidence of any unpaid wages. Without any "unpaid wages," there can be no liquidated damages. D.C. Code § 32-1308(a)(1)(A).

## B.    Plaintiff Cannot Recover Punitive Damages Because There Is No Evidence FNN Acted With Malice When It Fired Him for Misconduct

The Court should grant FNN summary judgment with respect to Plaintiff's prayer for

punitive damages.  "Punitive damage awards are disfavored under District of Columbia law." *Raynor v. Richardson-Merrell, Inc.*, 643 F. Supp. 238, 245 (D.D.C. 1986).  "Before punitive damages may be assessed against a corporation for the acts of its employees, a plaintiff must show 'by clear-and-convincing evidence that the [employee's] tortious acts were 'accompanied by conduct and a state of mind evincing malice or its equivalent.'" *Destefano v. Children's Nat'l Med. Ctr.*, 121 A.3d 59, 65-66 (D.C. 2015) (quotation omitted).

"To establish 'malice or its equivalent,' the plaintiff must prove two things: (1) that the employee 'acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff,' and (2) that the employee's conduct 'was outrageous, grossly fraudulent, or reckless toward the safety of the plaintiff.'" *Id.*  (quotation omitted).  When plaintiff fails to show that the alleged conduct—here the termination—was made with malice or part of a pattern of such abuse, summary judgment must be granted.  *Karaahmetoglu v. Res-Care, Inc.*, 480 F. Supp. 2d 183, 190 (D.D.C. 2007); *see also Russ v. Van Scoyoc Assocs., Inc.*, 122 F. Supp. 2d 29, 36 (D.D.C. 2000) (striking plaintiff's demand for punitive damages "[s]ince there has been no evidence presented that [anyone at employer] acted with malice or reckless indifference" to plaintiff's rights).

Even if FNN violated the D.C. Code (it did not), there is no evidence whatsoever that FNN acted with malice when it terminated Plaintiff.  *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536-377 (1999) (stating, in employment context, that "[t]here will be circumstances where intentional [conduct] does not give rise to punitive damages liability," such as when "the employer [is] simply unaware of the relevant [legal] prohibition" or when "the employer [acts] with the distinct belief that its [act] is lawful").  To the contrary, as discussed above, all of the evidence demonstrates that Mr. Boughton decided to terminate Plaintiff in response his insubordinate

outburst at his manager—part of a pattern Plaintiff's unprofessional, "toxic" behavior.

Far from exhibiting an "evil motive" or "actual malice," the day before Plaintiff's outburst, when he did not show up for work, his supervisor repeatedly checked on Plaintiff's wellbeing and reiterated that he could take an additional sick day if he needed more time to recover. Even on the day after Plaintiff skipped work, Tuesday, September 27, 2022, when Plaintiff's supervisor called him and asked that he keep her better informed going forward, the evidence shows that the point of her statements was to improve Plaintiff's performance the "*next time around*." (*See* Ex. 6, Japaridze Tr. 59:9-61:14 ("I wanted to make sure that next time around, there would have been a better way to do it. It did affect our coverage. So I just wanted to make sure he knew that if he's not up for it for whatever reason, any kind of medical reason, he can give us a heads-up, and it would just make life easier for everyone. . . . So I just wanted to make sure that he knew that in the future, if there is a way for him to notify me, that will be great."); Ex. 22, FNN_0000417-18 at 417 (email from Ms. Japaridze to Plaintiff immediately after their September 27 telephone call: "Jason, It is absolutely unacceptable to raise your voice and keep yelling at your manager when I am trying to have a civilized, professional phone conversation with you. I definitely don't deserve being called a 'lousy manager', being screamed at and being hang up on. If you don't understand why you need to give your coworkers and your manager heads up when you don't show up for work, I honestly don't know how to make you understand it. You can NEVER talk to me or as a matter of fact to anyone at FOX like this.").) And even immediately after his heated telephone call on Tuesday, September 27, 2022, Plaintiff's supervisor sent a message to FNN's human resources group, expressing that she "care[d] about [Plaintiff] but [she] can't subject anyone else to this type of outbursts." (Ex. 13, FNN_0000551-52.)

