# EXHIBIT C

to

---

**PLAINTIFF'S OPPPOSITION TO
FOX NEWS NETWORK, LLC'S MOTION FOR SUMMARY JUDGMENT**

---

# Japaridze Deposition Excerpts

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JASON Donner,

    Plaintiff,

      vs.              CIV. NO.:  1:23-CV-03401-AHA

FOX NEWS NETWORK, LLC.,

    Defendant.

DEPOSITION OF NUNU JAPARIDZE

DATE:           April 11, 2025

TIME:           10:11 a.m. to 1:30 p.m.

LOCATION:      Videoconference-Zoom

SETTING FIRM:  Klaproth Law, PLLC

REPORTER:      Jill Saravis-Regan, Court
                 Reporter and Notary Public for
                   The State of Florida at Large

FILE:           1588932

granted?

Q. When you say "two hours," is that two hours of -- someone's start of their shift?

A. Correct.

Q. Are there circumstances in which you, as a supervisor, would deny sick leave?

MR. KOHLHOFER: Object to form.

THE WITNESS: I would never deny a sick leave.

BY MR. KLAPROTH:

Q. Why do you say that?

A. I have never ever denied a sick leave, and I'm never going to deny a sick leave. If somebody is sick, they're sick. I'm not going to force them to come to work if they're not feeling well.

Q. Do you ever ask for proof that the person is sick?

A. I don't believe I have asked for proof ever.

Q. If one of the individuals you're supervising takes sick leave and notifies you, what do you do after that?

MR. KOHLHOFER: Object to form.

THE WITNESS: I usually wish them a speedy recovery and ask them if they need anything and to let me know when they will be back.

BY MR. KLAPROTH:

Q.   Is it the policy or practice of FOX News to -- or the supervisor, then, to contact HR about someone calling in sick?

MR. KOHLHOFER:  Object to the compound question. You can answer.

THE WITNESS:  No, I don't have to contact HR if somebody is out sick.

BY MR. KLAPROTH:

Q.   So there is no requirement that you do that?

A.   There is no requirement that I do that.

Q.   Is there any requirement, after someone calls in sick, to follow up with them later that day?

A.   There is no requirement, but I usually do, to make sure they're okay and to find out if they will be back.

Q.   So that's your personal practice, then, to follow up with the employee later in the day after they call in sick?

A.   I usually do.

Q.   And how do you do that?  Do you do it by E-mail, phone, text message?

A.   It depends how they notified me.  If notification was via E-mail, I'm more likely to follow up with an E-mail.  If it was a text notification, I would just reply to the text.  So it could be phone call, E-mail, or text.

as well as your counsel.

A. Okay.

Q. And I will share my screen as well.

So you should have Exhibit No. 4 in front of you, which is FNN280 --

A. I do.

Q. -- through FNN288288.

(The document referred to was previously marked for identification as Exhibit No. 4.)

BY MR. KLAPROTH:

Q. Have you seen --

A. Yes, I have --

Q. -- this document before?

I'm sorry.

A. Sorry. Yes, I do, I see it.

Q. And have you seen this document before?

A. I have.

Q. And it says it's the Supplemental Policies for FOX News Media. Do you see that?

A. Yes.

Q. And then I highlighted the third sentence in the first paragraph that says, "In addition to FOX Corporation Employee Handbook, employees that are a part of the FOX News Media brand are also responsible for being familiar and complying with the following supplemental policies."

Do you see that?

A. I do.

Q. And then on the second page, I highlighted the section "Regular Hours of Work." Do you see that?

A. I see it on the screen, yes.

Q. And that section states, "Some employees will be regularly scheduled to work an eight-hour shift, though some may be regularly scheduled to work a longer shift. Because news is a 24-hours-a-day, 365-days-a-year business, the company must staff flexibly to handle breaking stories. As part of this exciting business, all employees have to be flexible, too. Your hours often may vary from the regular schedule --" of working hours "-- working extra hours may be required."

Do you see that?

A. I do.

Q. Has it been your experience as the director of news development that staff that you supervise will have flexible work schedules?

