## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JASON DONNER,

        Plaintiff,

v.

FOX NEWS NETWORK, LLC, a Delaware
Limited Liability Company,

        Defendant.

1:23-cv-03401-AHA

ORAL ARGUMENT REQUESTED

## DEFENDANT FOX NEWS NETWORK, LLC'S
## REPLY IN FURTHER SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................................... 1

ARGUMENT .............................................................................................................................. 2

I.     PLAINTIFF FAILS TO RAISE A GENUINE ISSUE OF FACT SUPPORTING HIS
CLAIM THAT THE SICK LEAVE ACT PROTECTS HIS ABSENCE FROM WORK
BECAUSE HE DID NOT REQUEST LEAVE AS SOON AS POSSIBLE ....................... 2

II.    PLAINTIFF FAILS TO RAISE ANY GENUINE ISSUE OF FACT SUPPORTING HIS
CLAIM THAT FNN FIRED HIM "BECAUSE" HE TOOK SICK LEAVE .................... 6

    A.    The Undisputed Facts Show That FNN Did Not Retaliate Against Plaintiff.......... 6

    B.    Plaintiff Has Not Advanced "Direct Evidence" of Retaliation ................................ 8

    C.    Plaintiff Cannot Establish Prima Facie Retaliation Based on the Timing of His
Termination ......................................................................................................... 10

    D.    Even if Plaintiff Has Established *Prima Facie* Retaliation, He Has Not Met His
Burden to Demonstrate That Each Basis FNN Asserted For Terminating Him Was
Pretextual ............................................................................................................ 12

         1.    Plaintiff Has Not Shown That His Unprofessional, Insubordinate Conduct
Toward His Manager Was a "Phony" Reason for Firing Him ................. 13

         2.    Plaintiff Has Not Shown That the Parallels Between What His Manager
Experienced When They "Got Into It" and What Other Employees Had
Said About Plaintiff's Conduct Was a "Phony" Reason for Firing Him... 17

         3.    Plaintiff Cannot Show Pretext by Attacking a Basis for His Termination
That FNN Has Not Asserted ................................................................... 19

    E.    Plaintiff Was Required To, And Has Not, Adduced Evidence from Which a
Reasonable Jury Could Find That One Day of Leave Was the "But For" Cause For
His Termination.................................................................................................... 19

III.   PLAINTIFF FAILS TO ESTABLISH ANY BASIS FOR LIQUIDATED OR PUNITIVE
DAMAGES................................................................................................................... 21

    A.    Plaintiff Cannot Recover Liquidated Damages Because He Has No Evidence of
"Unpaid Wages," as the D.C. Code Requires ...................................................... 21

    B.    Plaintiff Failed to Present Sufficient Evidence for Punitive Damages ................. 23

CONCLUSION........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Athridge v. Iglesias*,
  2004 WL 7345458 (D.D.C. Dec. 21, 2004)..................................................................................5

*Avco Corp. v. U.S. Dept. of Justice*,
  884 F.2d 621 (D.C. Cir. 1989).................................................................................................23

*Bankers Standard Ins. Co. v. Anand*,
  2020 WL 4698363 (D.D.C. Aug. 13, 2020) ...............................................................................5

*Bostock v. Clayton Cnty., Georgia*,
  590 U.S. 644 (2020).................................................................................................................21

*Brady v. Office of the Sergeant at Arms*,
  520 F.3d 490 (D.C. Cir. 2008).................................................................................................13

*Breen v. Chao*,
  253 F.Supp.3d 244 (D.D.C. 2017)...........................................................................................10

*Burrage v. United States*,
  571 U.S. 204 (2014).................................................................................................................21

*Carpenter v. Fed. Nat. Mortg. Ass'n*,
  174 F.3d 231 (D.C. Cir. 1999)...................................................................................12, 14, 18

*DeJesus v. WP Co. LLC*,
  841 F.3d 527 (D.C. Cir. 2016).................................................................................................13

*Destefano v. Children's Nat'l Med. Ctr.*,
  121 A.3d 59 (D.C. 2015) .........................................................................................................25

*District of Columbia v. Bryant*,
  307 A.3d 443 (D.C. 2024) .......................................................................................................20

*Edwards v. U.S. E.P.A.*,
  456 F. Supp. 2d 72 (D.D.C. 2006)...........................................................................................12

*Escamilla v. Nuyen*,
  200 F. Supp. 3d 114 (D.D.C. 2016).........................................................................................21

*Foster v. Univ. of Maryland-E. Shore*,
  787 F.3d 243 (4th Cir. 2015) ...................................................................................................17

*George v. Leavitt*,
   407 F.3d 405 (D.C. Cir. 2005) ................................................................................................ 14

*George v. Molson Coors Beverage Co. USA, LLC*,
   22-7111, 2023 WL 2661588 (D.C. Cir. Mar. 28, 2023) ........................................................... 16

*Hamilton v. Geithner*,
   666 F.3d 1344 (D.C. Cir. 2012) ................................................................................................ 11

*Hardin v. Dadlani*,
   221 F. Supp. 3d 87 (D.D.C. 2016) ............................................................................................ 25

*Harner v. USAA Gen. Indem. Co.*,
   590 F. Supp. 3d 1217 (S.D. Cal. 2022) ..................................................................................... 24

*Holcomb v. Powell*,
   433 F.3d 889 (D.C. Cir. 2006) ........................................................................................... 16, 19

*Hunter v. Sprint Corp.*,
   453 F. Supp. 2d 44 (D.D.C. 2006) ............................................................................................ 22

*Johnson v. Interstate Mgmt. Co.*,
   849 F.3d 1093 (D.C. Cir. 2017) ................................................................................................ 14

*McGrane v. Proffitt's Inc.*,
   2000 WL 34030843 (N.D. Iowa Dec. 26, 2000) ....................................................................... 25

*Mercado v. Prrc, Inc.*,
   2015 WL 6958012 (D. Conn. Nov. 10, 2015) ........................................................................... 25

*Minter v. District of Columbia*,
   809 F.3d 66 (D.C. Cir. 2015) .................................................................................................... 17

*Oviedo v. Washington Metro. Area Transit Auth.*,
   948 F.3d 386 (D.C. Cir. 2020) ............................................................................................... 8, 9

*Reese v. Park Place Condo. Homeowners Ass'n I*,
   2025 WL 885107 (D.D.C. Mar. 21, 2025) ................................................................................ 17

*Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
   507 F. Supp. 2d 93 (D.D.C. 2007), *aff'd*, 548 F.3d 137 (D.C. Cir. 2008) ................................ 18

*Said v. Nat'l R.R. Passenger Corp.*,
   317 F. Supp. 3d 304 (D.D.C. 2018), *amended for other reasons on
   reconsideration*, 390 F. Supp. 3d 46 (D.D.C. 2019), *aff'd*, 815 Fed. Appx. 561
   (D.C. Cir. 2020) ........................................................................................................................ 10

*Sims v. Dist. of Columbia*,
   33 F. Supp. 3d 1 (D.D.C. 2014) ................................................................................................8

*Slate v. Am. Broad. Companies, Inc.*,
   941 F. Supp. 2d 27 (D.D.C. 2013), *aff'd*, 584 F. App'x 2 (D.C. Cir. 2014)..............................4

*Thomas v. Dist. of Columbia*,
   227 F. Supp. 3d 88 (D.D.C. 2016) ..........................................................................................15

*Tirado v. Express Home Sols. L.L.C.*,
   2023 WL 1438404 (D.D.C. Feb. 1, 2023) ...............................................................................22

*Uhl v. Zalk Josephs Fabricators, Inc.*,
   121 F.3d 1133 (7th Cir.1997) .................................................................................................12

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013).................................................................................................................20