Nor is there evidence that the other FNN employees involved in the process leading to the

decision to terminate Plaintiff, i.e., Mr. Boughton and Ms. Campa, engaged in conduct with "evil motive" or "actual malice" sufficient to warrant punitive damages.  Instead, Mr. Boughton (Washington Bureau Chief) and Ms. Campa (Human Resources) responded in the evening hours to Plaintiff's supervisor reporting that the Plaintiff yelled at her in a "verbal rage" and called her a lousy manager, which she described as "actually scary."  (Ex. 26, FNN_0000553-54; Ex. 25, FNN_0000424-25.)  There was no reason to doubt the accuracy of the supervisor's report considering that Plaintiff "*apologize[d]*" to the supervisor in an email, which she forwarded to Mr. Boughton and Ms. Campa.  (Ex. 25, FNN_0000424-25.)  Plaintiff also did not state that his "emotional reaction" or "defensive[ness]" was based on Ms. Japaridze having raised concerns about Plaintiff missing work on Monday, September 26, but, rather, explained:  "So *when my work product was criticized without any examples to back it up*, I got very emotional and hurt and defensive[.]"  (*Id.* at 411 (emphasis added).)  Even today, Plaintiff acknowledges that FNN has never told him that he was not allowed to take sick leave, that he was repeatedly offered the opportunity to take additional sick leave on Tuesday, September 27, 2022, and that less than six months prior to the termination FNN had *required* him to take "approximately 5-6 weeks of paid leave."  (Ex. 21, Pl.'s Answer to FNN RFA 16; Ex. 1, J. Donner Tr. 202:10-12.)

On these facts, no reasonable jury could award Plaintiff punitive damages.  *See Robinson v. Ergo Sols., LLC*, 4 F. Supp. 3d 171, 180 (D.D.C. 2014) (holding plaintiff is "not entitled to punitive damages" when he puts on no evidence "regarding the mental state of the alleged wrongdoers"); *see also, e.g.*, *Blincow v. MillerCoors, LLC*, 2018 WL 3869162, at *5 (E.D. Cal. Aug. 15, 2018) (granting summary judgment on punitive damages for employment discrimination claim where "record raise[d] no factual disputes as to the culpable intent requirement"); *Aguirre v. Schomac Grp., Inc.*, 2005 WL 8160552, at *5 (D. Ariz. July 6, 2005) (granting summary

40

judgment on punitive damages where plaintiff "c[a]me forward with no evidence that Defendants knew that firing Plaintiff would wrongfully violate his [ ] rights").

## **CONCLUSION**

For the reasons described above, the Court should grant summary judgment for FNN on Plaintiff's sole remaining claim.  Alternatively, to the extent the case moves forward, the Court should grant summary judgment in FNN's favor with respect to the availability of liquidated and punitive damages.

Dated: June 23, 2025                    Respectfully submitted,
     Washington, D.C.

By: */s/ Vincent H. Cohen, Jr.*
Vincent H. Cohen, Jr., Esq. (Bar No. 471489)
Christina G. Sarchio, Esq. (Bar No. 456254)
D. Brett Kohlhofer, Esq. (Bar No. 1022963)
DECHERT LLP
1900 K Street, N.W.
Washington, D.C. 20006-1110
Tel: 202 261 3300
Fax: 202 261 3333
vincent.cohen@dechert.com
christina.sarchio@dechert.com
d.brett.kohlhofer@dechert.com

J. Ian Downes (*Pro Hac Vice*)
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-2000
Fax: (215) 994-2222
Ian.downes@dechert.com

*Attorneys for Defendant Fox New Network, LLC*