A. Yes, they sometimes work before their start time, or after their stop time.

Q. And what determines that, is it just the news of the day?

A. Mostly news of the day.

Q. Is there a process to determine when someone is

going to have to be flexible?  Like, for example, you know, the president issues a tariff at 8 a.m. in the morning, and you need coverage, how would that process work?

MR. KOHLHOFER:  Object to form.

You can answer.

THE WITNESS:  It's determined by the news development.  If there are things happening that are news-breaking after employees' out time, employees are usually expected to stay and cover.  The same thing applies if things are happening before their in time.  There are a lot of times that they are expected to cover that.

BY MR. KLAPROTH:

Q.   And how does that get conveyed to them?  Is there, like -- is there, like -- do you put something in "Workday" that says, you know, start time today is 7:30 a.m.; or is it just more informally, like you'd send a text message or E-mail, I need you to cover this press conference?

MR. KOHLHOFER:  Objection, compound question.

You can answer.

THE WITNESS:  There's no way to put things in "Workday" like that, so it would be just communicated to the employees.

BY MR. KLAPROTH:

Q. And is there any system to track the hours they're working, or no?

A. No.

Q. And, so, say, for example, there was a vote on the Hill that went until, like, midnight and staff had to work until midnight, is there any process for the following day that they would, you know, be able to come in late? Like, how does that work?

A. Yeah. I mean, they work out with me the schedules. I'm pretty reasonable when it comes to accommodating people. If somebody is working super late, and if I have an ability for them to start a little later in the day, I would be able to accommodate that; but there's usually communication about stuff like that. It's a news industry, so things can change. And, usually, things change; sometimes at last minute.

Q. Understood. And is there any sort of formal paperwork you do, to do that, or is it more informally, you know, you-can-come-in-at-noon-today type of communication?

A. There is no paperwork.

Q. Are you aware -- does a news producer -- would a news producer receive overtime if they worked late or additional hours beyond, say, 40 hours a week?

beginning of March, did you supervise Jason Donner prior to that?

A. I did not.

Q. Did you work with Jason Donner prior to that?

A. I did.

Q. In what capacity?

A. If I needed information from the Capitol Hill, if I needed someone on the Hill to follow up on something that I was working on, so just any way that I would work with any other producers.

Q. You completed a performance evaluation for Jason Donner, correct?

A. I did.

Q. What are the performance evaluations completed? Is there, like, a schedule or calendar? Are they completed, say, for example, the end of June of every year?

A. I believe it's different dates every year; but it's around sometime in April when it is the employee part of the evaluation. And then a supervisor part is later in April, and then it gets delivered to -- a couple of months after that.

Q. So the performance evaluation that was completed for Jason would have only been based on about two months of your supervision of him?

A.   Based on -- yeah, two months of my direct supervision.  But as I've told you, the way I do it, I base it on my own experiences and some of the feedback that I collect from people.

MR. KLAPROTH:  I'm going to show you what's marked as "Exhibit 8."  Alright, I'm going to share my screen.

(The document referred to was previously marked for identification as Exhibit No. 8.)

BY MR. KLAPROTH:

Q.   So this says -- on the top it says "Jason W. Donner," in the left-hand corner.  Then on the top right, it says "2022 Performance Review."  Do you see that?

A.   I do.

Q.   And then underneath Mr. Donner's name, it says your name next to the manager field.  Do you see that?

A.   I do.

Q.   And it says, "Evaluated by Nunu Japaridze."  Do you see that?

A.   Correct.

Q.   Is it fair to say that this is a performance evaluation in 2022 that you completed on behalf of Jason Donner?

A.   Correct.

Q.   And over here on the bottom right-hand -- or I'm

Q.   Did you report a -- to HR that you received a complaint of a toxic work environment?

A.   I made a chart of where such allegation was made.

Q.   And did HR do an investigation?

MR. KOHLHOFER:  Objection to form.

THE WITNESS:  I'm not sure.

BY MR. KLAPROTH:

Q.   Did anything come of that?

A.   Well, I did further inquiries, and I had a conversation with Jason to make him aware of some of the issues.

THE WITNESS:  I think we lost him again.

MR. KOHLHOFER:  We have you back.

MR. KLAPROTH:  Okay.