*Vertex Pharms. Inc. v. United States HHS*,
   774 F. Supp. 3d 211 (D.D.C. 2025)........................................................................................22

*Waggel v. George Washington Univ.*,
   957 F.3d 1364 (D.C. Cir. 2020)..............................................................................................17

*Walker v. Johnson*,
   798 F.3d 1085 (D.C. Cir. 2015)..............................................................................................20

*Woodruff v. Peters*,
   482 F.3d 521 (D.C. Cir. 2007)................................................................................................17

*Wright v. Office of Wage Hour*,
   301 A.3d 660 (D.C. 2023) ......................................................................................................22

**Statutes**

D.C. Code § 2-1402.11 ...................................................................................................................20

D.C. Code § 2-1402.61 ...................................................................................................................20

D.C. Code § 32-531.03 ................................................................................................................5, 6

D.C. Code § 32-531.12 ...................................................................................................................23

D.C. Code § 32-1303 ......................................................................................................................24

D.C. Code § 32-1306 ......................................................................................................................22

D.C. Code § 32-1308 ..........................................................................................................2, 22, 23

## INTRODUCTION

Defendant Fox News Network, LLC ("FNN") is entitled to summary judgment because Plaintiff's Opposition has not shown any genuine dispute of material fact as to whether the Sick Leave Act protects Plaintiff's failure to show up on Monday, September 26, 2022: it does not. There is no dispute that the Sick Leave Act and FNN's policy both required Plaintiff to request sick leave *as soon as possible*. (SUFR 4.)  But the undisputed record shows that Plaintiff did not notify his supervisor until approximately 11:30 a.m. on September 27—hours into the workday— that he needed to take a sick day, even though he informed his father the day before that would be absent from work. (SUFR 37.)  Plaintiff's own father confirmed at his deposition that he knew as of Sunday, September 25, 2022, that his son planned to take sick leave the next day.  Plaintiff has thus failed to satisfy a basic requirement to receive protection under the Sick Leave Act.

Even more fundamentally, no reasonable jury could find on this record that FNN decided to terminate Plaintiff "because" he took a day of sick leave.  Far from retaliating against him for taking a sick day, Plaintiff's supervisor offered him *a second day off*, which Plaintiff did not accept. FNN also produced evidence showing that it ended Plaintiff's employment because he was insubordinate to his supervisor on a call where Plaintiff himself admits that they "got into it" when he was "very emotional" and "defensive."  Plaintiff does not dispute that either this or FNN's other stated basis for termination—Plaintiff's similar pattern of conduct toward other employees— constitutes a legitimate, non-retaliatory basis for terminating him.  Nor has Plaintiff come forward with evidence that would allow a reasonable jury to find that both of FNN's reasons for termination are pretextual, that is, that *FNN itself does not believe* the reasons given (i.e., they are "phony"), *Fischbach v. Dist. of Columbia Dept. of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

Against that backdrop, Plaintiff has tried to manufacture a fact dispute by claiming that he

remembers the phone call with his supervisor differently, but not only does he ignore the documentary evidence, he ignores that the pretext analysis focuses on what FNN reasonably believed. Plaintiff cannot withstand summary judgment by mischaracterizing documents or resting on the temporal proximity between his sick day and his termination when the record shows an intervening event—Plaintiff's verbal abuse of his supervisor. The record is simply devoid of any evidence of pretext.

Even if Plaintiff's Sick Leave Act claim somehow survives summary judgment, this Court should grant judgment to FNN on Plaintiff's demand for liquidated and punitive damages. As to liquidated damages, Plaintiff does not dispute that D.C. Code § 32-1308 expressly requires evidence of "unpaid wages"—which he has no evidence are owed. As to punitive damages, he has not advanced any evidence that establishes the requisite mental state for such an award.

For the reasons set forth in FNN's Motion and below, the Motion should be granted.

## **ARGUMENT**

### I. **PLAINTIFF FAILS TO RAISE A GENUINE ISSUE OF FACT SUPPORTING HIS CLAIM THAT THE SICK LEAVE ACT PROTECTS HIS ABSENCE FROM WORK BECAUSE HE DID NOT REQUEST LEAVE AS SOON AS POSSIBLE**

Plaintiff does not genuinely dispute that he knew on Sunday, September 25, 2022, after a night out at an Elton John concert, that he would not be able to make it to work the next morning, yet he waited until at least 11:30 or 11:40 on Monday, September 26, to notify his supervisor of his planned absence. (SUFR 37.) Despite understanding in September 2022 that he was required to notify her as soon as possible if he would be out (SUFR 4; *see also* SUFR 48), as required by FNN's policy and D.C. law, Plaintiff did not inform his supervisor of his planned absence until *hours after* he had told a colleague that he "d[id not] feel like talking [on] the phone" that morning and that his "depression came back yesterday" (not that he needed a day off). (SUFR 47.) Those facts doom Plaintiff's Sick Leave Act claim—the only remaining claim in the case—because both

2

that statute and FNN's sick leave policy required him to notify his supervisor about the need for a sick day "as soon as possible" (SUFR 4; *see* D.C. Code § 32-531.03 ("as early as possible"))— which he indisputably did not do.  Plaintiff's argument that he satisfied FNN's policy by "call[ing] in sick within two hours of the start time" ignores that the policy mandates that the notice occur "as soon as possible" and in no event "later than two hours after [his] normal starting time."  (Opp. 20.)  No reasonable jury could conclude that Plaintiff called out "as soon as possible" when he gave notice to his supervisor *the day after he gave notice to his father.*

At his deposition, Plaintiff's father testified that on Sunday, September 25, 2022, Plaintiff told him that he "was going to have to call in sick the next day," "can't go into work tomorrow," and "was going to report that he couldn't make it."  (FNN Ex. 14, A. Donner Tr. 11:13-17, 103:3-104:17.)   Plaintiff attempts to explain away those case-dispositive statements in a footnote unsupported by any record evidence and speculating that his father was "clearly confused."  (Opp. 21 n.8.)  Plaintiff's efforts to add brackets and ellipses to suggest that his father meant to refer to a conversation with Plaintiff on September 18—the day before his COVID vaccination—do not create a genuine dispute of material fact.  (Opp. 21 n.8.)  Indeed, Plaintiff's revisionist history of his father's testimony cannot be squared with *several* undisputed parts of his father's deposition. For example, the father testified that Plaintiff told him that "***he was having a negative reaction to the COVID, flu shot***," and "***he said, I just can't go into work tomorrow***."  (Reply Ex. 1, A. Donner Tr. 103:2-105:18 (emphasis added).)  Based on that conversation, his father's "perception was that ***he was going to contact the office and inform that he was not going to be able to go in the next day . . . – that he had a reaction from the COVID flue – the vaccine***."  (*Id.* (emphasis added).) Thus, for a jury to accept Plaintiff's last-minute revision of his father's sworn testimony, it would have to reach the illogical conclusion that Plaintiff experienced COVID-19 vaccine symptoms

3

*before* being vaccinated. Plaintiff does not dispute that he had already received the vaccine at the time he informed his father of his planned sick day. (*See* FNN Ex. 14, A. Donner Tr. 11:13-17 ("he had had his shot").)

Plaintiff's conjecture about what his father "clearly" meant is not evidence, and it therefore cannot create a genuine dispute of fact in opposition to a motion for summary judgment. In Plaintiff's response to FNN's statement of material facts, ***he has not disputed the substance of his father's testimony***. (SUFR 37.) Nor has he attempted to address that purported confusion by, for example, submitting an errata sheet on this issue. Rather, he offers the Court nothing more than attorney argument rife with conjecture and surmise. Particularly on such a critical issue, far more is required to survive summary judgment. *See Slate v. ABC, Inc.*, 941 F. Supp. 2d 27, 44 (D.D.C. 2013) (rejecting plaintiff's "attempts to manufacture a genuine factual dispute" with "unsubstantiated allegations and assertions").