BY MR. KLAPROTH:

Q.   Did you tell Jason which what was -- specifically, who had complained about him?

A.   I did not.

Q.   Did you tell him what was said?

A.   I gave him a generic picture of what was said, yes.

Q.   Well, when you say "generic," did you tell him precisely what the complaint was?

A.   I can tell you my recollection of what I told him.  People complaining of toxic work environment, people

complaining of condescending tone, and people complaining of him being unprofessional.

Q. Did you give any examples of how he was unprofessional?

A. I did not give specific examples.

Q. Did you give an example as to how he created a toxic work environment?

A. I talked to him about the importance to talk to people in a respectful and professional way, and I did talk to him about the importance of having a calm demeanor and just being respectful to follow coworkers.

Q. And, so, my question was a little more specific. It was, did you give him an example of how he created a toxic work environment?

A. Again, to answer your question, I talked to him about the importance of being respectful to people and how -- the way he was communicating with people, and the way people felt around him. They considered it toxic.

Q. Is the answer to my question, no?

MR. KOHLHOFER: Objection, asked and answered.

THE WITNESS: I'm sorry, can you repeat the question? Answer to what question?

BY MR. KLAPROTH:

Q. Do you remember what I asked you?

A. If I gave him specific examples, I did not give

him specific examples.

Q. Thank you.

As of -- do you know when you completed this evaluation, do you have a memory?

A. Shortly after Jason did.

Q. So you -- I think you testified it may have been in April. Does that sound right?

MR. KOHLHOFER: Objection, misstates testimony. You can answer.

THE WITNESS: It was probably sometime around April, if I had to guess.

BY MR. KLAPROTH:

Q. At that point in time, did you decide to fire Jason Donner?

A. No, I did not.

Q. And there was no written warnings added to his personal file at that point in time, right?

MR. KOHLHOFER: Objection to form. You can answer.

THE WITNESS: No.

BY MR. KLAPROTH:

Q. And you did not recommend that he be put on a performance improvement plan, correct?

A. Correct.

Q. And you didn't recommend that he be suspended,

correct?

A. Correct.

MR. KLAPROTH: Why don't we take a short break at this point, just maybe five minutes. And then -- does that work for everybody?

THE WITNESS: Yes, that sounds great.

MR. KLAPROTH: Why don't we come back at, like, let's say 11:10. Does that work for everybody?

THE WITNESS: Thank you very much.

MR. KOHLHOFER: Thank you.

(Thereupon, a short break was taken.)

BY MR. KLAPROTH:

Q. Ms. Japaridze, we're back on the record. You're still under oath. Do you understand that?

A. I do.

MR. KLAPROTH: I'm going to show you what's marked as "Exhibit No. 11." So Exhibit No. 11 is FNN455 through 457.

(The document referred to was previously marked for identification as Exhibit No. 11.)

BY MR. KLAPROTH:

Q. And Ms. Japaridze, there appears to be an E-mail sent from Jason Donner on Friday, September 23, 2022. Do you see that?

A. I do.

A.  Correct.  I mean, as of Friday when Jason was sending out the note, that was his understanding, that neither Senate nor House was in session.

Q.  And what does that mean to you?  Does that mean it's going to be a slow news day, or -- you know, because if we look at Thursday, there's one, two, three, four, five, six, seven, eight, nine, nine potential events; and then on Monday, there's nothing listed.

MR. KOHLHOFER:  Object to form.

THE WITNESS:  The way it works in news, it could look as a very slow day on paper, but you never know until the day of.  So looking at that E-mail now, you can make an assumption that it will be a slower day; however, in my experience, we've had numerous days where we didn't expect to be busy, and some of the biggest, breaking news happened.

BY MR. KLAPROTH:

Q.  Gotcha.  And I guess that's the nature of the -- you know, the 24-hour news cycle, things pop up that are unanticipated, correct?

A.  Absolutely.

Q.  So on September 26, 2022, Jason Donner did come in to work, correct?

A.  Correct.

Q.  And did you speak with him at all that day?

A.   Briefly, I did.

Q.   And was it a telephone call?

A.   It was a telephone call.

Q.   And during that telephone call, he told you he wouldn't be coming in to work?

A.   My recollection of it was that I just wanted to check with him to make sure he was okay; and he seemed out of it, but, yes, he was not going to work that day.