In addition to trying to contort his father's sworn testimony, Plaintiff misrepresents his supervisor's deposition to suggest he complied with the FNN policy's timing requirements. But NuNu Japaridze's testimony is not, as Plaintiff insists, "enough to defeat . . . summary judgment on this issue." (Opp. 20.). First, the testimony of Ms. Japaridze that Plaintiff relies on ***does not mention FNN's policy***. Rather, Ms. Japaridze explains that she "granted" Plaintiff's request even though he failed to submit a "formal" sick leave request and had simply failed to show for work "by the time [she] talked to [Plaintiff]." (Pl.'s Ex. C, Japaridze Tr. 38:14-25; 39:1-12.) While Ms. Japaridze was "fine" with how Plaintiff handled his sick leave request and said that she *thought* it was "appropriate[]" (*Id.* at 62:8-11, 65:5-9), at no point has she "testified unequivocally that [Plaintiff had] complied with [FNN]'s sick leave policy" (Opp. 20.), as Plaintiff suggests. To the contrary, Ms. Japaridze made clear that "[i]f he has time to notify people, he should." (Pl.'s Ex.

4

C, Japaridze Tr. 62:3-4.)  That is consistent with her contemporaneous actions at the time of the events, including calling Plaintiff the next day to "address how he can handle the same kind of situation in a better way next time."  (FNN Ex. 6, Japaridze Tr. 59:9-24.)

Beyond that, even if Plaintiff accurately recounted Ms. Japaridze's testimony, which he did not, he cannot avoid summary judgment based on an inadmissible opinion.  Indeed, "[a] lay witness may not . . . testify as to a legal conclusion"—here, that Plaintiff gave adequate notice that he needed a sick day.  *Athridge v. Iglesias*, 2004 WL 7345458, at *1 (D.D.C. Dec. 21, 2004); *Bankers Standard Ins. Co. v. Anand*, 2020 WL 4698363, at *7 (D.D.C. Aug. 13, 2020) (defendant's statement that incident "was her 'fault'" could not be used to "show that she acted negligently (because that would be an improper legal conclusion)").  Ms. Japaridze also did not have sufficient facts to form a fair opinion on this issue because no facts in the record show that she knew Plaintiff told his father he needed to take sick leave *the day before—*well before he notified Ms. Japaridze.

Separately, Plaintiff efforts to invoke the Sick Leave Act's "emergency" provision, D.C. Code § 32-531.03, fails for the same reasons outlined in FNN's Motion (and above).  He provides no evidence that would allow a jury to conclude that he experienced an "emergency" on the morning of Monday, September 26, 2022, that prevented him from calling in sick.  To the contrary, he was well enough to exchange text messages with a fellow producer that morning, (Pl.'s Ex. D, J. Donner Tr. 238:9-20; Pl.'s Ex. 17, Plaintiff000203-07)—yet simply failed to contact his supervisor, much less inform her that he needed the full day off.  Nor would the side effects Plaintiff claimed to have experienced from the COVID vaccine qualify as an emergency, because those symptoms began five to six days before he missed work (*see* Pl.'s Ex. D, J. Donner Tr. 222:14-223:10)—and he managed to summon the energy to see an Elton John concert in between.  (SUFR 36.)  Moreover, even if Plaintiff's symptoms qualified as an emergency, he did not provide

FNN notice "prior to the start of the next work shift or within 24 hours of the onset . . . whichever occurs sooner," as required by D.C. Code § 32-531.03. Indeed, by "Tuesday or Wednesday," and "probably Tuesday," of the week *before* September 26, 2022, Plaintiff's symptoms were so severe that he felt "like a freight train hit [him]" and "he "thought [he] was going to pass out." (Pl.'s Ex. D, J. Donner Tr. 222:14-223:10.) Thus, more than 100 hours elapsed between the onset and any notice to FNN, rendering Plaintiff noncompliant with the emergency provision.

For all of these reasons, Plaintiff's conduct is not protected under the Sick Leave Act

## II.    PLAINTIFF FAILS TO RAISE ANY GENUINE ISSUE OF FACT SUPPORTING HIS CLAIM THAT FNN FIRED HIM "BECAUSE" HE TOOK SICK LEAVE

### A.    The Undisputed Facts Show That FNN Did Not Retaliate Against Plaintiff

Based on Plaintiff's Opposition and the record it attaches in support, there is no genuine dispute on the following facts, which show that FNN did not retaliate against Plaintiff:

- In 12 years at FNN, no one ever told Plaintiff he could not take sick leave. (SUFR 1, 96.)

- Ms. Japaridze became Plaintiff's manager in early 2022. By March 2022, she discussed with Plaintiff at a lunch meeting that his coworkers found him toxic and had expressed concerns about his late arrivals and their difficulty reaching him during the workday.[1] Shortly thereafter, Ms. Japaridze sent a follow-up email to Plaintiff summarizing the topics they had discussed during lunch. (SUFR 9, 15, 28, 32, 33.)

- Between April and May 2022, Plaintiff took "approximately 5-6 weeks of paid leave," which was free to him as a benefit through FNN's Employee Assistance Program (EAP), which exists "[t]o help employees through difficult periods," stemming from issues including mental health concerns and the "abuse of alcohol and illegal or legally obtained drugs." Plaintiff's EAP leave in April 2022 was through a formal referral, which can occur where FNN "determines that an employee's personal issues are interfering with their job performance," with the "goal of assisting them to improving their job performance to a satisfactory level." (SUFR 20, 22, 23, 97.)

- In his 2022 Performance Review, Ms. Japaridze rated Plaintiff's "Professionalism" as "2 – Below Expectations," and, in a narrative, memorialized the above-referenced March 2022

---

[1] Plaintiff has raised several hearsay objections to out of court statements FNN advances, but these statements are not hearsay because their truth is not the issue. As set out below, the pretext inquiry focuses on what information FNN had received and believed when it decided to terminate Plaintiff.

communications.  Tellingly, Plaintiff's written response contains the following:  "There is no incentive to work hard and go above and beyond when management doesn't listen to your reporting and doesn't give you respect."  (SUFR 32, 33.)

- On Monday, September 19, 2022, Plaintiff had a COVID vaccine and worked for the rest of the week.  Then, that Saturday night, he attended an Elton John concert.  He was scheduled to work the following Monday (September 26).  But, on Sunday, September 25, Plaintiff informed his father that he "was going to have to call in sick the next day"; he "just can't go into work tomorrow"; and he "was going to report that he couldn't make it." (SUFR 34, 35, 36, 37.)

- On Monday, September 26, Plaintiff did not show up at all.  He was not "late."  (SUFR 56.)

- At 9:48 a.m., he messaged a colleague that he "d[id not] feel like talking [on] the phone" and that his "depression came back *yesterday*," i.e., Sunday, September 25.  But Plaintiff did not speak with his supervisor that day until around the "11:30, 40 time frame."  As the day went on, his supervisor reached out repeatedly, offered him information on FNN's EAP, and offered him the next day off—which Plaintiff declined.  (SUFR 47, 51, 53, 54, 55.)[2]

   - On Tuesday, September 27, Plaintiff returned to work.  In the later part of the day, Ms. Japaridze noted to Plaintiff that he had not given notice of his absence the day before.  He "got very emotional and hurt and defensive," because he perceived Ms. Japaridze was "accusing [him] again of not doing [his] work."  As he reported to a colleague the next day: "NuNu and I got into it last night she accused me of not doing my job without any evidence when asked for it and I told her I won't speak with her without HR present anymore. . . .  I know I screwed up on Monday and overslept and exhausted and that was fair.  But she said I don't do my work all the time."  (SUFR 57, 58, 59, 69, 71, 72.)