Q.   And what do you mean "he seemed out of it"?

A.   It just seemed like he was not really in a good head space, so he asked to be off for the rest of the day.

Q.   And you understood that to be a request for sick leave?

A.   By the time I had talked to him, he had not shown up to work, so I was already checking on him to make sure that he was okay.

Q.   And, so, when he told you he wasn't going to work, you understood that to be a request for sick leave?

A.   Correct.

Q.   Did you grant that request or deny it?

A.   I granted it.  Again, just to just to clarify this, there was no formal request for a sick leave.  It was just he was not feeling well, and I told him to just take care of himself and I was glad that he was doing okay.

Q.   When you say "formal request," is there a form that has to be submitted?

A.   No, there was no E-mail request or no request prior to not showing up at work that he was going to take a sick day.

Q.   But he did communicate to you, his supervisor, that he needed a sick day, right?

A.   He did.

Q.   Do you know what time that telephone call occurred?

A.   It was after he had missed something that he was supposed to do, but I don't remember the exact time.

Q.   Do you know what he missed?

A.   There was a 10:00 event that he was supposed to cover.

Q.   Was that the McConnell event?

A.   I believe so.

Q.   And when you say he was supposed to cover it, did you send him an E-mail over the weekend requesting that he cover it?

A.   No, I did not.

Q.   So did you tell him he had to cover it?

A.   I didn't ask.

Q.   Was there any sort of record or documentation that said he had a -- that you were aware of that said he

had to cover it?

MR. KOHLHOFER: Object to form.

THE WITNESS: There was either a text or verbal communication between the producers prior to our daily 9:30 call where they usually go over who covers what. And that was the first time that people were not able to get in touch with him.

BY MR. KLAPROTH:

Q. Did anyone cover the event?

A. I think, if I remember it correctly, one of the producers picked it up.

Q. Is that standard practice if someone is out sick, that one of the coworkers or a producer would pick up one of the events?

A. It's either one of the producers on the Hill or I might send someone from the newsroom. I mean, it's -- it needs to get done regardless if the person is out. If it's something important, it needs to be done.

Q. So the answer is, yes, that's standard practice?

A. Correct.

MR. KOHLHOFER: Objection, mischaracterizes her testimony.

BY MR. KLAPROTH:

Q. After you spoke with Jason Donner, you contacted Nicolle Campa, correct?

A.   Correct.

Q.   And what was the point of that?

A.   To let her know that we were not able -- I mean, repeat your question again.  Was it after or before; what was your question?  Sorry.

Q.   Sure.  So my question was, after you spoke with Jason Donner about him not coming into work and calling in sick, you then reached out to Nicolle Campa, correct?

MR. KOHLHOFER:  Object to form.

THE WITNESS:  I updated Nicolle Campa that I had talked to Jason.

BY MR. KLAPROTH:

Q.   And Nicolle Campa is with HR, right?

A.   Correct.

Q.   And that is not standard practice after someone calls in sick, to contact HR, correct?

A.   Correct.

Q.   So why did you contact Nicolle Campa?

A.   Nicolle Campa is in charge of our mental health benefit, and she has been dealing with Jason prior to this incident about his mental health issues.  It seemed to me, from the producer who spoke to him, that he was not in a good space so I wanted to make sure that if there was follow-up necessary, Nicolle would take care of it.  It's something that Nicolle was aware of.

Q.   Did Jason Donner tell you when you spoke with him on the 26th why he needed to take a sick day?

MR. KOHLHOFER:  Object to form.

THE WITNESS:  I think he mentioned something about the booster, something about being tired.  I don't remember the exact conversation, but it was clear to me he wasn't coming to work.

BY MR. KLAPROTH:

Q.   When you say "the booster," are you referring to the COVID booster?

A.   Correct.

Q.   Later that evening on the 26th, you contacted Bryan Boughton and Nicolle Campa to let them know that Jason Donner was going to be in -- out of work the following day, is that correct?

A.   I don't remember that.

MR. KLAPROTH:  I'm showing you Exhibit 13.

Actually, before we take a look at that, let's take a look at Exhibit 12.  So you should have Exhibit No. 12 in front of you, and the Bates number is FNN544.