   - Ms. Japaridze alerted Bryan Boughton (her supervisor) and Nicolle Campa (FNN HR) of her call with Plaintiff and forwarded Mr. Boughton a copy of her email memorializing the call.  Ms. Japaridze also texted Ms. Campa this contemporaneous description of her call with Plaintiff:  "When I mentioned about the need to be on time or give us heads up he starting yelling[.]  Got triggered and started yelling.  I told him to calm down, that he was actually screaming.  He called me a lousy manager."  Ms. Japaridze described the interaction as "actually scary because he went on this verbal rage," and observed that Plaintiff "is in a really bad place."  FNN terminated Plaintiff the next morning.  (SUFR 66, 67, 85.)[3]

---

[2] *See also* FNN Ex. 1, J. Donner Tr. 263:9-14 (Ms. Japaridze "offered [Plaintiff] to take the [following] day off"); FNN Ex. 19, FNN_0000353-54 (Plaintiff stated he would "rather come to work"); FNN Ex. 20, FNN_0000351-52 (Ms. Japaridze stated she "would rather [Plaintiff] come back to work when he is in a better place" and attached EAP information).

[3] *See also* FNN Ex. 7, Boughton Tr. 45:19-24.

**B.**    **Plaintiff Has Not Advanced "Direct Evidence" of Retaliation**

Although Plaintiff contends he has "direct evidence" that FNN retaliated against him for taking sick leave such that it is "sufficient on its own to entitle [him] to a jury trial," a closer look at the evidence cited—and the underlying undisputed facts—shows otherwise.    (Opp. 22.) Plaintiff acknowledges that evidence is not "direct" unless it "proves the particular fact in question *without any need for inference*."  *Id.* (quoting *Sims v. Dist. of Columbia*, 33 F. Supp. 3d 1, 9 (D.D.C. 2014)).  Cases involving "direct evidence" are "rare," *Sims*, 33 F. Supp. 3d at 9.  Here, Plaintiff could not find one case supporting his contention that what he advances is "direct" and "sufficient on its own for a jury trial."  *Oviedo v. Washington Metro. Area Transit Auth.*, 948 F.3d 386, 394 (D.C. Cir. 2020).  As in the cases that Plaintiff cites, no evidence in this case, if believed by a jury, would outright prove that FNN retaliated against Plaintiff for taking sick leave on September 26, 2022, "without the need for [an] inference."  *Sims*, 33 F. Supp. 3d at 9.  Most favorably to Plaintiff, the evidence he calls "direct" would all require (at least) one inference:

***Talking Points Document.***    The email containing proposed talking points for Plaintiff's termination meeting cannot, without an inference, establish retaliation.  First, the talking points, particularly the first three bullets (which are the three he relies on), were prepared by Nicolle Campa from Human Resources, who undisputedly did not make the termination decision.  (SUFR 73.)  *See Oviedo*, 948 F.3d at 395 (non-decisionmaker's statements could not be "direct evidence" of decisionmaker's discrimination).  Second, none of these three bullets indicates that Plaintiff's absence on September 26 was even *a factor* in the termination—let alone its "but for" cause.  By contrast, the one bullet that calls Plaintiff's behavior "totally unacceptable" and "not behavior that is tolerated" refers to his verbal abuse of his supervisor when she called him to discuss, *inter alia*, proper procedures for taking a sick day—exactly the rationale FNN has given for this termination. (FNN Ex. 8, FNN_0000560 ("even more problematic, when you and NuNu spoke last night, you

were extremely disrespectful, insubordinate, and hung up the phone on her," which is "unacceptable" and "not behavior that is tolerated").)

*__HR/Legal Email.__*  Ms. Campa's email to the Head of HR and internal counsel does not, as Plaintiff contends, state that that Plaintiff was "terminated because 'Yesterday, Monday, [Plaintiff] did not show up to work and did not inform his manager." (Opp. 23 (quoting Ex. 19).)  The key word—*because*—appears in Plaintiff's brief, but not the sentence from which he quotes.  The fact that Plaintiff needed to add the word "because" to make his point demonstrates exactly why this so-called "evidence" is not "direct":  he needs an inference to make his desired point.

*__Testimony & Email re Plaintiff's Call with Supervisor.__*  The testimony about, and email following, the call during which Plaintiff "got into it" with his supervisor (SUFR 71; *see* FNN Ex. 22, FNN_0000417-18) similarly do not establish "direct evidence" that FNN terminated Plaintiff for taking sick leave the previous Monday.  Plaintiff does not contend, and the document cited does not demonstrate, that Plaintiff's supervisor said he was not permitted to take sick leave or that he would be terminated for doing so.  In fact, the document expressly refers to the need to "have another meeting to follow up on [his] unacceptable behavior" during the call.  (FNN Ex. 22, FNN_0000417-18.)  And Plaintiff himself has confirmed that none of his supervisors ever told him that he was not permitted to take sick leave.  (SUFR 96.)  Plaintiff's need to rely on multiple sources to argue this evidence is "direct" underscores that it is not.  "To qualify as direct evidence, a statement or remark must 'itself show bias in the employment decision.'"  *Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 322 (D.D.C. 2018) (cleaned up).[4]

*__Testimony re Termination Meeting.__*  Plaintiff's self-serving testimony regarding his

---

[4] *Amended for other reasons on reconsideration*, 390 F. Supp. 3d 46 (D.D.C. 2019), *aff'd*, 815 Fed. Appx. 561 (D.C. Cir. 2020), and *aff'd*, 815 Fed. Appx. 561 (D.C. Cir. 2020).

termination meeting does not qualify as "direct evidence" that his absence from work on September 26 was a factor, let alone a "but for" cause, of his termination. Plaintiff himself acknowledges that he was given several reasons for termination, including his own unreliability (*see also* HR/Legal email, *supra*). Plaintiff also concedes that Mr. Boughton **did not say Plaintiff was being terminated because he missed work two days prior**—that is simply what Plaintiff "figured" Mr. Boughton meant. (Pl.'s Ex. D, J. Donner Tr. 301:18-20.) Rather, given that Plaintiff recognizes there may well have been other "instances where Plaintiff was late for a 'beat call' or 'work related event'" (SUFR 92; FNN Ex. 21, Pl.'s Answer to FNN RFA 19), Plaintiff's **belief** that Mr. Boughton was specifically referring to the sick day at issue does not constitute direct evidence of retaliation. *See Said*, 317 F. Supp. 3d at 322 (remark that "[y]ou all look alike" did "not clearly refer to plaintiff's race" and thus was not "direct" because "an inference is required to conclude that [manager] was referring to the plaintiff's race, rather than" something else (cleaned up)); *Breen v. Chao*, 253 F.Supp.3d 244, 258 n.9 (D.D.C. 2017) (comments about plaintiff's age were not "direct" evidence of age discrimination as they were "subject to multiple interpretations").

For each foregoing reason, Plaintiff has not presented "direct evidence" of retaliation.

### C.    Plaintiff Cannot Establish Prima Facie Retaliation Based on the Timing of His Termination

Plaintiff has also not established *prima facie* retaliation because he has not demonstrated that the "but for" cause of his termination was retaliation for taking sick leave on September 26, 2022. Temporal proximity between his sick day and his termination is not, as Plaintiff contends, enough to establish a *prima facie* case of retaliation (Opp. 25-26), despite the undisputed evidence that (i) his supervisor's reaction to his sick leave was to offer him *additional* sick leave, and (ii) the termination decision occurred only hours after he "got into it" with his supervisor and verbally

abused her on Tuesday, September 27, 2022. (SUFR 71; *id.* 72 (quoting Pl.'s Ex. D, Donner Tr. 267:3-269:1 ("She offered me Tuesday off")); FNN Ex. 22, FNN_0000417-18; FNN Ex. 7, Boughton Tr. 38:6-10.)