(The document referred to was previously marked for identification as Exhibit No. 12.)

BY MR. KLAPROTH:

Q.   This is a text message between -- or a text

message conversation between you and Nicolle Campa, correct?

A. Correct.

Q. And just for clarity on the record, the time stamps here says 12:34 p.m. Eastern Standard time. Do you see that?

A. I see -- can you read the time again?

Q. It says 12:34 p.m. Eastern Standard Time.

A. Correct.

Q. My understanding is that your lawyer has informed me that at this current time of the year in September, the Eastern Seaboard is actually on Eastern Daylight savings time, so we should add an hour to each of these times, okay? It's just the way it was produced, I suppose, but that's my understanding.

So when it says "12:34," in actuality, it was 1:34. Do you understand that?

A. I do.

Q. Okay, so the first conversation you write to Nicolle Campa, "Can you call me when you get a chance so I can update you on Jason?" Do you see that?

A. I do.

Q. You don't use his last name here, correct?

A. Correct.

Q. You had already previously spoken with Nicolle

Campa prior to this text message about Jason Donner, correct?

A.   Most likely, yes.

Q.   So what was your prior communication with Nicolle Campa about Jason Donner on September 26th?

A.   Just the fact that we were trying to get in touch with him.

Q.   So you reached out to HR to say, hey, we're trying to get in touch with Jason Donner and we can't get in touch with him?

A.   Correct.

Q.   Why would you do that?

A.   Again, Nicolle is the person in charge of the mental health services benefit, so I wanted to see if there was something on her end, maybe the therapies.  She was working with Jason.  I don't know.  She would have -- she might have more knowledge of what was going on with Jason than I would.

Q.   So is it fair to say, prior to even speaking with Jason Donner, you had reached out to HR because you had concerns that Jason Donner was having mental health issues that day?

MR. KOHLHOFER:  Objection to form.

THE WITNESS:  I did not say "mental health issues."  I just notified her that we were not able to

come up with HR before for various reasons.

BY MR. KLAPROTH:

Q.   So when you reach out to HR on September 26th, is it for disciplinary reasons because Jason -- you couldn't get in touch with him, or is it because you were concerned about his health?

A.   I'm concerned about his well-being.

Q.   So prior to speaking with Jason Donner, you were concerned about his well-being.  Is that right?

A.   Correct.

Q.   And you believed he may have been sick or having a mental health-type of issue.  Is that fair?

A.   Correct.

Q.   Is having a mental health issue, is that a valid basis to take a sick day?

A.   It is.

Q.   So looking back at this text at -- where it says 12:34 -- we understand to be 1:34 -- you write, "Can you call me when you get a chance so I can update you on Jason?"  Do you see that?

A.   I do.

Q.   Do you recall what the update was you wanted to provide to Nicolle Campa?

A.   If I had to guess, probably just the fact that I was able to talk to him, and then -- that he was okay.

Q.   And that he was taking a sick day?

A.   Well, it would have been that he was fine, that it was not anything serious.

Q.   You say nothing serious because you understood it to be some sort of complication with the COVID booster?

A.   Correct.

Q.   And it looks like you guys played phone tag a little bit, but did you eventually contact Nicolle Campa again and speak with her over the phone after this initial text message at 1:34?

A.   I don't remember.

Q.   Do you remember anything Nicolle Campa said to you on September 26, 2022?

A.   No, I don't.

Q.   At this point in time -- excuse me.

At this point in time, had you decided to fire Jason Donner?

MR. KOHLHOFER:  Objection, vague.

THE WITNESS:  I did not.

BY MR. KLAPROTH:

Q.   Were you looking for reasons the fire Jason Donner?

A.   I was not.

Q.   Were you upset that he missed work that day?

A.   I was concerned that he missed work that day.

Q.   What were you concerned about?

A.   I was concerned whether or not he was okay.

Q.   So your concern was for his well-being.  Is that right?

A.   Correct.

Q.   And you weren't upset that he missed work?

A.   No.

MR. KLAPROTH:  I want to take a quick look at Exhibit No. 13, which I referred to before.  And this is FNN353 through 354.  Just so you know, there's highlighting on these documents I'm showing you.  The highlighting is from me; it's not original to the document.