The D.C. Circuit has not, as Plaintiff suggests, established a "bright-line" rule as to when temporal proximity supports an inference of causation for retaliation claims. *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012). Rather, it has held that district courts must "evaluate[] the specific facts of each case to determine whether inferring causation is appropriate." *Id.* Here, as FNN's motion established, any such inference would be unreasonable because the Court would have to ignore undisputed material facts about what happened between Plaintiff and his manager within hours of FNN's decision to terminate—a call in which Plaintiff was so "emotional" and "defensive" that he felt compelled to apologize to his manager. (SUFR 59, 64.)

Plaintiff's observation (in a footnote) that FNN relies on authorities from other jurisdictions does not support his contention that those cases are "inconsistent with *Singletary*." (Opp. 25-26.) *Singletary v. Dist. of Columbia.*, simply held that the district court erred by not accounting for certain protected activity when it concluded there was insufficient temporal proximity between protected activity and the alleged retaliatory acts. 351 F.3d 519, 524-25, 530 (D.C. Cir. 2003). In no way did that case hold that intervening conduct—here, Donner's belligerent phone call—could not sever an otherwise proper causal inference. *Id.* Plaintiff's other authorities (*see* Opp. 25-26) likewise do not hold that causation based on temporal proximity should be impervious to obviously relevant intervening events. In related contexts, the D.C. Circuit has recognized that intervening events can and do undermine inferences of causation that might otherwise be drawn based on temporality. *See, e.g.*, *Carpenter v. Fed. Nat. Mortg. Ass'n*, 174 F.3d 231, 236 (D.C. Cir. 1999) (citing authority for the proposition that "intervening satisfactory rating defeats causal link").

11

Thus, it is unsurprising that neither Plaintiff nor FNN could not find any cases in this jurisdiction rejecting the intervening cause doctrine.

Plaintiff's contention that he "does not rely upon temporal proximity alone" also does not adequately distinguish FNN's authorities because each of the bases he advances as additional support for his *prima facie* retaliation case is inextricably intertwined with the temporal inference he is implicitly seeking. For each evidentiary source he cites, Plaintiff also mischaracterizes the evidence and draws inferences that are not supportable by the record. But, regardless, as discussed in section II.D, *infra*, even if that allowed for a *prima facie* case, it comes nowhere close to establishing pretext and thus still fails.

### D. Even if Plaintiff Has Established *Prima Facie* Retaliation, He Has Not Met His Burden to Demonstrate That Each Basis FNN Asserted For Terminating Him Was Pretextual

Assuming *arguendo* that Plaintiff established *prima facie* retaliation, he still cannot show pretext—which is necessary because he does not dispute that FNN met its *McDonnell-Douglas* burden of production to offer at least one legitimate, non-retaliatory basis for the termination. (*See* Opp. 27.) *See Edwards v. U.S. E.P.A.*, 456 F. Supp. 2d 72, 94 (D.D.C. 2006) ("[I]nsubordination is firmly established as a legitimate reason that satisfies an employer's burden of production.") (collecting cases). To survive summary judgment, Plaintiff must establish that the reasons FNN gave for his termination are "phony," and he cannot rest solely on the temporal proximity between his sick day and his termination. (Mot. 32–35.) Here, however, Plaintiff has failed to "cast doubt" on either—much less both—of FNN's asserted reasons for firing him. *See DeJesus v. WP Co. LLC*, 841 F.3d 527, 533 (D.C. Cir. 2016). Plaintiff does not offer genuine support for his contention that FNN cannot "keep its story straight," (Opp. 27), and, in fact, his arguments boil down to little more than unsupported speculation, mischaracterizations of the record, and reliance on temporal inferences. Because FNN's stated reasons for terminating plaintiff are "reasonable in

light of the evidence," there is "no basis for permitting [this case to see a] jury." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).

### 1. *Plaintiff Has Not Shown That His Unprofessional, Insubordinate Conduct Toward His Manager Was a "Phony" Reason for Firing Him*

Plaintiff cannot, as he attempts (Opp. 28), establish pretext by disputing the details of the phone call when he undisputedly "got into it" with his supervisor, (SUFR 71)—including whether he thinks he went into a "verbal rage"; what exactly he remembers calling her; or whether he thinks he "raised his voice." Rather, at this stage, an "employer prevails if it 'honestly believes in the reasons it offers.'" *Brady*, 520 F.3d at 495; *Fischbach v. District of Columbia Dept. of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

Plaintiff's Opposition does not change the indisputable, contemporaneous evidence showing the sincerity of Ms. Japaridze's belief that Plaintiff was insubordinate. (*E.g.*, FNN Ex. 22, FNN_0000417-18.) Although Plaintiff attempts to rewrite history in his Opposition brief, his own email following up on their call confirms his "defensive" and "emotional" reaction, for which he "apologized." (*Id.*) Ms. Japaridze quickly relayed her account of what happened and shared Plaintiff's email with Mr. Boughton, who decided to terminate Plaintiff in light of his inappropriate behavior toward his supervisor. (FNN Ex. 24, FNN_0000557-58.)[5]

Plaintiff certainly cannot establish a genuine fact dispute as to whether the decision of Mr. Boughton—the Washington bureau chief and Ms. Japaridze's manager—to terminate his employment was pretextual. Not even Plaintiff disputes that, after hearing Ms. Japaridze's

---

[5] Plaintiff's speculation that his supervisor was sending documents "to create a false paper trail," (Opp. 28), is not evidence that would allow a reasonable jury to infer that Ms. Japaridze did not actually believe what she wrote. *See Carpenter*, 174 F.3d at 236 (plaintiff's own inference of "retaliatory intent" from supervisor's written comments were "not . . . evidence sufficient to allow a reasonable jury to infer that [the employer's] reasons for her [performance] rating were false").

description of and reaction to Plaintiff's conduct on the September 27 call, "Mr. Boughton understood that Ms. Japaridze was 'very upset' by how Plaintiff had treated her." (SUFR 76, 79.) "Mr. Boughton believed that Plaintiff was perpetuating a pattern of 'similar behavior' to what others at FNN had reported about Plaintiff's workplace behavior and concluded that Plaintiff's lack of professionalism 'was going to continue to be a bad problem' for FNN." (SUFR 79; FNN Ex. 7, Boughton Tr. 45:21-46:2.))[6]  Accordingly, "[e]ven if [Plaintiff] had produced sufficient evidence to dispute whether the [insubordination] occurred, [he] did not provide sufficient evidence to call into question whether [FNN] 'honestly and reasonably believed' that the [insubordination] occurred." *Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1100 n.2 (D.C. Cir. 2017); *see George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false").

Plaintiff's attempt to couch his manager as the aggressor on that call is similarly pointless. "[T]he relevant question is not whether [Plaintiff had] a difficult boss who unfairly clashed with [him] but whether [he] was terminated for seeking to exercise" his rights under the Sick Leave Act. *Thomas v. Dist. of Columbia*, 227 F. Supp. 3d 88, 103 (D.D.C. 2016) ("contention that [manager] was aggressive . . . d[id] not show that [employer's] proffered, nonretaliatory reason for [his] termination [wa]s pretextual, but rather, if anything, strengthens [employer's] position [that termination was] unrelated to the FMLA").