(The document referred to was previously marked for identification as Exhibit No. 13.)

BY MR. KLAPROTH:

Q.   So starting with the earliest in time E-mail, it's from you to Jason Donner, September 26th at 10:50 a.m..  Do you see that?

A.   I do.

Q.   And that's on the second page.  And in that E-mail you write, "We were worried about you because no one can get in touch with you.  Kelly jumped in to cover the 10 a.m. event.  Kelly said that she just heard from you and that you had a rough weekend.  Can you call me

down.  I'll call out sick and let her know.  I'm sorry.

Does that refresh your recollection that you spoke to Jason Donner around 11:40 or so on September 26th?

MR. KOHLHOFER:  Object to form.

THE WITNESS:  I don't know what time I spoke to him.

BY MR. KLAPROTH:

Q.  Okay, so you have no specific memory as to what time?

A.  No, I don't.

Q.  Looking back at Exhibit 13, your E-mail on September 26th, 4:42 p.m., I believe you testified earlier that there's no requirement or practice or policy that you follow up with a staff member after they call in sick, but you had a personal practice of following up.  Is that right?

A.  Correct.

Q.  Is that what you're doing here at 4:42, you're following up with Jason to see how he's doing?

A.  Correct, and also making sure he knows he can take next day off if he needs to.

Q.  Okay.  He responds to you at 5:20, do you see that?

A.  I do.

Q.  And then at 5:56, you forward this E-mail

conversation you had with Jason Donner, but you changed the subject to "Updating on Jason," and you forwarded it to Bryan Boughten and Nicolle Campa, correct?

A.   Correct.

Q.   Why are you updating Bryan Boughten and Nicolle Campa on Jason Donner?

A.   I'm updating them to let them know that he is fine, and he will be back to work tomorrow.

Q.   Bryan Boughton is the Washington Bureau Chief, correct?

A.   Correct.

Q.   So he's the number one person, the head honcho in the DC bureau, correct?

A.   Correct.

Q.   Is it standard practice to reach out to Bryan Boughton to provide updates when an employee calls in sick?

A.   No, it is not.

Q.   Had you had any prior communications with Bryan Boughton as of 5:56 p.m. on September 26th regarding Jason Donner?

A.   I don't remember.

Q.   As of 5:56 p.m., had you decided that you wanted to -- Jason Donner to be fired?

A.   No, I did not.  We lost you.

Q.   So at September 26, 2022 at 7:15 p.m. you forward yourself an E-mail.  Do you see that?

A.   Correct.

Q.   And then you took the subject as "Donner E-mail," do you see that?

A.   I do.

Q.   And you're forwarding yourself an E-mail conversation between you and Jason Donner that occurred on September 13, 2022.  Do you see that?

A.   I do.

Q.   Why, on the evening of September 26, 2022, are you digging up old E-mails by Jason Donner and forwarding them to yourself?

MR. KOHLHOFER:  Object to form.

You can answer if you remember.

THE WITNESS:  I don't remember.

BY MR. KLAPROTH:

Q.   Was it because you were trying to find a basis to get him fired?

A.   I don't remember.

Q.   So you have no memory or recollection why you would forward yourself this conversation on September 26, 2022, at 7:15 p.m.?

A.   Correct.

MR. KOHLHOFER:  Objection, asked and answered.

BY MR. KLAPROTH:

Q. And I think your answer was "correct." Is that right?

A. Yes, it is.

Q. Is it standard practice for you when someone calls in sick, one of your subordinates, to then go back and look for old E-mails about that person?

A. No, it is not.

Q. Is there anything significant that jumps out to you in this E-mail conversation between you and Jason Donner on September 13, 2022?

A. I would have to read it, if you could give me a minute.

Q. Yeah, please do.

A. Okay. I've read it.

Q. Is there anything significant to you that jumps out about this E-mail conversation?

MR. KOHLHOFER: Objection, vague.

THE WITNESS: Not really.

BY MR. KLAPROTH:

Q. What about where Jason Donner writes on 11:30 a.m. on September 13, 2022, "I'm sorry, but I have to respectfully disagree."

Does that have any significance to you?