Next, the evidence Plaintiff offers purportedly to show that Ms. Japaridze "was scheming

---

[6] While Plaintiff purports to dispute SUFR 79, the three pages of argument he has copied into the document has nothing to do the actual fact alleged—i.e., how Mr. Boughton was assessing various reports that were being made by Plaintiff's coworkers about Plaintiff and whether he reasonably thought they were going to "continue to be a bad problem for" FNN.  Accordingly, Plaintiff has not genuinely disputed this material fact.  Fed. R. Civ. P. 56(c)(1)(B).

with Campa and Boughton to fire Donner" (Opp. 28) misses the mark on several fronts.

Factually, the evidence Plaintiff cites in support of FNN's supposed "scheming" does not support that inference. For example, he repeatedly argues that FNN somehow failed to "follow company procedures or policies" in connection with his absence, but he really means that there were no policies or procedures that applied to the actions he identifies. (Opp. 28; *see* Pl.'s Ex. 3-5 (various policies and standards, none of which include a process or policy that Plaintiff contends was not followed); FNN Ex. 2-3 (same)). That fact pattern does not track any of the authorities that mention not following procedures as evidence of pretext.

In addition, while Plaintiff repeatedly suggests that, shortly after granting him sick leave, Ms. Japaridze began to collect "emails" about Plaintiff, he provides evidence of that happening once—and has no explanation for why that lone instance matters. Plaintiff speculates that Ms. Japaridze saved that email because, in the email she collected, he "pushed back on criticism he received from Japaridze regarding a news story he pitched." (Opp. 12.) But Plaintiff does not cite evidence demonstrating that the "push[] back" purportedly evidenced by this email was ever given by FNN as a basis for his termination. And, in fact, the existence of this email is entirely consistent with testimony from Ms. Japaridze that she was planning to call Plaintiff the following day to address other business issues and to offer feedback for handling the situation better "next time." (FNN Ex. 6, Japaridze Tr. 59:9-24.)

Plaintiff's observation that Mr. Boughton, Ms. Japaridze, and Ms. Campa were communicating about his absence is similarly misleading and unsupported. Indeed, the only evidence in the record about the reason for those communications is that managers and an HR employee in the FNN Washington Bureau were concerned about Plaintiff, given his history involving a multi-week EAP leave. (SUFR 20, 21, 22, 23, 55, 98.)

Similarly, Plaintiff's suggestion that the same three FNN employees communicated about him on Tuesday, September 27, *before* he "got into it" with Ms. Japaridze, has no evidentiary basis and is little more than his own speculation. For her part, Ms. Japaridze testified that she had no recollection of discussing Plaintiff that day until after their call. As to the document Plaintiff cites, Ms. Japaridze specifically testified that she routinely communicates with Mr. Boughton and Ms. Campa in the ordinary course of business about issues unrelated to Plaintiff, and Plaintiff identifies no evidence in support of his speculation that the message he identifies as evidence of pretext has anything to do with him. (*See* Pl.'s Ex. C, Japaridze Tr. 58:22-25 ("The time stamp, 18:42:45, that refers to Jason. Anything prior to that could be about anyone. Bryan, Nicolle, and I have all kinds of conversations throughout the day on various topics and various people.").) Thus, Plaintiff's contention that Ms. Japaridze was scheming "go[es] far beyond reasonable inference and into the realm of unfettered speculation." *Holcomb*, 433 F.3d at 901.

Putting aside its other problems, Plaintiff's argument is also legally flawed. "Suspicious timing," which he claims can establish pretext, is merely another way of arguing for an inference based on "temporal proximity." It is settled law, however, that "dislodging an employer's nonretaliatory explanation as pretextual . . . requires 'positive evidence beyond mere proximity.'" *George v. Molson Coors Beverage Co. USA, LLC*, 22-7111, 2023 WL 2661588, at \*3 (D.C. Cir. Mar. 28, 2023); *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020) (same); *Minter v. District of Columbia*, 809 F.3d 66, 72 (D.C. Cir. 2015) (same).

Plaintiff's cases do not alter that rule. In fact, *Reese v. Park Place Condo. Homeowners Ass'n I*, 2025 WL 885107 (D.D.C. Mar. 21, 2025), is Plaintiff's only case that even mentions "suspicious timing," and even that case does not actually decide that "suspicious timing" established pretext. Rather, there, a court merely mentioned "suspicious timing" in a list of what

16

*other jurisdictions* have said can establish pretext *in connection with Fair Housing Act discrimination cases* (which this case is not). *Id.* It has no applicability here.

Even if "suspicious timing" were legally permissible to consider (it is not), no reasonable jury could conclude on this record that FNN would provide Plaintiff roughly five to six weeks of paid leave through its EAP (SUFR 98), only then suddenly to fire him in retaliation for needing one more day for ostensibly the same reason.[7] That conclusion is further supported in light of the undisputed fact that, in this case, Plaintiff's manager offered him a second day (which he declined). Indeed, the real difference between Plaintiff's last week at FNN and his time in the EAP program was that he previously heeded the network's suggestion to get help, whereas here he declined and wound up "getting into it" on a call with his manager.[8]

> **2.    *Plaintiff Has Not Shown That the Parallels Between What His Manager Experienced When They "Got Into It" and What Other Employees Had Said About Plaintiff's Conduct Was a "Phony" Reason for Firing Him***

Plaintiff also did not establish pretext in connection with the second basis FNN gave for his termination: the similarity between his conduct on the call with his supervisor and other similar reports that other FNN employees had made earlier in 2022. Still, in a last-ditch attempt to show pretext, Plaintiff attempts to contrast statements about his toxic behavior at work with what he characterizes as a lack of prior discipline. Even so, Plaintiff does not dispute that his supervisor had a lunch meeting with him in March 2022 (the same year he was terminated) to address reports

---

[7] *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243 (4th Cir. 2015), reversed summary judgment where there was no evidence of the proffered termination reason. Here, there are several such records. (E.g., FNN Ex. 22, FNN_000417-18 (apologizing for defensive reaction)).

[8] Plaintiff argues that Mr. Boughton decided to terminate Plaintiff *before* his supervisor informed him about her September 27, 2022 call with Plaintiff—but again he misstates the evidence. He cites a text message from Mr. Boughton giving another FNN executive a "[h]eads up" about the termination at 7:38 pm EDT. (Opp. 14 (quoting Ex. 18).) But the "heads up" message plainly occurred *after* Mr. Boughton had learned about Plaintiff's outburst (7:07 pm EDT). (FNN Ex. 24.)

from Plaintiff's coworkers who found him toxic.  (*See* SUFR 15 (admitting that meeting occurred).)[9]   It is also indisputable that, after that discussion, Plaintiff received his 2022 Performance Review, which rated his "Professionalism" as "2 – Below Expectations."  (FNN Ex. 12, FNN_0000343-347 at 346.)

In any event, the fact that Plaintiff did not have a years-long record of formal discipline does not establish that FNN's decision to terminate him was pretextual.  *See Ball v. George Washington Univ.*, 2019 WL 1453358, at *13 (D.D.C. Mar. 31, 2019) ("That [plaintiff] had never been disciplined for conduct before June 23, 2015 does not make [employer's] conclusions about his conduct after June 23, 2015 pretextual."), *aff'd*, 798 Fed. Appx. 654 (D.C. Cir. 2020); *see also Carpenter*, 174 F.3d at 236 (rejecting pretext argument based on high scores in previous evaluations that, similar to here, were done by different supervisors, and collecting cases for the proposition that the "things never change" proposition in connection with employee performance reviews is "clearly without basis in reality").