A. No.

Q. When he wrote that, did you think he was being insubordinate?

A. I don't have a recollection of this -- context of it.

Q. But we can agree that on September 26, 2022 at 7:15 p.m., the day Jason Donner called in sick, you had forwarded yourself an earlier conversation with Jason Donner?

A. Correct.

Q. Were you still working at 7:15 p.m., is that part of your set hours?

A. I don't have set hours.

Q. So were you still working at this time?

A. I don't remember.

Q. When you forwarded this E-mail to yourself, would you have forwarded it to a personal E-mail address, or would it have been to your own FOX News E-mail address?

A. It could have been, I don't remember.

Q. Would you have been doing it to move it to the top of your inbox so you had it handy?

A. It could have been.

Q. So on September 27, the following day, you reached out to Bryan Boughton and Nicolle Campa for an update on Jason Donner, right?

A. Which day? I'm sorry. I think --

MR. KOHLHOFER: Object to form, the same reason.

THE WITNESS: In the part where I say, "One thing I forgot to mention," in that part, I'm referring to Jason.

BY MR. KLAPROTH:

Q. Okay, so you're referring to Jason Donner there, correct?

A. Correct.

Q. Earlier in time, at the 3:14 stamp, and when you and Nicolle Campa are talking about, she writes, "Hello available to connect? I have an update." And you responded, "sure."

Were you also referring to Jason Donner there?

A. I'm not sure. It could have been a variety of things. Jason, I mean, I don't have any recollection of talking about Jason prior to my text.

Q. Can we agree that the only third party, the only person that's being referred to in this text conversation, outside of you, Nicolle Campa and Bryan Boughton, the only third party is Jason Donner referred to in this text conversation?

A. The time stamp, 18:42:45, that refers to Jason. Anything prior to that could be about anyone. Bryan, Nicolle, and I have all kinds of conversations throughout the day on various topics and various people.

Q.   Did you discuss with Bryan Boughton and Nicolle Campa that you had planned to have a phone call with Jason Donner on September 27, to discuss his absence from work on the 26th?

A.   I don't remember.

Q.   So you have no memory of discussing a planned phone call you were going to have with Jason Donner?

A.   I don't.

Q.   You called Jason Donner on September 27, 2022, that evening, correct?

A.   Correct.

Q.   And why did you call?

A.   One, to check on him to see how he was doing; and two, to address how he can handle the same kind of situation in a better way next time.

Q.   What do you mean by that, "handle the same situation in a better way?"

A.   I wanted to talk to him that if he ever feels sick or if he feels not -- you know, in a way where he's not able to come to work, it would be best if he notifies people so we have time to rearrange things and make sure that our coverage doesn't take a hit.

I wanted to provide -- I wanted to check on him and also provide some feedback, which I often did with Jason.

Q.   So is it fair to say that you were dissatisfied

with the way he handled calling in sick?

A.   When he didn't show up for work, that wasn't something that I worried about.  I wanted to make sure that next time around, there would have been a better way to do it.  It did affect our coverage.  So I just wanted to make sure he knew that if he's not up to it for whatever reason, any kind of medical reason, he can give us a heads-up, and it would just make life easier for everyone.

Q.   What did he do wrong when he called in sick that day that needed improvement?

MR. KOHLHOFER:  Object to form.

THE WITNESS:  It wasn't improvement.  It was just making sure he was aware that if he's not feeling well, whether it's the night before or the night, you know, whatever heads-up he can give us would be super helpful.  It's just feedback.  I mean, I've had conversations about Jason, about different things.

So as a manager, it is my job to provide feedback to people on things that could be handled differently. It doesn't mean they did anything wrong; but, you know, I provide people feedback on how things can be handled and make sure that they are comfortable with knowing that they can take time off if they need to.

BY MR. KLAPROTH:

Q.   And so you said, how to do things better.  How could he have done things better, according to you?

A.   If there is a way to notify people, he can notify people.  If there is no way, there is no way.  I mean, if you're sick, you're sick.

Q.   And so my question is, what could he have done better, according to you?

A.   In general, as I said, if there is a way to notify people, I would like to be notified.  If there is no way, that is fine.  So I just wanted to make sure that he knew that in the future, if there is a way for him to notify me, that will be great.  If there is no way, that's fine as well.  But again, we started conversation that day with just making sure he was fine.