Plaintiff does not dispute that FNN's Employee Handbook identifies "unprofessional conduct," "improper conduct toward a supervisor," and "insubordination" as examples of conduct that may lead to "immediate termination."  (SUFR 5.)  And Plaintiff has not identified a single FNN policy that required it to handle discipline for Plaintiff's unprofessionalism differently.  "An employer need not apply a 'progressive discipline policy' to avoid an inference of pretext, especially where, as here, an employer's written policies expressly permit it to terminate the

---

[9] Plaintiff has repeatedly objected to FNN's communications documenting his inappropriate conduct as hearsay.  But, as FNN explained in its Motion, and Plaintiff simply has ignored, where, as here, "third-party statements concerning the plaintiff's performance are offered . . . as an explanation of why [the employer] believed that terminating the plaintiff's employment . . . was necessary and appropriate," the statements are "not inadmissible hearsay."  *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 507 F. Supp. 2d 93, 99 n.10 (D.D.C. 2007), *aff'd*, 548 F.3d 137 (D.C. Cir. 2008). Such statements show FNN's state of mind when it decided to fire Plaintiff.

employee automatically for the misconduct at issue.  *Ball*, 2019 WL 1453358, at \*13 (terminated employee failed to demonstrate pretext by contending a lack of prior discipline).

### 3. *Plaintiff Cannot Show Pretext by Attacking a Basis for His Termination That FNN Has Not Asserted*

Plaintiff's additional pretext arguments lack merit because Plaintiff mistakenly focuses on a reason for his termination that FNN has never asserted.  (Opp. 28 (under heading "*First*," e.g., arguing it was pretextual for Plaintiff to have been terminated for "miss[ing] work and fail[ing] to 'follow company procedures of informing [his manager] that he was not coming in").)  While FNN agrees that he did not comply with its sick leave policy, this is not why FNN fired him.  Thus, these points cannot logically establish pretext.  *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006) (pretext inquiry focuses on "reason asserted by the employer").

### E. Plaintiff Was Required To, And Has Not, Adduced Evidence from Which a Reasonable Jury Could Find That One Day of Leave Was the "But For" Cause For His Termination

Even if Plaintiff could establish that the above-referenced reasons FNN gave for his termination were pretextual, which he has not, he still cannot demonstrate that the same evidence allows "a reasonable jury. . . not only [to] disbelieve the employer's reasons, but [to] conclude that the real reason . . . was [the allegedly] prohibited one" under the statute at issue.  *Walker v. Johnson*, 798 F.3d 1085, 1093–94 (D.C. Cir. 2015).  As FNN explained in its Motion (Mot. 25-26), Plaintiff has to establish that his use of a sick day on September 26, was *the "but for" cause* of FNN's decision to fire him, not merely one or even a "substantial" factor, as Plaintiff prefers.  (Opp. 34.)

*District of Columbia v. Bryant*, 307 A.3d 443 (D.C. 2024), does not save Plaintiff's argument.  That case did not, as he suggests, reject *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013), and hold that *all* employment retaliation claims under D.C. statutes turn on a "substantial factor" test.  (Opp. 27.)  *Bryant* focused on one DCHRA provision (D.C. Code § 2-

19

1402.61(a)) that—unlike the Title VII provision in *Nassar* and the Sick Leave Act provision here—does not use the term "because" for the causal standard. In fact, *Bryant* expressly recognized that the obvious textual differences between the provision at issue in that case and Title VII **"lead to different interpretations."** *Bryant*, 307 A.3d at 456.[10] The *Bryant* Court also emphasized that it had been influenced by "decades" of precedent, including cases decided after *Nassar*, holding that "substantial factor" was the causal standard for the DCHRA. By contrast, here, there are no D.C. Court of Appeals decisions addressing the applicable standard under this statute, and the provision here uses the exact same term ("because") as Title VII provision addressed in *Nassar*. This Court should therefore interpret "because" as the U.S. Supreme Court has done to require "but for" causation.

Plaintiff resists that conclusion because he cannot prove "but for" causation. Indeed, the Supreme Court has repeatedly explained how "but for" causation works: "a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020).

As applied here, Plaintiff's telephone call with Ms. Japaridze on Tuesday, September 27, exerted an "incremental effect" on top of the other employee complaints and became "the straw that broke the camel's back." *Burrage v. United States*, 571 U.S. 204, 211 (2014). The same cannot be said for Donner's absence earlier that week, as the record demonstrates. Indeed, Plaintiff does not dispute that when he missed work that Monday, his supervisor offered him an additional

---

[10] In *Anderson v. BDO USA, P.C.*, this District interpreted and relied on *Bryant* to assess whether a plaintiff pursuing a claim under a different local employment provision (D.C. Code § 2-1402.11(a)) had to plead "but for" causation. 2024 WL 4753761, at *4 (D.D.C. Nov. 12, 2024). There, Judge Boasberg reasoned that **the statute did not "restrict an employer from terminating an employee 'because of' her age,"** and instead used a different term to describe the required causal standard, **meaning it "d[id] not require 'but-for' causation." Id.**

day off as well as the information for the company's EAP, through which FNN had already demonstrated a willingness to allow him to take five to six weeks of paid leave. (SUFR 54-55, 98.) Nothing (beyond Plaintiff's own speculation) supports his theory that any meetings or communications about terminating him occurred prior to the call in which he admits to "got into it" with his manager and had an "emotional" and "defensive" reaction the following day. (SUFR 59, 71.) On that record, there can be little doubt which was a "but for" cause and which was not.

### III.    PLAINTIFF FAILS TO ESTABLISH ANY BASIS FOR LIQUIDATED OR PUNITIVE DAMAGES

#### A.    Plaintiff Cannot Recover Liquidated Damages Because He Has No Evidence of "Unpaid Wages," as the D.C. Code Requires

Plaintiff first asks the Court simply not to decide summary judgment on liquidated damages now. But he does not explain why—and certainly raises no genuine dispute of material fact that should delay resolution of this question. *See* Fed. R. Civ. P. 56(a). Plaintiff's only supposed support comes from two cases about a *different* "liquidated damages" remedy in the Fair Labor Standards Act (FLSA), which, unlike this case, involves a fact-intensive "good faith" exception that sometimes makes summary judgment unworkable. *Escamilla v. Nuyen*, 200 F. Supp. 3d 114, 125–26 (D.D.C. 2016) (summary judgment unavailable because of fact-intensive question about FLSA's "good faith" exemption); *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 62-63 (D.D.C. 2006) (summary judgment could "hardly be resolved at this time" because of the "present posture *of this case*" involving open issue about FLSA's "good faith" exemption to liquidated damages) (emphasis added)). Plaintiff does not articulate any comparable obstacles to summary judgment here, and the Court should reject Plaintiff's effort to skirt this issue.

While Plaintiff is correct that an aggrieved party may seek liquated damages in a suit involving the Sick Leave Act, Plaintiff glosses over FNN's argument in its Motion that liquidated damages are unavailable to Plaintiff here because, in private civil actions, liquidated damages are

available for only "unpaid wages," not "back wages," and there is no evidence that FNN owes Plaintiff any "unpaid wages." (Mot. 35-37.) Plaintiff does not dispute that—unlike D.C. Code § 32-1306, which is available only to the Attorney General—Plaintiff's basis for seeking liquidated damages is D.C. Code § 32-1308, which expressly requires "unpaid wages." Nor does Plaintiff offer evidence of (or even claim that) he is owed "unpaid wages" as the D.C. Court of Appeals has applied the term—i.e., amounts owed where an employer "fail[s] to timely [] pay for the [] work . . . performed as an employee." *Wright v. Office of Wage Hour*, 301 A.3d 660, 683, 670 (D.C. 2023); *accord Tirado v. Express Home Sols. L.L.C.*, 2023 WL 1438404, at *3 (D.D.C. Feb. 1, 2023) (similarly applying "unpaid wages" under § 32-1308(a)(1)(A)). Ultimately, none of Plaintiff's responses justifies departing from a straightforward statutory requirement.