Q.   So do you agree that he notified Kelly Farras that he was calling in sick and that she notified you, right?

A.   Correct.

Q.   And we also agree that Jason Donner, you spoke with him on the phone on September 26, and he told you he wasn't going to come into work today because he wasn't feeling well, correct?

A.   Correct.

Q.   So what could he have done better, according to you?

A.   In this particular case, he did what he could do, but I just wanted to make sure that he's aware that he can take time off if he's not feeling well.  If he has time to notify people, he should notify people.  I mean, just -- again, I just wanted to have a conversation with him; A, to make sure he was okay; B, he knew what options he had.  And that was the intent of the conversation.

Q.   And so your testimony is that in this particular circumstance, he handled it appropriately in calling in sick?

A.   He did.

MR. KOHLHOFER:  Objection.

BY MR. KLAPROTH:

Q.   And what else was discussed, if anything, during that telephone call?

A.   Well, the telephone call started with me checking on him to make sure he was fine.  And then I brought up some -- I brought up how, in the future, in the -- if there is a way to notify people, it will be super helpful, because we had to scramble to rearrange things.  So as soon as I started talking about that, I noticed that Jason got really upset.

Q.   And how did you notice he got upset?

A.   He started raising his voice, he became very unprofessional, he -- I mean, he conducted the call in an

situations where he calls in sick?

A.    Just different ways of calling out sick and making sure he understands that -- what options he has when he calls out sick.

Q.    What options does he have, other than the ones he did; calling into work and then telling you?

A.    In his situation, it was fine how he handled it. If he has time to notify the supervisor that he will be out, that would be the best practice.

Q.    And you agree there's circumstances, exigent circumstances, where a person may not be able to call in sick prior to the start of their shift, right?

A.    Absolutely, yes.

Q.    And in those situations, it's acceptable to call in sick as soon as reasonably possible.  Is that fair?

A.    It is fair.

Q.    Was there anything else discussed during this phone call?

A.    It wasn't a productive discussion.  I mean, it was -- again, it got out of control as soon as I started talking about different ways of notifying people.  And, yeah, I mean, he got very defensive.  He got unprofessional.  He started yelling.  He raised his voice, and the conversation ended.  Whether he hung up or the call disconnected, I don't know, but it ended, and it was

A.  I think I forwarded the E-mail I sent to Jason, if I remember it right.

Q.  Did you have a telephone call with her, too, that evening?

A.  Yeah, I believe she called me right away.

Q.  And did you tell her during that phone call that you wanted Jason Donner fired?

A.  I did not.

Q.  What did you tell her?

A.  She called me.  She was asking if I was okay, if I was doing okay.  I told her what had happened, just filled her in on the conversation and that was it.

Q.  Did you want Jason Donner fired at that point?

A.  No, I did not.

Q.  Did you ever request that he be fired?

A.  No, I did not.

Q.  Whose decision was it to fire Jason Donner?

A.  I had a conversation with Nicolle and Bryan the same day because Bryan also separately called me to check on me.  And during that conversation, when we talked about it, we decided that at that point, after multiple instances, multiple complaints, multiple efforts to improve the situation, that was the best outcome at that point.

Q.  So it was a joint decision?

A. I don't remember who exactly; but, yeah, we all agreed on that.

Q. Did you record your conversation with Jason Donner on the 27th?

A. I did not.

Q. Did you take notes?

A. I did not.

Q. Bear with me one moment here.

When was that -- you talked about this joint decision or this agreement that Jason Donner should be terminated. When did that occur, was that the 27th, the evening after -- the same evening you spoke with Jason Donner?

MR. KOHLHOFER: Objection to form, mischaracterizes testimony.

THE WITNESS: Sorry. I was listening to you. Can you repeat the question?

BY MR. KLAPROTH:

Q. Sure. You mentioned that you had this conversation with Nicolle Campa and Bryan Boughton where it was decided that Jason Donner should be fired. Was that the evening of the 27th?

A. Yes, it was the same evening that I had a conversation with Jason.

Q. And there was a plan to schedule a meeting for the 28th to do this firing, right?