Plaintiff then pivots to an argument about how FNN's reading of the statute would violate the canon against surplusage. Plaintiff has not identified any part of the statute that becomes "superfluous, void, or insignificant," *Vertex Pharms. Inc. v. United States HHS*, 774 F. Supp. 3d 211 (D.D.C. 2025), if § 32-1308(a)(1)(A)(ii) simply means what it says: Plaintiff may pursue "liquidated damages *equal to treble the amount of unpaid wages*." Indeed, Plaintiff does not explain why he thinks he has found "surplusage" by comparing § 32-1308(a)(1) to a different Code provision that separately authorizes the recovery of "back pay for lost wages." (Opp. 31 (quoting D.C. Code § 32-531.12)). The fact that an entirely separate part of the Code authorizes recovery of back pay has nothing to do with statutory limits that the D.C. Council placed on a plaintiff's ability to recover liquidated damages (i.e., if he can demonstrate unpaid wages). Thus, Plaintiff gives the Court no justifiable reason to read the term "unpaid wages" out of § 32-1308(a)(1)(A)(ii).

The Court also should not, as Plaintiff invites, attempt to divine "the D.C. Counsel's intent" from the report prepared by the Subcommittee on Workforce during the law's drafting process.

The single out-of-context phrase from the Subcommittee Report that Plaintiff repeatedly quotes in his Opposition is at best ambiguous. That is, the sentence Plaintiff advances is "just as consistent with" FNN's construction "as it is with [Plaintiff's]" and "[n]either the cited portions nor any other segment of the legislative history provides . . . the sort of unambiguous direction that might give [the Court] pause in following the plain words of the statute." *Avco Corp. v. U.S. Dept. of Justice*, 884 F.2d 621, 624 (D.C. Cir. 1989).

"[R]esort may be had to legislative history when a statute is ambiguous, or where the ordinary meaning would lead to absurd or futile result. But 'the plainer the language, the more convincing contrary legislative history must be.'" *Id.* at 625. Here, the most sensible reading of the 220-page Report, which is *entirely* about amending the Wage Theft Act, is that the Council was focused on wage theft (i.e., unpaid wages) and intended to clarify that terminated employees can pursue wage theft remedies when that infraction occurs in connection with a Sick Leave Act violation. Indeed, several parts of the same Report and the amended statute expressly contemplate that such violations may occur.[11]

Because there is no dispute that Plaintiff timely received his final paycheck, there is no wage theft and no unpaid wages. With no genuine dispute of material fact on this issue, the Court can enter summary judgment on this remedy.

### B.    Plaintiff Failed to Present Sufficient Evidence for Punitive Damages

Plaintiff's Opposition confirms there is no triable issue of fact concerning whether FNN acted with the requisite mental state to award punitive damages. As FNN's Motion established

---

[11] *See, e.g.*, D.C. Code § 32-1303(5) (in certain cases subcontractors must indemnify general contractor for wages, damages, etc. "owed as a result of the subcontractor's violations of [*inter alia*] the Sick and Safe Leave Act, ***unless those violations were due to the lack of prompt payment*** in accordance with [the terms of certain contracts]") (emphasis added); *see also, e.g.*, Subcommittee Report at 2 (wage theft occurs where employer "hold[s] back final paychecks").

(and Plaintiff does not dispute), punitive damages are available only where Plaintiff advances evidence that can meet a scienter-based standard ("malice or its equivalent"), which is different from the merits standard for a retaliation claim.  But Plaintiff identifies no such evidence of malice.

Plaintiff claims that four actions by FNN warrant punitive damages.  But the first three are recycled merits arguments: (1) that FNN "reprimanded Donner for taking a sick day"; (2) that FNN "create[d] a pretextual reason for Donner's termination"; and (3) that purported inconsistences exist between FNN employee testimony and "talking points" that FNN HR prepared as a reference point during Plaintiff's termination meeting. (Opp. 34.)  Liability under the Sick Leave Act claim, of course, is not enough to warrant punitive damages. *See Harner v. USAA Gen. Indem. Co.*, 590 F. Supp. 3d 1217, 1229 (S.D. Cal. 2022) ("liability and punitive damages require different standards of proof").

The last point Plaintiff advances in support of punitive damages is that he was purportedly "escort[ed] . . . out by security after his termination."  (Opp. 34.)  Plaintiff claims that this was "designed to inflict emotional distress and humiliate Donner in front of his colleagues" (Opp. 34), he but offers no support.  Nor could he.  Plaintiff never mentioned the security-guard escort when FNN asked him to "[s]tate with specificity the basis for your contention that you are entitled to punitive damages, including each and every fact and piece of evidence that you contend supports that remedy." (Pl.'s Ex. 10, Interrog. 14.)  Nor did his counsel ever ask FNN employees about why Plaintiff was escorted by security or more broadly about FNN's post-termination security practices.  There is, however, a document in the record establishing that, in light of Plaintiff's emotional outburst, Ms. Campa arranged to have security present as a "precaution."  (FNN Ex. 8, FNN_0000560-61.)

Even if Plaintiff had introduced evidence that FNN escorted Plaintiff out of the building to

embarrass him, which he has not, that would not be enough to justify punitive damages. Courts have held that "escorting a terminated employee from a place of business" does not rise to the level of outrageous conduct even if the employee considers it "humiliating." *McGrane v. Proffitt's Inc.*, 2000 WL 34030843, at *18 (N.D. Iowa Dec. 26, 2000) (granting summary judgment on claim of intentional infliction of emotional distress for failure to show outrageous conduct); *Mercado v. Prrc, Inc.*, 2015 WL 6958012, at *6 (D. Conn. Nov. 10, 2015) (distinguishing reasonable "security escort out of a building" from "a cadre of police officers that 'swarms' an employee as he arrives at work, places him in handcuffs, and puts him in a police car").

Plaintiff's legal support is similarly lacking. In *Destefano v. Children's Nat'l Med. Ctr.*, 121 A.3d 59 (D.C. 2015), the court *rejected* the demand for punitive damages, concluding that "[t]he jury *could not have lawfully assessed punitive damages*" even though the defendant forged documents in an "attempt to cover up" its negligence. *Id.* at 68 (emphasis added). And *Hardin v. Dadlani*, 221 F. Supp. 3d 87 (D.D.C. 2016), *judgment entered*, 2016 WL 11785655 (D.D.C. Nov. 8, 2016), the other case on which Plaintiff relies, involved egregious examples of racial discrimination nowhere present in this case. The court denied defendants' motion for judgment as a matter of law on the issue of punitive damages where defendant stated that he "didn't want it to be an African American staff" and instead wanted "hot, blonde, white chicks" and required job applicants to submit photographs that had the effect of disclosing their race. *Id.* No remotely similar facts exist here.

In sum, Plaintiff has not met his burden to demonstrate that there are facts in the record to support an award of punitive damages. Thus, summary judgment is required.

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion.

25

Dated: August 25, 2025
      Washington, D.C.

Respectfully submitted,

By: */s/ Vincent H. Cohen, Jr.*
Vincent H. Cohen, Jr., Esq. (Bar No. 471489)
Christina G. Sarchio, Esq. (Bar No. 456254)
D. Brett Kohlhofer, Esq. (Bar No. 1022963)
DECHERT LLP
1900 K Street, N.W.
Washington, D.C. 20006-1110
Tel: 202 261 3300
Fax: 202 261 3333
vincent.cohen@dechert.com
christina.sarchio@dechert.com
d.brett.kohlhofer@dechert.com

J. Ian Downes (*Pro Hac Vice*)
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-2000
Fax: (215) 994-2222
Ian.downes@dechert.com

*Attorneys for Defendant Fox New Network, LLC*