**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JASON DONNER,

               Plaintiff,

      v.

FOX NEWS NETWORK, LLC, a Delaware
Limited Liability Company,

               Defendant.

1:23-cv-03401-AHA

ORAL ARGUMENT REQUESTED

**FOX NEWS NETWORK, LLC'S RESPONSE TO PLAINTIFF'S**
**COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Loc. Civ. R. 7(h), Defendant Fox News

Network, LLC ("FNN"), by its undersigned counsel, submits the following response to Plaintiff

Donner's Counterstatement of Undisputed Material Facts (ECF No. 33-2):[1]

1.      Fox News is owned by Fox Corporation, a publicly traded company with

approximately $14 billion in annual revenue and $3 billion in annual profits. Fox 10-K at Plaintiff

_000121, 189 (Exhibit 24).

> **Response:** FNN objects insofar as the information concerning Fox Corporation's
> financial information is hearsay. FNN likewise objects to the statement as vague
> and ambiguous because "Fox News" is susceptible to several different meanings.
> The statement is also immaterial, for several reasons not the least of which is that
> it has absolutely nothing to do with any issue presented in the pending Motion for
> Summary Judgement.[2] Subject to the objection(s), the statement itself is also

---

[1] FNN objects to Plaintiff's bolded headings in his Counter Statement of Undisputed Facts, as
they are not factual statements but rather argumentative assertions. To the extent any response is
required, FNN disputes their accuracy and characterization, as they improperly frame the issues
in a manner that is misleading and unsupported by the record.

[2] *See also Africano v. Atrium Med. Corp.*, 2021 WL 4477867, at *3 (N.D. Ill. Sept. 30, 2021)
(finding "evidence associated with the financial status of Defendant's parent company …
irrelevant where, as here, the parent is not a named party, the parent did not participate in the
conduct giving rise to Plaintiff's claims, and Plaintiff has not demonstrated that the corporate veil
should be pierced."); *Salinas v. State Farm Fire & Cas. Co.*, 2012 WL 5187996, at *4 (S.D. Tex.

disputed.  To the extent "Fox News" means Defendant Fox News Network, LLC ("FNN"), FNN is a Delaware limited liability company, and its sole member is Fox Television Stations, LLC, another Delaware limited liability company.  *See* Notice of Removal, ECF No. 7-1 (filed Nov. 14, 2023), at ¶ 11.

2.      Fox Corporation touts Fox News as the "top-rated national cable news channel in both Monday to Friday primetime and total day viewing" and available in over 70 million homes. *Id.* at Plaintiff000076-77.

> **Response:**  FNN objects insofar as the information concerning Fox Corporation's public financial reporting is hearsay.  The statement is also immaterial.[3]  Subject to the forgoing, undisputed.

3.      Fox News hired Donner in September 2010 in the position of "Desk Assistant." Boughton Dep. 9:07-20 (Exhibit A); Donner Dep. 31:07-15 (Exhibit D); Personnel File at FNN_328 (Exhibit 1).

> **Response:**  Undisputed, but immaterial.

4.      Donner's responsibilities included "coordinat[ing] [Fox News'] coverage for the day, sending crews out, producers, things out into the field to cover events." Boughton Dep. 9:13-20; Donner Dep. 31:7-32:01.

> **Response:**  FNN objects insofar as the quoted testimony explains the "assignment desk" and not specifically Plaintiff's responsibilities. The statement is also immaterial.  Subject to the foregoing objection(s), undisputed that Plaintiff was involved in these tasks at certain points.

5.      A little more than a year after he was hired, in December 2011, Donner was promoted to "Associate Producer." Donner Dep. 32:2-22 (Ex. D).

---

Feb. 23, 2012) (explaining that "relevant financial data must be specific to the defendant, not its parent") (quotation omitted); *In re Davol, Inc./C.R. Bard, Inc. , Polypropylene Hernia Mesh Prods. Liab. Litig.*, 2021 WL 2646771, at *3 (S.D. Ohio June 28, 2021) (summarizing authority finding "evidence of the parent corporation's financial condition irrelevant to the subsidiary's ability to pay punitive damages").

[3] *See supra* note 1.

**Response:**   The statement is immaterial.  But FNN does not dispute the testimony that is being cited, which states that Plaintiff's associate-producer promotion was "possibly" around "December of 2011" and "could have been around that point."

6. And then within three years, he was promoted again to "Producer." *Id.*

**Response:**  FNN objects to the statement as vague and ambiguous because it does not give a point of reference for "within three years."  The statement is also immaterial. But FNN does not dispute that at some point Plaintiff became a producer.

7. "A Producer is someone who will go out in the field or from the bureau oversee gathering of news elements." Boughton Dep. 9:24-10:5 (Ex. A).

**Response:**  Immaterial, but undisputed.

8. In 2018, he was promoted to Capitol Hill Producer. Donner Dep. 32:16-22.

**Response:** FNN objects to the statement as vague and ambiguous as stated.  To the extent the statement refers to Plaintiff, the statement is immaterial, but undisputed.

9. His responsibilities included, "covering Capitol Hill" and news events that occurred at the Capitol. Donner Dep. 43:2146:14; Boughton Dep. 10:21-25.

**Response:** FNN objects to the statement as vague and ambiguous as stated.  To the extent the statement refers to Plaintiff, undisputed.

10. At all times, Donner worked in Washington, DC for Fox News' Washington Bureau. Personnel File at FNN_328 (Exhibit 1).

**Response:**   FNN objects to the statement as immaterial.  Subject to the foregoing, undisputed.

11. As a Capitol Hill Producer, Donner had a "flexible schedule" that was "based on events and news."  Boughton Dep. 42:05-44:07 (Ex. A).

**Response:** This statement is immaterial and incomplete.  While FNN does not dispute that Plaintiff's schedule as a Capitol Hill Producer was informed by events or news, the cited testimony does not support the proposition that Plaintiff's schedule was based on his own personal judgment with respect to "events and news" because he worked on a team and had a supervisor.  (Pl.'s Ex. A, Boughton Tr. 43:18-25 (Q.  Do you agree that Jason Donner as a Capitol Hill producer did have a flexible schedule consistent with this [referring to the Supplemental Policies

section pictured below]?  A.  Yes.  Q.  And there were no set hours?  A.  I believe they came up with hours on a regular basis and agreed who would be in at what time amongst the team, including NuNu [Japaridze].).)

12.    Indeed, Fox News' "Supplemental Policies" stated:

REGULAR HOURS OF WORK

Some employees will be regularly scheduled to work an eight-hour shift, though some may be regularly scheduled to work a longer shift. Because news is a 24-hours-a-day, 365-days-a-year business, the Company must staff flexibly to handle breaking stories. As part of this exciting business, all employees have to be flexible, too. Your hours often may vary from the regular schedule and working extra hours may be required.

Employees may be required to work extra hours or overtime based on the unpredictable demands of the news business. Employees must be willing to work to complete the job and to get the news or program on the air on time. Every effort will be made by management to be fair in the allocation of overtime work.

Fox News' Supplemental Policies at FNN_281 (Exhibit 4).

> **Response:**  Undisputed, except to the extent Plaintiff has added highlighting.

13.    And according to Donner's Supervisor, NuNu Japaridze, neither an employee's start time nor their hours would be recorded; there was no paperwork regarding an employee's scheduled hours or hours worked. Japaridze Dep. 17:21-20:22 (Ex. C).

> **Response:**  The statement, which is immaterial, is disputed as incomplete and inaccurate.  The statement does not accurately characterize Ms. Japaridze's testimony regarding scheduled start times. (Pl.'s Ex. C, Japaridze Tr. 19:15-25 ("Q. And how does that get conveyed to them?  Is there, like – do you put something in "Workday" that says, you known, start time today is 7:30 a.m.; or is it just more informally, like you'd sent a text message or E-mail, I need you to cover this press conference? [...] THE WITNESS:  There's no way to put things in "Workday" like that, so it would be just communicated to the employees.").)  Also, Plaintiff's own exhibits reflect pages of records pertaining to FNN employees' hours. (*E.g.*, Pl.'s Ex. 1 (ECF No. 33-4 at ECF page 8-9) (reflecting hours associated with Plaintiff's "Time Off Requests" for several eight-hour periods – both vacation days and sick leave – throughout calendar year 2022, including four days before his EAP leave in April 2022 and more than a dozen days after his EAP leave ended).)

14.      The staff schedules were determined by the "news of the day" and "news developments," but in the "news industry" "things can change. And, usually, things change; sometimes at last minute." *Id.*; *see also* Boughton Dep. 43:18-44:07 (Ex. A).

> **Response:**  This statement is immaterial. It is also undisputed but incomplete. (*See* Pl.'s Ex. A, Japaridze Tr. 20:5-17 (Ms. Japaridze responding to question about process for setting her staff's schedules when newsworthy events drive scheduling changes:  "Yeah.  I mean, ***they work out with me the schedules. I'm pretty reasonable when it comes to accommodating people.***  If somebody is working super late, ***and if I have an ability for them to start a little later in the day, I would be able to accommodate that; but there's usually communication about stuff like that***.  It's a news industry, so things can change.· And, usually, things change; sometimes at last minute.") (emphasis added); Pl.'s Ex. A, Boughton Tr. 43:18-25 (Q.  Do you agree that Jason Donner as a Capitol Hill producer did have a flexible schedule consistent with this [referring to the Supplemental Policies section pictured below]? A.  Yes. Q.  And there were no set hours? A.  I believe they came up with hours on a regular basis and agreed who would be in at what time amongst the team, including NuNu [Japaridze].).)

15.      Because of this, Boughton could not say when Donner's work start time was. Boughton Dep. 41:23-25.

> **Response:**  This statement is immaterial.  It is also undisputed but incomplete.  In the cited portion of Mr. Boughton's deposition transcript, he was asked (in the present tense), "[w]hat is Mr. Donner's normal starting work time," and he responded:  "I don't know that."  When asked a more precise question later in the deposition, Mr. Boughton explained that he was, in fact, "generally" aware of Mr. Donner's hours in September 2022, and, in fact, as to Monday, September 26, 2022, specifically, Mr. Boughton testified: "I know he was supposed to be at that 10:00 am event, so I would expect he would be there at least about an hour before that." (FNN's Ex. 7, Boughton Tr. 83:10-17.)

16.      Campa, the Senior Vice President of Human Resources, also did not know Donner's schedule. Campa Dep. 23:10-12 (Ex. B).

> **Response:** Immaterial, but undisputed.

17.      For Donner, that meant that "some days [he was] there at 8 a.m." and "[s]ome days [he was] there till, like, midnight." Donner Dep. 43:17-47:02 (Ex. D).

> **Response:**  Objection that the statement is vague and ambiguous because it begins with the phrase "For Donner, that meant," and it is unclear what "that" is intended

5

to mean, particularly because the preceding statement refers to the fact that FNN's Senior Vice President of HR did not know Plaintiff's comings and goings, and the statement before that refers to whether the head of FNN's Washington Bureau knew Plaintiff's schedule. Either way, the statement is immaterial. And it is disputed that Plaintiff testified that there was a connection between Ms. Campa's (or Mr. Boughton's) awareness of his schedule and the specific times he sometimes arrived and left Capitol Hill. It is, however, undisputed that, when asked to describe how his duties changed when he became a Capitol Hill Producer in 2018, Plaintiff testified that there were certain days when he arrived at 8 a.m. and others that he departed at midnight. (Pl.'s Ex. D, J. Donner Tr. 43:17-44:6.)

18.    He was "always sort of on call" and "never really had a day off," and would often work "six days a week." *Id.*

> **Response:** This statement is immaterial. It is undisputed that, when asked to describe how his duties changed when he became a Capitol Hill Producer in 2018, Plaintiff testified that he was "always sort of on call" and "never really had a day off." But it is disputed that Plaintiff never actually had a day off. (*See, e.g.*, Pl.'s Ex. 1 (ECF No. 33-4 at ECF pages 8-9) (reflecting hours associated with Plaintiff's "Time Off Requests" for several eight-hour periods – both vacation days and sick leave – throughout calendar year 2022, including four days before his EAP leave in April 2022 and more than a dozen days after his EAP leave ended).) It is also disputed that Plaintiff testified that he "'would often work 'six days a week.'" There, Plaintiff's testimony was that, because his team was "so short-staffed" in the 2017-2018 period, "there were times [he] was working six days a week." (Pl.'s Ex. D, J. Donner Tr. 43:17-44:13.)

19.    And even after he got home from work, he'd "read for a couple of hours...to make sure [he'd] ask the right questions the next day" to members of Congress. *Id.*

> **Response:** While immaterial, it is undisputed that this was part of Plaintiff's testimony at his deposition.

20.    For personnel matters, Fox News has a "progressive disciplinary" policy memorialized in its employee handbook, that included "verbal reprimands, written warning, reassessment or demotions, suspension without or without pay, and/or termination on first offense." Campa Dep. 26:13-27:18 (Ex. B); *see also* Fox News Standards of Business Conduct Policy at FNN_326 (Exhibit 5).

> **Response:** This statement is immaterial and disputed. Specifically, Ms. Campa did not testify that FNN has memorialized a "progressive disciplinary" policy in its

"employee handbook."   Rather, in the testimony from Ms. Campa cited by this statement, she discusses and characterizes part of a page from FNN's Standards of Business Conduct ("SOBC"), and describes it as a "typical progressive disciplinary action."  The excerpt of the SOBC to which she refers (which speaks for itself and is indisputable) provides as follows:  "The consequences for violating the Standards or any other FOX policy will depend on the nature and severity of the violation and can include verbal reprimands, written warnings, reassignment or demotion, suspension with or without pay, and/or termination on a first offense.  FOX will determine, in its sole and absolute discretion, what the appropriate consequences will be for any such violation."  (Pl.'s Ex. 5, FNN_0000326.)

21.    When an employee is disciplined, it is recorded in their personnel file contained in the "Workday" software. Campa Dep. 27:19-28:05 (Ex. B).

**Response:**  This statement is immaterial and disputed, as it is not supported by the testimony Plaintiff cites.  Ms. Campa did not state that all instances of discipline from all time periods are recorded in FNN's Workday software.  Rather, in the portion of Ms. Campa's deposition to which this statement refers, the transcript shows that Plaintiff's counsel first asked her if "there is a record when an employee is disciplined," but *then the question put to Ms. Campa narrowed to whether, "[in the case of] a written warning[] does it go into their file, or does it go into Workday*, something like that," and, in response to that question, Ms. Campa stated "[t]here would be a record of it," and "it would be in Workday," "Now that we have Workday," i.e., since FNN began using its Workday system.  (Pl.'s Ex. B, Campa Tr. 27:19-28:05 (emphasis added).)  In statement 21, Plaintiff does not address when written warnings would be expected to begin appearing in the Workday system.

22.    According to Fox News' records, ***Donner was never disciplined during the 12 years he worked for Fox News***. Campa Dep.  28:06-31:08 (reviewing personnel file and confirming there is no record of any disciplinary action); see also Personnel File (Exhibit 1).

**Response:** This statement is immaterial and disputed.  FNN incorporates by reference its response to statement 21, *supra*.

Ms. Campa testified that she did not identify any written warnings in the Workday file presented to her.  (Pl.'s Ex. B, Campa Tr. 30:18-31:4.)

As noted in FNN's response to statement 21, *supra* (which is incorporated by reference), the question put to Ms. Campa was narrowed, such that she was being asked to look for written warnings.  She was not asked to look for evidence that Plaintiff had "[]ever" been "disciplined during the 12 years he worked for Fox News," as statement 22 indicates.

Ostensibly, Plaintiff does not dispute that there is evidence of his termination (the basis of this lawsuit) in the Workday file or that termination qualifies as discipline. (Pl.'s Ex. 1, at FNN_0000328 (ECF No. 33-4, at ECF page 2) ("Jason Donner (Terminated)").)  Nor could Plaintiff genuinely dispute – and it is indisputable – that his Workday file contains his 2022 Performance Review, where (i) he receives a score of "2 – Needs Improvement" in the "Professionalism" competency, and (ii) his supervisor, Ms. Japaridze, memorializes a meeting between Plaintiff and his supervisor to address professionalism concerns raised to her by Plaintiff's coworkers:  "As a supervisor my highest priority is to make sure all of my team members are treated in a respectful and professional way.  On March 14th, Jason and I discussed the importance of treating coworkers professionally even when he is extremely frustrated."  (Pl.'s Ex. 1, at FNN_0000347 (ECF No. 33-4, at ECF page 37); *cf.* SUFR 15 (not disputing that the March 2022 meeting occurred).)

23.    The Washington Bureau Chief for Fox News, Bryan Boughton, further testified that he could not identify a single instance where Donner was ever disciplined, or received a verbal or written warning. Boughton Dep. 21:10-22:10 (Ex. A).

**Response:** Immaterial and disputed in part.  FNN does not dispute that Mr. Boughton testified he could not recall personally disciplining Plaintiff or that Mr. Boughton is the Washington Bureau Chief.  However, the remainder of statement 23 is disputed.  In the testimony purportedly supporting statement 23, Mr. Boughton is repeatedly asked and testifies specifically *about the supervisor Plaintiff had before Ms. Japaridze, Anita Siegfriedt*, and whether she disciplined or gave a warning to Plaintiff, not generally whether Mr. Boughton could identify a single instance where Plaintiff was ever disciplined or received a verbal or written warning.  (Pl.'s Ex. A, Boughton Tr. 21:6-22:12.)

24.    Donner also received positive annual performance reviews at Fox News. *See* 2019 Performance Review (Exhibit 6); *see* 2021 Performance Review (Exhibit 7); *see* 2022 Performance Review (Exhibit 8).

**Response:** Immaterial and disputed in part and incomplete.  Plaintiff's performance reviews, each of which contain numerical scores and narrative evaluations all speak for themselves.  In particular, FNN disputes the characterization as to Plaintiff's 2022 performance review, where he scored a "2 – Below Expectations" in his professionalism competency and where his supervisor made several narrative comments that are far from "positive."

8

25.     The purpose of the annual performance review is to create a historical record of key accomplishments, career aspirations, and performance deficiencies. Campa Dep. 40:21-44:15 (Ex. B).

> **Response:** FNN objects on the grounds that this is not a material fact. Subject to the foregoing objection, undisputed.

26.     Fox News also uses a rating system where 1 means "not meeting expectations at all, and 2 meaning needs improvement, 3 means meets expectations, 4 is exceeds expectations, and 5 is outstanding." *Id.*

> **Response:**  Undisputed.

27.     In 2019, Donner's supervisor, Anita Siegfriedt, gave Donner 4s and 5s for every category. *See* 2019 Performance Review (Exhibit 6).

> **Response:** FNN objects on the grounds that this is not a material fact and the document Plaintiff characterizes speaks for itself. Subject to the foregoing, disputed insofar as not every area of evaluation receives a numerical score.  Undisputed with respect to the categories receiving numerical scores.

28.     In 2021, Siegfriedt gave Donner 3s and 4s in every category. *See* 2021 Performance Review (Exhibit 7).

> **Response:** FNN objects on the grounds that this is not a material fact and the document Plaintiff characterizes speaks for itself. Subject to the foregoing objection, disputed insofar as not every area of evaluation receives a numerical score. (*See, e.g.*, Pl.'s Ex. 7 at FNN_0000342 (under "Development" heading: "At times Jason's decisions are not aligned with priorities set by management . . . We encourage Jason to better understand the motivations and reasons behind the priorities that management sets, and to ensure that his decisions are better aligned with the company's goals.  We encourage Jason to take a more positive approach to all assignments, management decisions and the challenges that come with the job. . . .  Jason should not hesitate to express concerns when he has them, but he should ensure that he's doing so in a manner that is positive and presents potential solutions rather than focusing solely on the problems themselves.").)  Otherwise, undisputed with respect to the categories receiving numerical scores.

29.     And in 2022, Donner's new supervisor, who had taken the helm two months prior, NuNu Japaridze, found Donner met expectations, giving him all 3s, with the exception of one

9

category where she gave him a 2. *See* 2022 Performance Review (Exhibit 8); Japaridze Dep. 24:23-25:4 (Exhibit C).

> **Response:** This statement is immaterial. It is also disputed as incomplete and inaccurate. The document Plaintiff characterizes speaks for itself. Subject to the foregoing, FNN does not dispute that Ms. Japaridze assigned Plaintiff 3s or 2 for the categories provided in his 2022 Performance review.

30.    And as discussed more fully below in Section C, this review came on the heels of Donner complaining about Japaridze and management to HR regarding Fox News' false reporting on the January 6ᵗʰ insurrection. *See* Donner Complaint to HR (Exhibit 23).

> **Response:** FNN objects to the statement's description of Plaintiff's "complaints" as hearsay. FNN also objects to the statement, which necessarily depends on the truth of FNN's news reporting, as inadmissible hearsay.[4] In addition, the document cited as the sole basis for the statement contains significant hearsay and hearsay within hearsay. Beyond that, the statement is immaterial, argumentative, and disputed. Even if it were admissible, the cited document does not support the substance of the statement for several reasons, including that the statement mischaracterizes the content of the document it relies upon and does not establish or tend to establish that Plaintiff's "review came on the heels of" this email.

31.    Despite this, Japaridze still wrote, "Jason is a hard working producer who puts long days when news developments require it... While I have only been Jason Donner's manager for a very short time, it is clear to me that Jason deeply cares about the Capitol Hill unit and his team. Jason is passionate about delivering the best production air." *See* 2022 Performance Review (Exhibit 8).

---

[4] *See Atkins v. Fischer*, 232 F.R.D. 116, 132 (D.D.C. 2005) ("[C]ourts within this Circuit have consistently barred newspaper articles from introduction as evidence due to the fact that they constitute inadmissible hearsay."); *Corner Pocket, Inc. v. Travelers Indem. Co.*, 2014 WL 657615, at *2 (W.D. Pa. Feb. 20, 2014) ("[G]enerally, newspaper articles and television programs are considered hearsay under Rule 801(c) when offered for the truth of the matter asserted and statements in newspapers by individuals other than the article's author often constitute double hearsay.") (quotation omitted).

**Response:** This statement is immaterial and the document that Plaintiff quotes with ellipses speaks for itself. But FNN does not dispute that Ms. Japaridze wrote the words that Plaintiff quotes in Paragraph 31.

32.     Donner was also never put on a performance improvement plan while employed by Fox. Campa Dep. 33:04-33:21 (Ex. B).

**Response:** Undisputed, but immaterial.

33.     And HR had never received a single complaint about Donner. Campa Dep. 53:07-53:16; Def.'s Ans. to Interrog. No. 5 (Exhibit 2).

**Response:** This statement is immaterial and disputed. First, in the testimony Plaintiff cites, Ms. Campa stated that she did not personally receive any complaints about Plaintiff in Human Resources—not that HR never received a single complaint about Plaintiff. Second, later in Ms. Campa's testimony she draws a distinction between how she had originally interpreted the meaning of the term "complaint" when it was put to her, and other discussions she did have with Plaintiff's colleagues which did not rise to the level for formal complaints but that did describe inappropriate and unprofessional behavior on the part of Plaintiff. (*See, e.g.*, FNN Ex. 10, Campa Tr. 9:9-17, 97:3-98:8 (Ms. Japaridze reported to Ms. Campa that Plaintiff had *again* been very "disruptive," including that he had been "late everyday" and that "others had to pick up" the slack); *id.* at 99:2-13 (Ms. Japaridze also reported that "this was not the first time that had happened," and passed along the names of other FNN employees who had reported similar concerns); FNN Ex. 11, FNN_0000515 (Ms. Campa's took contemporaneous notes from a call with Ms. Japaridze regarding Plaintiff's disruptive conduct).) Third, the cited interrogatory response from FNN states that Plaintiff was not placed on a formal performance improvement plan and does not support the Statement. It says nothing about whether HR had received "complaints" about Plaintiff.

34.     And moreover, in 2020, Donner was elected as the Chair of the Radio and Television Correspondents' Association (RTCA), and presided over the annual dinner. Donner Dep. 88:19-90:1, 134:15-136:13 Ex. D).

**Response:** Undisputed, but immaterial.

35.     Having Donner elected as the Chair of the RTCA was a significant benefit to Fox News and is a "very prestigious" honor. Donner Dep. 134:15-136:13.

**Response:** This statement is immaterial, but disputed as incomplete and inaccurate. (*See* Reply Ex. 2, Boughton Tr. 25:9-13, 25:22-26:2 (testifying that he did not see

11

it as a "special honor," that FNN is not necessarily benefited when its staff members are selected, and that he would not encourage staff members to seek out the chair position).)

36.    Fox News provides employees with nine days of sick leave. Campa Dep. 13:714:10 (Ex. B).

> **Response:** Undisputed as to the year 2022.

37.    And when the sick leave is exhausted, an employee may use accrued paid time off to cover additional absences. Fox New's Employee Handbook at FNN_211 (Exhibit 3).

> **Response:**  This statement is immaterial and disputed insofar as it is incomplete. The documents governing FNN's sick-leave policies speak for themselves.  Subject to the foregoing, FNN does not dispute that, in the event an employee exhausts all available sick time, the employee may use any accrued but unused paid time off to cover additional absences from work that would have otherwise been covered by the use of sick time unless otherwise prohibited by law. (*See* Pl.'s Ex. 3, FNN Employee Handbook at FNN_0000211.)

38.    The permissible uses for sick leave under the policy are "pretty broad," and includes if the "employee, spouse, significant other, [or] children [are] ill." Campa Dep. 13:7-14:10.

> **Response:** This statement is immaterial and disputed as incomplete. The documents governing FNN's sick-leave policies speak for themselves and the word "broad" does not appear in the excerpts of FNN's employee handbook that Plaintiff attached to his opposition. (*See* Pl.'s Ex. 3, FNN Employee Handbook at FNN_185-87, 206-211.) Subject to the foregoing, FNN does not dispute that permissible uses of sick time include when the employee is absent from work as a result of an illness or to care for certain of the employee's family members.

39.    The written policy further states, sick leave may be used "when the employee is absent from work (whether a full or partial day) as a result of an illness, injury, or medical condition, to obtain diagnosis, care (including preventative care), or treatment for an illness, injury, or medical condition, or for other medical reasons, including seeing a health care provider;..." ." Fox News' Employee Handbook at FNN_210 (Exhibit 3)

> **Response:** FNN objects on the grounds that the statement is incomplete and the document speaks for itself. Subject to the foregoing objection, undisputed.

12

40.    And under the policy, it is "self reporting," meaning the employee needs to just "let their manager know." Campa Dep. 15:1-9 (Ex. B).

> **Response:**  FNN objects to the term "self reporting" as vague and ambiguous and immaterial.  Subject to the foregoing, the statement is disputed as incomplete and inaccurate.   The documents governing FNN's sick-leave policies speak for themselves.  But the term "self reporting" does not appear in the excerpts of FNN's employee handbook that Plaintiff attached to his opposition. (*See* Pl.'s Ex. 3, FNN Employee Handbook at FNN_185-87, 206-211.)  The handbook provides that "[i]f you are unable to work due to illness or injury, you should contact your supervisor as soon as possible and no later than two hours after your normal start time."  (*Id.* at FNN_0000209.)

41.    Under Fox News' written sick policy, if an employee is "unable to work due to illness or injury," the employee should contact his "supervisor as soon as possible and no later than two hours after [the employee's] normal starting time." Fox News' Employee Handbook at FNN_209 (Exhibit 3).

> **Response:** FNN objects on the grounds that the statement is incomplete and the document speaks for itself. Subject to the foregoing objection, undisputed.

42.    And when asked whether Fox News' sick leave policy is consistent with the D.C. Sick Leave Act, which provides "In the case of an emergency, the employer shall be notified prior to the start of the next work shift or within 24 hours of the onset of the emergency, whichever occurs sooner," Fox News' SVP of HR testified that Fox News' policy is silent as to the requirements for taking sick leave in the case of an emergency. Campa Dep. 15:20-16:15. (Ex. B)

> **Response:**  This statement is immaterial, but undisputed.

43.    Under Fox News' sick leave policy, is "not in the normal course of business" for a supervisor to contact human resources when an employee takes sick leave." Campa Dep. 17:01-18:02 (Ex. B).

> **Response:** FNN objects to the statement as vague and ambiguous because the sentence appears to be missing a quotation mark and word and it is unclear, as this statement is phrased.  The documents governing FNN's sick-leave policies speak for themselves.  FNN also objects on the grounds that the statement is immaterial

13

and incomplete. FNN further objects to the extent that the statement assumes Plaintiff took sick leave in the normal course of business when he voiced mental health issues to a colleague and HR had been "dealing with [Plaintiff] prior to this incident about his mental health issues." (Pl.'s Ex. C, Japaridze Tr. 41:18-25.) Subject to the foregoing objection, undisputed.

44.     There is also no policy requirement that a supervisor follow up on the status of an employee after an employee takes sick leave. Campa Dep. 18:19-19:07.

> **Response:** FNN objects on the grounds that the statement is immaterial and incomplete. Subject to the foregoing objection, undisputed.

45.     After the 2020 election, Donner found that the "network was changing as a whole," which he spoke out against. Donner Dep. 197:4-199:05 (Ex. D).

> **Response:** FNN objects on the grounds that the statement is immaterial, incomplete, argumentative, and inaccurate. Subject to the foregoing, FNN does not dispute that Plaintiff testified to the above statement.

46.     For example, when Fox News wanted to cover a Senator Ron Johnson press conference speaking out against the COVID-19 vaccine, Donner "suggested that we should put a doctor on it to talk about the pros and cons." *Id.*

> **Response:** FNN objects on the grounds that the statement is immaterial, incomplete, and argumentative. Subject to the foregoing objection, undisputed that Plaintiff testified to the above statement.

47.     Donner testified, "I mean, that's life or death we're talking about with the COVID vaccine. How many older people in the demographic watch it and maybe not get a vaccine that could – you know, that just need a doctor to talk about it." *Id.*

> **Response:** FNN objects on the grounds that the statement is immaterial, incomplete, and argumentative. Subject to the foregoing objection, undisputed that Plaintiff testified to the above statement.

48.     Similarly, Donner was in the Capitol working on January 6th. *Id.*

> **Response:** FNN objects on the grounds that the statement is immaterial and incomplete. Subject to the foregoing objection, undisputed that Plaintiff testified to the above statement.

49.     He knew what happened that day in the Capitol, yet Fox News allowed false reporting to "go to air that you know wasn't true really hurts morale. It really hurts you, especially in a news organization." *Id.*

> **Response:** FNN objects on the grounds that the statement is immaterial, inaccurate, incomplete, and argumentative.   FNN also objects to the statement, which necessarily depends on the truth of FNN's news reporting, as inadmissible hearsay.[5] Subject to the foregoing, with the exception of "false reporting," FNN does not dispute that Plaintiff testified to the above statement.

50.     Donner "just really wanted us to be the most responsible shepherds of the truth that we could" but grew demoralized when "you slowly saw it decrease." *Id.*; *see also* Donner Dep. 130:08-131:07 (Ex. D).

> **Response:** This statement is immaterial and disputed as inaccurate, incomplete, and argumentative.   Subject to the foregoing, FNN does not dispute that Plaintiff testified to the above statement.

51.     In addition, Donner "covered everything about the [2020] election and that there wasn't any fraud." Donner Dep. 197:4-199:05 Ex. D).

> **Response:** FNN objects to this testimony as hearsay because, in the transcript, the preceding sentence makes clear that Plaintiff is referring to unnamed stories that he has read.   Further, FNN objects on the grounds that the statement is immaterial, incomplete, and argumentative.  Subject to the foregoing objection, undisputed that Plaintiff testified to the above statement.

52.     And despite, he "just ke[pt] seeing it more and more and more on air." *Id.*

> **Response:** This statement is immaterial and disputed as inaccurate, incomplete, and argumentative. Subject to the foregoing, FNN does not dispute that Plaintiff testified to the above statement.

---

[5] *See Atkins v. Fischer*, 232 F.R.D. 116, 132 (D.D.C. 2005) ("[C]ourts within this Circuit have consistently barred newspaper articles from introduction as evidence due to the fact that they constitute inadmissible hearsay."); *Corner Pocket, Inc. v. Travelers Indem. Co.*, 2014 WL 657615, at *2 (W.D. Pa. Feb. 20, 2014) ("[G]enerally, newspaper articles and television programs are considered hearsay under Rule 801(c) when offered for the truth of the matter asserted and statements in newspapers by individuals other than the article's author often constitute double hearsay.") (quotation omitted).

53.     In March of 2022, Donner complained to HR and his supervisor, Japaridze, about the excessive amount he was required to work, the limited pay he received for that excessive amount of work, and Fox News' false reporting on January 6th. *See* Email from Donner to Campa and Japaridze re Complaints (Exhibit 23).

> **Response:** FNN objects on the grounds that the statement is immaterial, incomplete, and argumentative. FNN also objects to the statement, which necessarily depends on the truth of FNN's news reporting, as inadmissible hearsay.[6] Subject to the foregoing, undisputed that Plaintiff wrote an email to Ms. Campa and Ms. Japaridze purporting to outline "[w]ork concerns in a written format." Plaintiff listed a number of "concerns" relating to his salary; his work-life balance; alleged internal "Lack of Understanding How Capitol Hill Works"; his title; Zoom calls; FNN's reporting relating to the events of January 6, 2021. The document speaks for itself.

54.     He specifically wrote:

---

[6] *See Atkins v. Fischer*, 232 F.R.D. 116, 132 (D.D.C. 2005) ("[C]ourts within this Circuit have consistently barred newspaper articles from introduction as evidence due to the fact that they constitute inadmissible hearsay."); *Corner Pocket, Inc. v. Travelers Indem. Co.*, 2014 WL 657615, at *2 (W.D. Pa. Feb. 20, 2014) ("[G]enerally, newspaper articles and television programs are considered hearsay under Rule 801(c) when offered for the truth of the matter asserted and statements in newspapers by individuals other than the article's author often constitute double hearsay.") (quotation omitted).

16

**Tucker Carlson/January 6th Aftermath**

Fox has not supported its journalists since the January 6, 2021 attack on the Capitol. By allowing highly paid hosts and contributors to make factually false statements about that day is not only demoralizing but creates a hostile work environment. I barely watch our programming or read our website anymore because it's hard to stomach these untruths being aired and written.

I raised my concerns last year multiple times:

- In the spring sperate times to Cherie Grzech and Anita Siegfriedt, who were sympathetic and said they would raise them to upper management.
- Then to Bryan Boughton and HR in the Fall when Tucker Carlson's Patriot Purge aired that showed sympathy to rioters who broke the law and stormed the Capitol and said the rioters were the real victims.

    o They broke the law by entering the Capitol and threatened myself and my co-workers.
    o My colleague was in the House Chamber when shots were fired by Capitol Police to protect House members evacuating.
    o Rioters broke into the building destroying windows and attacked police officers, including one floor below where I was located. They absolutely would have attacked members if they were not evacuated in time.
    o My colleagues and I continued reporting in the Senate Booth with the lights off as I plotted escape paths and potentially using a monopod as a weapon to protect ourselves.
    o Two Capitol Police officers I knew died as a result of January 6th, including one who committed suicide because he was so distraught about what happened.

Our lives were endangered that day. My colleagues and I put our lives at risk covering the story and yet my employer continually allows these lawbreakers to continually be portrayed as victims. It's difficult to feel supported when this is allowed to happen.

*Id.*

> **Response:** FNN objects on the grounds that the statement is immaterial and incomplete. FNN also objects to the statement, which necessarily depends on the truth of FNN's news reporting, as inadmissible hearsay.[7] Subject to the foregoing, undisputed that Plaintiff wrote an email to Ms. Campa and Ms. Japaridze purporting to outline "[w]ork concerns in a written format." Plaintiff listed a number of "concerns" relating to his salary; his work-life balance; alleged internal "Lack of Understanding How Capitol Hill Works"; his title; Zoom calls; FNN's reporting relating to the events of January 6, 2021. The document speaks for itself.

---

[7] *See Atkins v. Fischer*, 232 F.R.D. 116, 132 (D.D.C. 2005) ("[C]ourts within this Circuit have consistently barred newspaper articles from introduction as evidence due to the fact that they constitute inadmissible hearsay."); *Corner Pocket, Inc. v. Travelers Indem. Co.*, 2014 WL 657615, at *2 (W.D. Pa. Feb. 20, 2014) ("[G]enerally, newspaper articles and television programs are considered hearsay under Rule 801(c) when offered for the truth of the matter asserted and statements in newspapers by individuals other than the article's author often constitute double hearsay.") (quotation omitted).

17

55.    As of September 26, 2022, Donner had 76 hours of sick leave, 8 hours of a floating holiday, 160 hours of vacation, and 112 hours of Covid Time Off Plan, which he had not used:

**INTERROGATORY NO. 14:** Identify the amount of accrued sick leave and/or Paid Time Off (PTO) Jason Donner had accrued as of September 26, 2022.

**OBJECTIONS AND RESPONSES TO INTERROGATORY NO. 14:**

Subject to and without waiving its General Objections, FNN states that it will produce Plaintiff's final paystub, which reflects the following in a section titled "LEAVE BALANCE":

| Description | Hrs Taken | Balance |
|---|---|---|
| Sick Time Off | 0 | 76 |
| Floating Holiday | 8 | 8 |
| Vacation Carryover | 0 | 0 |
| Vacation | 0 | 160 |
| Covid Time Off Plan | 0 | 112 |

Def.'s Ans. to Interrog. No. 14 (Exhibit 2).

> **Response:** FNN objects to Plaintiff's insertion of the above image because it does not qualify as a factual assertion. FNN also objects to the image as incomplete because FNN's general objections, which are incorporated by reference, are not contained in the image. To the extent a response is required the statement is immaterial, except for the fact that Plaintiff had 8 hours of available sick leave on September 26, 2022, which FNN does not dispute.

56.    Indeed, Donner had only taken eight hours off in the entire year, and had a cumulative balance of 356 hours (or 44.5 days). *Id.*

> **Response:** This statement is immaterial and disputed as inaccurate and incomplete. Plaintiff does not dispute that he took roughly five to six weeks of paid leave during 2022 through FNN's EAP. (SUFR 98.) In fact, Plaintiff's own exhibit reflects hours associated with Plaintiff's "Time Off Requests" for several eight-hour periods – both vacation days and sick leave – throughout calendar year 2022, including four days before his EAP leave in April 2022 and more than a dozen days after his EAP leave ended. (*E.g.*, Pl.'s Ex. 1 (ECF No. 33-4 at ECF page 8-9).)

18

57.    Donner received the COVID-19 vaccine on September 19, 2022. Donner Dep. 219:16-21 (Ex. D).

> **Response:** Undisputed.

58.    A few days later it was "like a freight train hit" him. Donner Dep. 221:14-223:10.

> **Response:** Undisputed.

59.    Despite feeling ill from the vaccine, "he continued to work long hours" that week "because he did not want to leave his co-workers short-handed." Pl.'s Ans. to Interrog. No. 15 (Ex. 10); *see also* Donner Dep. 239:5-242:10 (describing the long hours worked while feeling ill).

> **Response:** FNN objects on the grounds that the statement is immaterial and incomplete. Subject to the foregoing objection, undisputed that Plaintiff testified to the above statement.

60.    "He had tried to soldier on through the symptoms but by September 26, 2022 his body gave out on him." Pl.'s Ans. to Interrog. No. 15 (Ex. 10).

> **Response:** FNN objects on the grounds that the statement is immaterial and incomplete. Indeed, Plaintiff does not dispute that on the night of September 24, 2022, he attended an Elton John concert at Nationals Park.  (SUFR 36.) Subject to the foregoing objection, undisputed that Plaintiff testified to the above statement.

61.    "Although Plaintiff had felt ill over the past week, he had planned to continue to work throughout his illness, including on September 26, 2022." *Id.*; Donner Dep. 264:14-265:1 ("if you can walk, we were expected to be there."); Donner Dep. 50:9-22 (generally he "never took days off...if [he's] able to get out of bed, [he's] going to be there" at work).

> **Response:** This statement is immaterial and disputed as inaccurate and incomplete. Regardless of Plaintiff's plans during the preceding week to work on September 26, 2022, by September 25, 2022, he no longer planned to show up for work. Indeed, Plaintiff's own father testified that, the day before Plaintiff's absence from work, Plaintiff told him that he planned on calling out sick. (SUFR 37.)

62.     But by Monday morning, September 26, 2022, Donner felt like his "body completely gave out." Donner Dep. 235:9-236:22.

> **Response:** FNN objects on the grounds that the statement is ambiguous as to timing, and thus, as stated, is immaterial and incomplete. Subject to the foregoing objection, undisputed that Plaintiff testified to the above statement.

63.     He was "dazed and confused," he felt "so ill [he] could barely turn over and get out of bed." *Id.*

> **Response:** FNN objects on the grounds that the statement is ambiguous as to the timing of what is being described in this statement in several respects, and therefore, as stated, is immaterial and incomplete. Subject to the foregoing objection, undisputed that Plaintiff testified to the above statement.

64.     "[H]e was too ill, fatigued, and overrun to go to work, so he had called in sick." Pl.'s Ans. to Interrog. No. 15 (Ex. 10).

> **Response:** FNN objects on the grounds that the statement is ambiguous as to the timing of what is being described in this statement in several respects, and therefore, as stated, is immaterial and incomplete. Subject to the foregoing objection, FNN does not dispute that Plaintiff is accurately quoting his answer to FNN's interrogatory. With respect to the underlying facts, there is also no material dispute in the record that Plaintiff planned to skip work as early as the day before (Sunday, September 25, 2022) but did not speak with his supervisor about the absence from work that Monday until the "11:30, 40 time frame" on the day of his absence (Monday, September 26, 2022). (SUFR 37, 52.)

65.     He saw a text message from his coworker, Kelly Phares, so he texted her back to let her know that he would be out sick. Pl.'s Ans. to Interrog. No. 15 (Ex. 10); Donner Dep. 234:9-236:20; *see also* ECF No. 32-20.

> **Response:** FNN objects on the grounds that the statement is ambiguous as to the timing of what is being described in this statement in several respects, and therefore, as stated, is incomplete. FNN also objects on the grounds the statement cites ECF No. 32-20 and there is no such document, so FNN is not on sufficient notice as to what Plaintiff relies on to support the statement. The statement is also immaterial because Ms. Phares was not Plaintiff's supervisor. Subject to the foregoing, disputed as incomplete and inaccurate. Plaintiff's text at 9:48 am stated only the following: "I don't feel like talking all [sic] the phone. Are you okay? My depression came back yesterday so I'm struggling." (FNN Ex. 17 at

20

Plaintiff000203.) Plaintiff did not tell Ms. Phares that he intended to call out sick until 11:39 a.m. (*Id.*)

66.    The text was sent at 9:48 AM. ECF No. 30-20; Donner Dep. 237:6-238:20 (Ex. D).

**Response:** FNN objects on the grounds that the statement is immaterial, including because Ms. Phares was not Plaintiff's supervisor. The document speaks for itself. Subject to the foregoing, disputed as incomplete and inaccurate. Plaintiff's text at 9:48 am stated only the following: "I don't feel like talking all [sic] the phone. Are you okay? My depression came back yesterday so I'm struggling." (FNN Ex. 17 at Plaintiff000203.) Plaintiff did not tell Ms. Phares that he intended to call out sick until 11:39 a.m. (*Id.*)

67.    There was a Senator McConnell event that Phares was "hoping" Donner could watch, but she confirmed that she would handle it. *Id.* (Phares writing, "I'll handle it. Hope you're ok. LMK if I can do anything.").

**Response:** FNN objects on the grounds that the statement is ambiguous as to the timing of what is being described in this statement in several respects, and therefore, as stated, is immaterial and incomplete. Also, disputed as incomplete. Plaintiff was assigned to cover the Senate on Monday, September 26, 2022. (FNN Ex. 1, J. Donner Tr. 229:16-21.) Subject to the foregoing, undisputed that Ms. Phares, who had a different assigned responsibility that day (i.e., not the Senate), had to find a way to "handle" Plaintiff's assignment alongside her own.

68.    Japaridze had never requested Donner to cover the Sen. McConnell event. Japaridize Dep. 39:18-23.

**Response:** FNN objects on the grounds that this statement is immaterial and incomplete. Plaintiff was assigned to cover news pertaining to the United States Senate on Monday, September 26, 2022, and "Sen. McConnell" refers to a United States Senator. (FNN Ex. 1, J. Donner Tr. 229:16-21.) Subject to the foregoing, undisputed that Ms. Japaridze did not specifically request that Plaintiff cover the event with Senator McConnell. (*See* Reply Ex. 3, J. Donner Tr. 59:6-60:17 (Plaintiff testifying that the producers coordinated and "broke it down ourselves" to "make sure things were covered").)

69.    Japaridze also testified that it is standard practice for a coworker to cover event when a person is out sick. Japaridze Dep. 40:12-20 (Ex. C).

**Response:** Immaterial, but undisputed.

70.     Donner then called his supervisor, Japaridze, around "11:30, 40 time frame." Donner Dep. 276:3-276:17 (Ex. D); Donner Dep. 238:21-239:2 ("mid-11 time frame."); ECF No. 32-20 (writing to Phares at 11:39 AM that he had spoke to Japaridze).

> **Response:** FNN objects on the grounds that the statement is incomplete.  FNN also objects on the grounds the statement cites ECF No. 32-20 and there is no such document, so FNN is not on sufficient notice as to what Plaintiff relies on to support the statement.  To the extent that Plaintiff is referring to ECF No. 30-20, FNN further objects on the basis that the last citation in this statement blatantly mischaracterizes ECF No. 30-20, which indisputably says the following in the text message that Plaintiff sent to his colleague, Ms. Phares, at 11:39 AM:  "I'll call out sick and let her know.  I'm sorry."  *Id.* at Plaintiff000203.  The message that says "I spoke to her" appears later in the thread and does not contain a timestamp.  *Id.* at Plaintiff000203.  Subject to the foregoing, FNN does not dispute that Plaintiff eventually spoke to Ms. Japaridze by "around" the "11:30, 40 time frame," to the extent that ambiguous phrase means sometime after 11:39 AM, which is when Plaintiff, in his own text message states:  "I'll call out sick."

71.     During the call with Japaridze, Donner told her "how sick [he] was." Donner Dep. 276:9-16. (Ex. D) Japaridze testified that Donner "seemed out of it" during the call, told her "he was not going to work that day," and requested sick leave. Japaridze Dep. 37:18-38:19 (Ex. C).

> **Response:** Undisputed.

72.     Japaridze confirmed that Donner took the sick day because of side effects of the COVID-19 vaccine. Japaridze Dep. 42:01-11 (Ex. C).

> **Response:** This statement is immaterial and disputed insofar as it mischaracterizes the cited testimony.   In the cited testimony, Ms. Japaridze testifies: "I think he mentioned something about the booster, something about being tired. I don't remember the exact conversation, but it was clear to me he wasn't coming to work." (Pl.'s Ex. C, Japaridze Tr. 42:1-11; *cf.* FNN Ex. 17 (ECF No. 30-20), at Plaintiff000203 (Plaintiff's text message at 9:48 AM that morning, to a fellow producer, stating:  "I don't feel like talking all the phone.  Are you okay?  My depression came back yesterday so I'm struggling.").)

73.     She also testified that even before she spoke with Donner, she believed Donner was sick, and would be taking a sick day based on a conversation she had with Phares. Japaridze Dep. 46:8-16, 48:5-11. 61:15-18 (confirming Phares notified Japaridze that Donner was calling in sick).

**Response:** FNN objects on the grounds that the statement is immaterial, incomplete, and mischaracterizes the cited testimony. In the testimony Plaintiff cites, Ms. Japaridze testified that she was "concerned about his well-being" because she "believed he may have been sick or having a mental health-type of issue." (Pl.'s Ex. C, Japaridze Tr. 46:11-13.) Subject to the foregoing, the statement is disputed to the extent that it mischaracterizes Ms. Japaridze's testimony, but otherwise undisputed.

74.    Japaridze "granted" Donner 's request for sick leave. Japaridze Dep. 37:18-39:23.

**Response:** Undisputed.

75.    Japaridze confirmed during her testimony that Donner "***handled it appropriate in calling in sick***." Japaridze 61:15-62:11.

**Response:**   FNN objects to the extent that (as Plaintiff has used it in his opposition brief) this is being offered as an opinion with respect to the applicability or interpretation of FNN's sick leave policy.  There is no allowable evidentiary basis to admit Ms. Japaridze's quoted testimony for that purpose. *See Ojeda v. Louisville Ladder Inc.*, 410 F. App'x 213, 215 (11th Cir. 2010) (summary judgment cannot be defeated with legal conclusions or improper lay witness testimony that would not be admissible at trial); *Athridge v. Iglesias*, 2004 WL 7345458, at *1 (D.D.C. Dec. 21, 2004) ("A lay witness may not, however, testify as to a legal conclusion."); *Bankers Standard Ins. Co. v. Anand*, 2020 WL 4698363, at *7 (D.D.C. Aug. 13, 2020) (statement by defendant that incident "was her 'fault'" could not be used to "show that she acted negligently (because that would be an improper legal conclusion)").  Further, there is nothing in the record indicating that Ms. Japaridze knew or even could have known that Plaintiff intended—at least one day prior to his Monday, September 26, 2022, absence from work—that he would take sick leave on Monday, September 26, 2022, as came to light in deposition testimony that occurred several days *after* Ms. Japaridze's deposition.  (FNN Ex. 14, A. Donner Tr. 11:13-17, 103:3-104:17; Reply Ex. 1, A. Donner Tr. 103:2-105:18.)  FNN also objects on the basis that the question put to Ms. Japaridze mischaracterized her prior testimony (which was the basis of the objection at the time) and cannot fairly be taken out of the context of her prior testimony.  The statement in Paragraph 75 is also immaterial and incomplete.  Subject to all of the foregoing, FNN does not dispute that the quotation stated in Paragraph 75 is accurately quoted from Ms. Japaridze's deposition transcript—specifically in a follow-up question put to Ms. Japaridze related to another question in which she was asked what Plaintiff could have done better, to which she responded:  "In this particular case, he did what he could do, but I just wanted to make sure that he's aware that he can take time off if he's not feeling well.  ***If he has time to notify people, he should notify people.***" (Pl.'s Ex. C, Japaridze Tr. 62:1-4 (emphasis added).)

76.    Japaridze testified, "it was fine how he handled it." Japaridze Dep. 65:05-11.

**Response:**    FNN incorporates by reference the objections and responsive statements in response to the statement in Paragraph 75, *supra*, as this out-of-context soundbite presents the same problems.  The statement in Paragraph 76 suffers from the same flaws.  The statement in Paragraph 76 is likewise immaterial and likewise incomplete.  Subject to all of the foregoing, FNN does not dispute that the quotation stated in Paragraph 76 is accurately quoted from Ms. Japaridze's deposition transcript, but it is incomplete insofar as it omits the very next sentence which is related to the answer being given:  "If he has time to notify the supervisor that he will be out, that would be the best practice."  (Pl.'s Ex. C, Japaridze Tr. 65:8-9.)

77.    And Donner did in fact handle it appropriately, although he did not have a set schedule, he called in sick within two hours of the start of his shift that was indicated in the Workday system. Donner Dep. 53:4-8 (the start time in Workday was 10 am), 74:2-75:12 (called in sick within 2 hours of the start time) (Ex. D).

**Response:**  FNN objects insofar as the first clause of the sentence in Paragraph 77 ("Donner did in fact handle it appropriately") is not a statement of fact that requires a response.  To the extent "appropriately" refers to compliance with the Sick Leave Act and/or FNN's sick leave policy, that is a legal conclusion that FNN disputes.

FNN also objects to Paragraph 77 on the grounds that its assertions are not supported or supportable by admissible evidence.  First, the assertions that Plaintiff "called in sick within two hours of the start of his shift that was indicated in the Workday system" and the parenthetical indicating that "the start in Workday was 10 am" are inadmissible hearsay because they assert that "the Workday system" indicated "the start of his shift" and that it said "10 am."  Second, no part of the cited testimony states that Plaintiff's schedule had never been "set," e.g., by his supervisor.  Third, To the extent not covered by the foregoing, FNN also objects on the basis that neither of the parenthetical descriptions in Paragraph 77 are supported or supportable by admissible evidence.  Also, the last part of Plaintiff's testimony cited (74:2-75:12) does not contain any testimony that supports the description he provides, i.e., that he "called in sick within 2 hours of start time."  The first page of cited testimony does, however, contain Plaintiff's admission that, in practice, he would "constantly work[] from the moment [he] got up," which "sometimes" be "7."  (FNN Ex. 1, J. Donner Tr. 53:9-16.)

In any event, as phrased, the statement in Paragraph 77 is immaterial.  To the extent a further response is required, FNN reiterates that the Workday system speaks for itself and indisputably does not contain a start time of 10am.

78.    As stated above, Fox News' sick policy does not require a supervisor to contact HR after an individual takes sick leave. Campa Dep. 17:01-18:02 (Ex. B).

24

> **Response:** FNN objects on the grounds that the statement is immaterial.  The documents governing FNN's sick-leave policies speak for themselves.  Subject to the foregoing, undisputed (to the extent "sick policy" means the sick leave policy).

79.    In conformance with this policy, Japaridze testified, "[n]o, I do not have to contact HR if somebody is out sick" nor has she ever requested proof that an employee is sick. Japaridze Dep. 11:15-12:7 (Ex. C).

> **Response:** FNN objects on the grounds that the statement is immaterial and that the purported nexus indicated by the first clause of Paragraph 79, i.e., between Ms. Japaridze's quoted statement and "conformance" with some policy, is not supported by the cited testimony or any other admissible evidence in the record.  There is no admissible evidence (cited here or otherwise) to support the notion that FNN failed to follow any policy with respect to Plaintiff's absence.  While the quoted text appears in Ms. Japaridze's testimony, it does not support the statement that it was "in conformance" with any policy.  Ms. Japaridze merely testified that it was not "standard practice" to contact human resources after someone calls in sick.  (Pl.'s Ex. C, Japaridze Tr. 41:15-17, 51:15-18.)  Immediately after that testimony, Ms. Japaridze testified that she nevertheless contacted Ms. Campa from FNN HR because she "is in charge of our mental health benefit, and she has been dealing with Jason prior to this incident about his mental health issues," and she understood "from the producer who spoke to him, that he was not in a good space" and "wanted to make sure that if there was follow-up necessary, Nicolle would take care of it." (Pl.'s Ex. C, Japaridze Tr. 41:15-25.)  To the extent further response is required, it is disputed insofar as it is incomplete and the reference to "conformance" with a policy is not supported by the record.

80.    Japaridze also testified it is not standard practice to contract the Washington Bureau Chief for Fox News when an employee calls in sick. Japaridze Dep. 50:25-51:18.

> **Response:** FNN objects on the grounds that the statement is immaterial and incomplete. Subject to the foregoing objection, undisputed.  FNN incorporates by reference the additional testimony cited and quoted in response to the statement in Paragraph 79.

81.    Yet Donner's request for sick leave was different. The first thing Japaridze did was contact the SVP of HR, Campa, even though that was not policy or standard practice. Japaridze Dep. 40:24-41:17 (Ex. C).

> **Response:**  FNN objects on the grounds that the statement is immaterial and argumentative.  In addition, FNN objects on the grounds that the first sentence is not supported by the cited testimony or otherwise supportable by admissible

evidence in the record. The same goes for the part of the second sentence that states "the first thing [Ms.] Japaridze did." Neither statement is supported by the cited text or other admissible evidence. Otherwise, the statement in Paragraph 81 is undisputed. For completeness, FNN incorporates by reference the testimony cited and quoted in response to the statement in Paragraph 79, because it provides necessary context for Ms. Japaridze's call to Ms. Campa. But there is no dispute the call was made.

82.     At approximately 12:34 PM EST, Japaridze texted Campa, "Can you call me when you get a chance so I can update you on Jason?" *See* Text from Japaridze to Campa (Sept 26, 2022 12:34 EST) (Exhibit 12); *see also* Japaridze Dep. 43:19-44:11.

> **Response:** This statement is immaterial and the document speaks for itself. Subject to the foregoing, FNN does not dispute that Ms. Japaridze texted Ms. Campa the above message at 12:34 p.m. EST. For completeness, FNN incorporates by reference the testimony cited and quoted in response to the statement in Paragraph 79, because it provides necessary context for the communication (i.e., concern for Plaintiff's mental state in light of how he seemed to his colleague).

83.     And notably, Japaridze had already spoken to Campa about Donner prior to this text message. Japaridze Dep. 43:19-44:11.

> **Response:** This statement is immaterial. Subject to the foregoing, FNN does not dispute that Ms. Japaridze testified that she "[m]ost likely" had spoken with Ms. Campa to convey "we were trying to get in touch with him." (Pl.'s Ex. C, Japaridze Tr. 43:25-44:7.) For completeness, FNN incorporates by reference the testimony cited and quoted in response to the statement in Paragraph 79, because it provides necessary context for the communication (i.e., concern for Plaintiff's mental state in light of how he seemed to his colleague).

84.     Despite it being standard practice not to follow up with an employee after they take a sick day, Japaridze emailed Donner "checking back on" him. *See* Email from Japaridze to Campa and Boughton (Sept 26, 2022 at 5:56 PM EDT) at FNN_353-354 (Exhibit 13).

> **Response:** FNN objects on the grounds that the statement is immaterial, incomplete and argumentative. Ms. Japaridze testified that "[t]here is no requirement" to follow up with an employee "after someone calls in sick," but she "***usually do[es], to make sure they're okay and to find out if they will be back***." (Pl.'s Ex. C, Japaridze Tr. 12:11-19.) For completeness, FNN incorporates by reference the testimony cited and quoted in response to the statement in Paragraph 79, because it provides necessary context for the communications that occurred on and around Plaintiff's sick day (i.e., concern for his mental state in light of how he

26

seemed to his colleague that day, coupled with the fact that his team's previous experience with him was that his conditions was so worrisome that it required him to take approximately six weeks of EAP leave). (*See* SUFR 20, 98.) The quoted document speaks for itself.

85.     Donner responded that day confirming that he would be at work the following day, and reiterating, "I'm just mentally and physically exhausted...I think the covid booster and working so much last week finally took the last bit out of me." *Id.*

> **Response:** Immaterial and the document speaks for itself, but undisputed.

86.     Contrary to standard practice, at 5:56 PM, Japaridze then forwarded Donner's response to SVP of HR, Campa, and the Washington Bureau Chief, Boughton. *Id.*; *see also* Japaridze Dep. 50:25-51:18 (not standard practice to contact the Bureau Chief when an employee calls in sick) (Ex. C).

> **Response:** FNN objects on the grounds that the statement is immaterial, incomplete, and argumentative. For completeness, FNN incorporates by reference the testimony cited and quoted in response to the Statement in Paragraph 79, because it provides necessary context for Ms. Japaridze's communication to Ms. Campa and Mr. Boughton. To the extent further response is required, it is disputed insofar as it is incomplete and the premise that the communication was "contrary to standard practice" is not supported by any admissible evidence cited here or in the record more broadly in this action. But there is no dispute that Ms. Japaridze emailed Ms. Campa and Mr. Boughton on the date and time alleged in this Statement.

87.     Japaridze did not stop there. That night, Japaridze then forwarded herself old emails Donner had sent Japaridze weeks prior and changed the subject to "donner email." *See* Email from Japaridze to Self (Sept 26, 2022 at 7:15 PM EDT) (Exhibit 14); *see also* Japaridze Dep. 53:0155:21 (Ex. C).

> **Response:** FNN objects on the grounds that the statement is argumentative. Subject to the foregoing, the statement is immaterial, but undisputed—to the extent that "old emails" means the one email thread that was forwarded as reflected in the cited document. There is no admissible evidence cited here or that exists elsewhere in the record that would support the assertion that Ms. Japaridze forwarded herself more than one email pertaining to Plaintiff that day.

27

88.     In those emails, Donner had pushed back on criticism he received from Japaridze

regarding a news story he pitched. *Id.*

> **Response:** FNN objects on the grounds that there is an "Id." citation to two
> different documents making it ambiguous which is the basis of the Statement.
> Because it begins with "in those emails," FNN understands that the intent was to
> cite the document itself, not Ms. Japaridze's testimony. Subject to the foregoing,
> to the extent Plaintiff's characterization of him having "pushed back" on "criticism"
> refers to the part of the cited email in which Ms. Japaridze apologizes for ending a
> call early and suggests an approach to present more quickly on team calls, and
> Plaintiff responds stating that he "respectfully disagree[s]" and explains why—this
> is undisputed. The document is in the record and speaks for itself. More
> importantly, this is immaterial because Plaintiff does not contend in his Opposition
> to the Motion for Summary Judgment that anything contained in this email was
> ever cited as the pretextual basis for terminating him.

89.     Clearly, at this point (less than 8 hours after he called in sick), Japaridze is trying

to create pretext to fire Donner. *Id.*

> **Response:** FNN objects on the grounds that there is an "Id." citation to two
> different documents making it ambiguous which is the basis of the Statement.
> Because the preceding statement (Paragraph 88) began with "in those emails," FNN
> understands that Plaintiff is continuing to reference the document itself (which
> speaks for itself), not Ms. Japaridze's testimony. FNN also objects on the grounds
> that the statement is ambiguous as to timing ("at this point") and as to what conduct
> Plaintiff is asserting occurred "less than 8 hours after he called in sick." In addition,
> FNN objects on the grounds that the statement qualifies as inadmissible
> speculation. Fed. R. Evid. 602. FNN further objects on the grounds that this is
> argumentative and a disputed legal conclusion that the Court need not treat it as
> true, even in the absence of a response from FNN. *Wheeler v. Georgetown Univ.
> Hosp.*, 52 F. Supp. 3d 40, 46 (D.D.C. 2014), *rev'd and remanded on other grounds*,
> 812 F.3d 1109 (D.C. Cir. 2016). This is because Rule 56's "deemed admitted" rules
> "apply only to facts." *Grimes v. D.C.*, 794 F.3d 83, 96–97 (D.C. Cir. 2015) (Griffith,
> J., concurring); *see also Johnson v. Washington Metro. Area Transit Auth.*, 314 F.
> Supp. 3d 215, 216 (D.D.C. 2018) ("The Court will not, however, accept facts that
> do not cite support from the record or ***conclusions masquerading as facts***."
> (emphasis added)). Subject to the foregoing objection, FNN does not dispute that
> Plaintiff did not contact his supervisor until the "11:30, 40 time frame,"
> approximately eight hours before the email that Plaintiff might be citing.

90.     The following afternoon, Campa texted Japaridze and Boughton, "Hello. Available

to connect? I have an update." *See* Text from Campa to Japaridze and Boughton re "update" (Sept

27, 2022 at 3:14 PM EST) (Exhibit 16).

28

> **Response:** Immaterial and the document speaks for itself, but undisputed.

91. Japaridze would not let it go that Donner called in sick. Although Japaridze admitted that Donner calling in sick was "acceptable" under Fox News' policy, on the evening of September 27, 2022, Japaridze called Donner to reprimand him for calling in sick. Japaridze 58:9-60:18; *see also* Emails from Japaridze to Donner (Sept 27, 2022 at 7:04 PM EDT) (Exhibit 17).

> **Response:** The entire statement is immaterial. With respect to the second sentence in Paragraph 91, to the extent that (as Plaintiff has used it in his opposition brief) this is being offered as an opinion with respect to the applicability or interpretation of FNN's sick leave policy, FNN incorporates by reference the objections and responsive statements in response to the statements in Paragraphs 75-77, *supra*. Subject to the forgoing, FNN does not dispute that Ms. Japaridze called Plaintiff on September 27, 2022 to provide him with feedback for handling the situation better "next time." (FNN Ex. 6, Japaridze Tr. 59:9-24.)

92. Indeed, after the telephone conversation Japaridze wrote, "If you don't understand why you need to give your coworkers and your manager heads up when you don't show up for work, I honestly don't know how to make you understand it." *See* Exhibit 17.

> **Response:** FNN objects on the grounds that the statement is incomplete. Subject to the foregoing, undisputed that Ms. Japaridze wrote and sent the statement in Paragraph 92 as part of the email in Exhibit 17. This particular part of the quoted document is also immaterial. The document speaks for itself.

93. And it is obvious that Japaridze tried to coverup the retaliation by creating a false paper trail as to the telephone conversation that occurred on the evening of September 27, 2022. *Compare* Exhibit 17; *with* Donner Dep. 270:6-271:16 (Ex. D).

> **Response:** FNN objects to this argumentative statement because there is no admissible evidence in the record in this action (or otherwise) that would support this assertion. This is not a statement of fact that calls for a response. Instead, this is a disputed legal conclusion. The Court need not treat it as true, even in the absence of a response from FNN. *Wheeler v. Georgetown Univ. Hosp.*, 52 F. Supp. 3d 40, 46 (D.D.C. 2014), *rev'd and remanded on other grounds*, 812 F.3d 1109 (D.C. Cir. 2016). This is because Rule 56's "deemed admitted" rules "apply only to facts." *Grimes v. D.C.*, 794 F.3d 83, 96–97 (D.C. Cir. 2015) (Griffith, J., concurring); *see also Johnson v. Washington Metro. Area Transit Auth.*, 314 F. Supp. 3d 215, 216 (D.D.C. 2018) ("The Court will not, however, accept facts that do not cite support from the record or ***conclusions masquerading as facts***."

29

(emphasis added)). In any event, Plaintiff's self-serving speculatory inference that his supervisor's follow-up email constituted a "coverup" to "create[e] a false paper trail" is not evidence that would allow a reasonable jury to infer that his supervisor did not actually believe the statements she wrote in that email. *See Carpenter*, 174 F.3d at 236 ("Although [plaintiff] infers retaliatory intent from her supervisors' September 1996 comments, they also do not constitute evidence sufficient to allow a reasonable jury to infer that [the employer's] reasons for her November 1997 rating were false.").

94.    Specifically, Donner testified that Japaridze came into the call "guns blazing." Donner Dep. 292:1-6.

> **Response:**  Immaterial and incomplete, but FNN does not dispute that Plaintiff made the above statement.

95.    He testified Japaridze "was upset because [he] took the day off." Donner Dep. 270:6-271:16.

> **Response:** FNN objects on the grounds that the statement is immaterial and incomplete. FNN further objects to the extent that Plaintiff lacks foundation to testify as to Ms. Japaridze's mental state at the time of conversation. Subject to the foregoing, FNN does not dispute that Plaintiff made the above statement.

96.    "She just started coming at [him] with, like you know, you called out sick...and you didn't let anybody know [though he did and in conformance with Fox News' sick leave policy]." *Id.*

> **Response:**  With respect to the part of the statement that asserts Plaintiff complied with the Sick Leave Act and/or FNN's sick leave policy, this is a disputed legal conclusion. The Court need not treat it as true, even in the absence of a response from FNN. *Wheeler v. Georgetown Univ. Hosp.*, 52 F. Supp. 3d 40, 46 (D.D.C. 2014), *rev'd and remanded on other grounds*, 812 F.3d 1109 (D.C. Cir. 2016). This is because Rule 56's "deemed admitted" rules "apply only to facts." *Grimes v. D.C.*, 794 F.3d 83, 96–97 (D.C. Cir. 2015) (Griffith, J., concurring); *see also Johnson v. Washington Metro. Area Transit Auth.*, 314 F. Supp. 3d 215, 216 (D.D.C. 2018) ("The Court will not, however, accept facts that do not cite support from the record or ***conclusions masquerading as facts*.**" (emphasis added)). Further, with respect to the part of the statement that asserts that Plaintiff complied with FNN's policy, there is no admissible evidence in the record in this action that would support this assertion because Plaintiff has not disputed his father's testimony that Plaintiff knew on Sunday, September 5—a day before he testified that he notified his supervisor—that he would need skip work.  (SUFR 37.) Subject to the forgoing, FNN does not dispute that Ms. Japaridze called Plaintiff on September 27, 2022 to

provide him with feedback for handling the situation better "next time." (FNN Ex. 6, Japaridze Tr. 59:9-24.). Nor does FNN dispute that Plaintiff made the above statement (except for the modification).

97.    Donner testified:

> I thought you were calling to see if I was feeling better. And I still didn't feel good at the time. So, yeah, it was a real shock to my system. I was really --I was kind of -- it was just really hurt. Because then she started going about how I was, like, irresponsible and how I don't show up to work and that I let everybody down and I'm late.

*Id.*

**Response:** Immaterial and incomplete, but, with those qualifiers, FNN does not dispute that Plaintiff testified to the above statement.

98.    Donner further described the call:

Q.  What prompted that call, if you remember?

A.  She called me while I was in the middle of working, and I told her I'd call her back. And I thought she was just checking in on me. And instead, I was being told that I was like – she just starts like going after me for being irresponsible and letting everybody down and tardiness. And, like, this is right after I helped their star border correspondent get multiple interviews in one day, and I was chasing Manchin all day. She just started, like, railing in to me. And I was, like, Well, I was sick. Like, I thought you were calling to see how I was feeling. And instead it was just, like, one thing after another. And I was just -- you know, I was just kind of devastated to hear that I wasn't doing my job or that I was late, that I let people down...I'm getting yelled at for having taken a day off. It was just, quite honestly, one of the most confusing conversations I've ever had. And then -- and every time I would try to ask, you know, okay, examples, examples, it was just --

Q.  Were you angry with NuNu, Mr. Donner?

A.  I was sad.

Q.  Did you yell at NuNu?

A.  No. She yelled at me.

Q.  Did you hang up on her?

A.  No.

Donner Dep. 286:15-288:9 (Ex. D).

> **Response:** FNN objects on the grounds that the statement is immaterial and incomplete. Subject to the foregoing, FNN does not dispute that Plaintiff testified to the above statements. (*See* FNN Ex. 1, J. Donner Tr. 316:11-14 (Plaintiff admitted that he raised his voice, explaining that "when someone is yelling, your voice automatically goes up an octave").)

99.     Donner testified that he did not do "anything wrong" during the conversation, and that he left the conversation "hurt," "sad," and "devasted." Donner Dep. 286:15-291:16.

> **Response:** Immaterial and incomplete, but, with those qualifiers, FNN does not dispute that Plaintiff testified to the above statement.

100.    Leaving the conversation, Donner "was just so sad, and [he] was ready to cry. [He] was like, 'Why are you doing this to me?'" Donner Dep. 295:1-6.

> **Response:** FNN objects on the grounds that the statement is immaterial and incomplete. Subject to the foregoing, FNN does not dispute that Plaintiff testified to the above statement.

101.    Nonetheless, still building pretext, Nunu forwarded herself her coverup email at 7:53 PM EDT. *See* Exhibit 17; *see* Donner Dep. 292:12-20 ("that's definitely a cover yourself revisionist. Like, you don't send it unless you want to cover yourself for what – to cover up what you had wanted...on the phone call.").

> **Response:** FNN objects to the extent that cited page in the above statement does not include the quoted language in the supporting parenthetical. The statement is argumentative and a legal conclusion that the Court need not treat as true, even in the absence of a response from FNN. *Wheeler v. Georgetown Univ. Hosp.*, 52 F. Supp. 3d 40, 46 (D.D.C. 2014), *rev'd and remanded on other grounds*, 812 F.3d 1109 (D.C. Cir. 2016). This is because Rule 56's "deemed admitted" rules "apply only to facts." *Grimes v. D.C.*, 794 F.3d 83, 96–97 (D.C. Cir. 2015) (Griffith, J., concurring); *see also Johnson v. Washington Metro. Area Transit Auth.*, 314 F. Supp. 3d 215, 216 (D.D.C. 2018) ("The Court will not, however, accept facts that do not cite support from the record or ***conclusions masquerading as facts***." (emphasis added)). In addition, FNN objects on the grounds that the statement qualifies as inadmissible speculation. Fed. R. Evid. 602. In any event, Plaintiff's self-serving speculatory inference that his supervisor's follow-up email (which speaks for itself) constituted a "coverup" is not evidence that would allow a reasonable jury to infer that his supervisor did not actually believe the statements she wrote in that email. *See Carpenter*, 174 F.3d at 236 ("Although [plaintiff] infers

retaliatory intent from her supervisors' September 1996 comments, they also do not constitute evidence sufficient to allow a reasonable jury to infer that [the employer's] reasons for her November 1997 rating were false."). To the extent any response is required, disputed.

102.    She then forwarded the email thread to Campa and Boughton at 7:49 PM EDT. *See* Exhibit 15.

**Response:** Undisputed.

103.    By the time Boughton received Japaridze's email, Fox News already decided to fire Donner. Specifically, on September 27, 2022, at 6:38 EST, Boughton texted Jay Wallace, who is the President of News based in New York the following:



Heads up. We need to fire Hill producer Jason Donner tomorrow. I'll text Irena also if you think or I can do tomorrow after it happens.    18:38:50

*See* Text from Boughton to Jay Wallace (Sept 27, 2022 at 6:38 EST) (Exhibit 18); Boughton Dep. 65:7-11 (re Wallace's title) (Ex. A).

> **Response:** FNN objects on the grounds that the statement is immaterial. Subject to the forgoing, disputed as inaccurate, misstating evidence, and argumentative. Plaintiff cites to a text message from Mr. Boughton giving Jay Wallace a "[h]eads up" about the termination at 7:38 pm EDT. (Pl.'s Ex. 18.) Therefore, to the contrary, it cannot be disputed that Mr. Boughton's message to Jay Wallace occurred well after he received the first email from Plaintiff's supervisor at 7:04 pm EDT and after Mr. Boughton responded describing Plaintiff's conduct as unacceptable at 7:07 pm EDT. (FNN Ex. 24.)

104.    And as discussed in *supra*, Irena Briganti is the "infamously aggressive enforcer within Fox's public-relations apparatus" and is also based in New York. *See* Footnote 2; *see also* Boughton Dep. 45:6-48:18.

> **Response:** FNN objects on the grounds that the statement is immaterial. FNN also objects to the statement in Paragraph 104 as impossibly and unfairly ambiguous and vague because it purports to require FNN to respond to the accuracy of a purported statement (which is argumentative) that is being cross-referenced but the

cross-referenced statement does not actually appear in the document (at either place that Plaintiff asserts).  Because the statement in Paragraph 104 calls on FNN to respond to the allegation that Plaintiff previously "discussed in *supra*" and "Footnote 2," but he indisputably did not do so, FNN objects that it cannot fairly understand what it is being called on to address in this response, and therefore objects and to the extent necessary states that nothing is admitted.  To the extent any further response is required, and to the extent Footnote 2 actually references Plaintiff's opposition brief, FNN objects insofar as the statement lacks references to the administrative record pursuant to LCvR 7(h)(2) and because the quoted statement is hearsay and contains hearsay within hearsay because, in his brief, Plaintiff asserts that this comes from a hyperlinked Rolling Stone article.  FNN objects because no amissible evidence in the record in this action supports any assertion made in this statement.

105.    According to Boughton, Briganti is the "head of media relations, the head of PR for

Fox News." Boughton Dep. 45:6-48:18.

**Response:** Immaterial, but undisputed.

106.    Thirty minutes later, Bought texted Briganti the following:



Sorry for late text. We will likely be terminating Cap Hill producer Jason Donner tomorrow. Nicolle has talked to Carl in legal and looping in Kevin.                                    19:08:14

Text from Boughton to Briganti (Sept 27, 2022 at 7:08 PM EST) (Exhibit 20).

**Response:** FNN objects to the statement as vague and ambiguous because it does not give a point of reference for the phrase "thirty minutes later" and the preceding paragraph refers to testimony from Mr. Boughton taken in the year 2025.  FNN also objects on the grounds that the statement is immaterial and incomplete, and the document speaks for itself. Subject to the foregoing, FNN does not dispute that Mr. Boughton sent the above in a text message.

107.    Briganti responded one minute later that Donner is "a leak":

Ok, he's a leak so pls give me a call so I have the details - he will go public                                                    19:09:05

*Id.*

34

> **Response:** FNN objects to the statement as vague and ambiguous because it does not give a point of reference for "one minute later." FNN also objects on the grounds that the statement is immaterial and incomplete, and the document speaks for itself. Subject to the foregoing, FNN does not dispute that Mr. Boughton received the above text message.

108.    When asked how someone as important as Briganti even knew who Donner was, and that immediately responded that he was a "leak," Boughton explained that "Irena keeps tabs on a lot of people in Washington who are in positions that interact with other media, and she was aware of him from when he gave his RTCA dinner." Boughton Dep. 45:6-48:18 (Ex. A).

> **Response:** FNN objects on the grounds that the statement is immaterial and incomplete. Subject to the foregoing, disputed that Mr. Boughton was asked about "how someone as important as Briganti even knew who Donner was." To the contrary, he was simply asked whether he was "surprised that [Ms. Briganti] even knew who Jason Donner was." Otherwise, undisputed that Mr. Boughton testified to the quoted statement above.

109.    Meanwhile, Campa was busy emailing the lawyers and head of HR that Donner was going to be fired. *See* Email from Campa re "Privileged & Confidential: Likely termination tomorrow – D.C. Bureau" (Sept 27, 2022 at 8:04 PM EDT) (Exhibit 19).

> **Response:** FNN objects on the grounds that the statement is immaterial, incomplete, and argumentative. Subject to the foregoing, FNN does not dispute that Ms. Campa sent an email to Mr. Lord and Mr. Guida on September 27, 2022, at 8:11 p.m. EDT. The documents and any corresponding drafts speak for themselves.

110.    Campa wrote in that email, "Yesterday Monday, Jason did not show up to work and did not inform his manager, NuNu Japaridze [not true], that he was not coming in to work. Until later in the day, well past the start of his shift." *Id.*

> **Response:** FNN objects on the grounds that the statement is immaterial. FNN also objects to the statement on the grounds that it includes inaccurate and misleading bracketed text that changes the meaning of the document. There is no admissible evidence in the record in this action that would support the statement as re-written. FNN further objects on the grounds that the statement is incomplete. The email speaks for itself and, for completeness, the cited email that Ms. Campa sent contains the following:

Apologies for the late email. [Redacted – Privileged]. Jason Donner. Jason has been at the network for about 12 years. Yesterday Monday, Jason did not show up to work and did not inform his manager, NuNu Japaridze, that he was not coming in to work until later in the day, well past the start of his shift. The Capitol Hill team and NuNu had to scramble last minute to cover an event at 10am with Sen. Mitch McConnell.

Today I spoke with a colleague, Caroline McKee, who is also part of the Capitol Hill team and she shared how Jason is unreliable, not dependable, and creates an uncomfortable environment as he has "blowups" and treats her and other Capitol Hill colleagues rudely and disrespectfully. Caroline mentioned Jason comes in late and leaves early quite often. She added just last week Jason was late to the Capitol twice. Caroline, who is ahigh performing producer has applied to other FOX News jobs in the hopes to get out of this uncomfortable environment. We have another colleague who no longer wants to work at the Capitol as a fill-in because of Jason.

Earlier this evening, NuNu and Jason connected on the phone to discuss a work matter and during the call, NuNu addressed the attendance issues. According to NuNu, Jason started yelling at her, called her a lousy manager, and hung up on her. During the call Jason also told NuNu he doesn't need to put up with this sh\*t from the network and that he works really hard. This is the first time NuNu has experienced this type of behavior from Jason, which aligns with the feedback I received from Caroline today.

We are moving forward with a termination tomorrow around 11 am. Given these new developments, I'm not inclined to offer any type of 'severance.' Please let me know if you disagree and I can loop in Joe first thing tomorrow.

(Pl.'s Ex. 19.)

111.    Campa spoke with two of Donner's coworkers earlier in the day who allegedly (the statements are inadmissible hearsay) trashed Donner. *Id.*

**Response:** FNN objects to this incomplete, argumentative statement that contains a legal conclusion characterizing statements made as hearsay. As discussed in FNN's Motion, *see* Mot. at 28 n.8, they are not. In any event, the Court need not treat as true Plaintiff's legal conclusion that those communications are hearsay, even in the absence of a response from FNN. *Wheeler v. Georgetown Univ. Hosp.*, 52 F. Supp. 3d 40, 46 (D.D.C. 2014), *rev'd and remanded on other grounds*, 812 F.3d 1109 (D.C. Cir. 2016). This is because Rule 56's "deemed admitted" rules "apply only to facts." *Grimes v. D.C.*, 794 F.3d 83, 96–97 (D.C. Cir. 2015) (Griffith, J., concurring); *see also Johnson v. Washington Metro. Area Transit Auth.*, 314 F. Supp. 3d 215, 216 (D.D.C. 2018) ("The Court will not, however, accept facts that do not cite support from the record or **conclusions masquerading as facts**."

(emphasis added)). Even to the extent that the statements qualify as hearsay (they do not), Plaintiff has opened the door to those statements being introduced by referring to, characterizing, and using the substance of those statements in his argument.   Subject to the foregoing, FNN disputes the argumentative characterization of the communications from Plaintiff's coworkers as "trashing" him, and for completeness in the record states that the cited email contains the following information that was reported to Human Resources about Plaintiff:

> Today I spoke with a colleague, Caroline McKee, who is also part of the Capitol Hill team and she shared  how Jason is unreliable, not dependable, and creates an uncomfortable environment as he has "blow-ups" and treats her and other Capitol Hill colleagues rudely and disrespectfully. Caroline mentioned Jason comes in late and leaves early quite often. She added just last week Jason was late to the Capitol twice. Caroline, who is ahigh performing producer has applied to other FOX News jobs in the hopes to get out of this uncomfortable environment. We have another colleague who no longer wants to work at the Capitol as a fill-in because of Jason.  Earlier this evening, NuNu and Jason connected on the phone to discuss a work matter and during the call, NuNu addressed the attendance issues. According to NuNu, Jason started yelling at her, called her a lousy manager, and hung up on her. During the call Jason also told NuNu he doesn't need to put up with this sh*t from the network and that he works really hard. This is the first time NuNu has experienced this type Of behavior from Jason, which aligns with the feedback I received from Caroline today.   We are moving forward with a termination tomorrow around 11 am.

(Pl.'s Ex. 19.)

112.    Campa then wrote in the first draft of the email, "***This afternoon***, NuNu [Japaridze] reached out to Jason [Donner] to discuss a work matter and during the call, NuNu addressed the attendance issues." *See* Exhibit 19 at FNN_0000473

> **Response:** FNN objects on the grounds that the statement is incomplete. Subject to the foregoing, FNN does not dispute that Ms. Campa made the above statement in a draft email to Mr. Lord and Mr. Guida on September 27, 2022.  The document speaks for itself.

113.    According to NuNu, this triggered Jason and he..." *Id.*

> **Response:** FNN objects on the grounds that the statement is incomplete. Subject to the foregoing, FNN does not dispute that Ms. Campa made the above statement in a draft email to Mr. Lord and Mr. Guida on September 27, 2022.  The document speaks for itself.

114.   This slip up by Campa is telling as it implies the plan to fire Donner had been set in place since the afternoon. Specifically, the call between Donner and Japaridze did not occur "this afternoon" but instead was approximately 7 PM based on the email Japaridze sent immediately after the call. *See* Exhibit 17 (email "following upon" on the call with Donner sent at 7:04 PM).

> **Response:** This is a legal conclusion and argumentative. The Court need not treat it as true, even in the absence of a response from FNN. *Wheeler v. Georgetown Univ. Hosp.*, 52 F. Supp. 3d 40, 46 (D.D.C. 2014), *rev'd and remanded on other grounds*, 812 F.3d 1109 (D.C. Cir. 2016). This is because Rule 56's "deemed admitted" rules "apply only to facts." *Grimes v. D.C.*, 794 F.3d 83, 96–97 (D.C. Cir. 2015) (Griffith, J., concurring); *see also Johnson v. Washington Metro. Area Transit Auth.*, 314 F. Supp. 3d 215, 216 (D.D.C. 2018) ("The Court will not, however, accept facts that do not cite support from the record or ***conclusions masquerading as facts***." (emphasis added)). In any event, Plaintiff's self-serving speculatory inference about what his supervisor's email "implies" is not evidence that would allow a reasonable jury to infer that his supervisor did not actually believe the statements she wrote in that email. *See Carpenter*, 174 F.3d at 236 ("Although [plaintiff] infers retaliatory intent from her supervisors' September 1996 comments, they also do not constitute evidence sufficient to allow a reasonable jury to infer that [the employer's] reasons for her November 1997 rating were false."). The document speaks for itself and Plaintiff's speculation that Ms. Campa "slipped up" is premised on the fact that her draft email stated "*This afternoon*, Nunu reached out to Jason to discuss a work matter and during the call" whereas the version she sent stated "*Earlier this evening*, Nunu and Jason connected on the phone to discuss a work matter and during the call." (Pl.'s Ex. 19 (emphasis added).)  Therefore, to the extent any response is required, disputed.

115.   Wasting no time, at 8:25 PM that evening (36 minutes after Japaridze forwarded the email thread between her and Donner in Exhibit 15), Campa put together "talking points" that were to be used during the meeting the following day to fire Donner. *See* Email from Campa to Japaridze and Boughton re "Talking points" for Terminating Donner (Sept 27, 2022 at 8:25 PM EDT).

> **Response:** FNN objects on the grounds that the statement is immaterial, incomplete, and argumentative. Further, Mr. Boughton testified that he did not bring any notes with him or emails to reference at the termination meeting the following day. (FNN Ex. 7, Boughton Tr. 76:14-25.) Subject to the foregoing, FNN does not dispute that Ms. Campa sent an email to Ms. Japaridze and Mr. Boughton at 8:26

p.m. EDT on September 27, 2022, or that Ms. Campa "put together" the talking points. The document speaks for itself.

116.    These talking points were forwarded to Boughton and Japaridze, and she invited

edits. *Id.*

> **Response:** FNN objects on the grounds that the statement is immaterial and incomplete. Further, Mr. Boughton testified that he did not bring any notes with him or emails to reference at the termination meeting the following day. (FNN Ex. 7, Boughton Tr. 76:14-25.) Subject to the foregoing, FNN does not dispute that Ms. Campa drafted and then sent an email to Ms. Japaridze and Mr. Boughton at 8:26 p.m. EDT on September 27, 2022, stating that they should "feel free to edit." The document speaks for itself.

117.    Boughton made no edits; Campa made edits, which were done in a red font. Campa

Dep. 73:9-74:9 (Ex. B); *see also* Email from Japaridze to Campa and Boughton re revised "Talking

points" (Sept 27, 2022 at 8:37 PM EDT) (Exhibit 22).

> **Response:** FNN objects on the grounds that the statement is immaterial.  Subject to the foregoing, disputed that Ms. Campa made edits to her own email.  The cited document speaks for itself.

118.    The first three bullet points memorializing the reasons for Donners termination are

as follows:

- Jason, on Monday you did not follow company procedures of informing your manager that you were unable to come to work.

- It wasn't until hours later that NuNu was informed by your peer you were not coming in.

- This led to us scrambling to cover a 10am event with Mitch McConnell

*Id.*

> **Response:** FNN objects on the grounds that Paragraph 118 is incomplete and *grossly* mischaracterizes the document which does not state that any of the quoted bullets "memorializ[ed] the reasons for Donners [sic] termination."  Nor is there any testimony, other documents, or any other admissible evidence in the record in this action that would support that statement. Subject to the foregoing, FNN does not dispute that Ms. Campa sent an email to Ms. Japaridze and Mr. Boughton at

8:26 p.m. EDT on September 27, 2022. The documents speak for itself.  The statement in Paragraph 118 is also immaterial.

119.    As for the first bullet point, Fox News admits it fired Donner for calling in sick, but claims it is justified in firing him because he did not follow the company sick leave policy. *Id.*

> **Response:**  FNN objects to this argumentative statement because there is no admissible evidence in the record in this action (or otherwise) that would support this assertion.  It is indisputable that the first bullet of the cited document does not purport to give a reason for Plaintiff's termination at all.  Only one of the talking points (the seventh bullet from the top, pertaining to Plaintiff's telephone call with Ms. Japaridze) states that behavior from Plaintiff was "totally unacceptable" and "not behavior that is tolerated."  The document speaks for itself.  The words on the page are not in dispute.   FNN does, however, object to Plaintiff's mischaracterization that this document is an admission of "Fox News," when Plaintiff elsewhere concedes (and the document itself demonstrates) that it was sent by a Human Resources representative (Ms. Campa), who Plaintiff does not contend made the termination decision.

120.    But we know this is false because Japaridze testified that Donner "***handled it appropriate in calling in sick***" and "it was fine how he handled it." Japaridze Dep. 61:15-62:11; 65:05-11 (Ex. C).

> **Response:** FNN objects to the term "this" as vague and ambiguous.  To the extent it refers to Paragraph 119, FNN incorporates by reference the objections and responsive statements in response to the statement in Paragraph 119, *supra*.  With respect to the statement about Ms. Japaridze's testimony, FNN incorporates by reference the objections and responsive statements in response to the statements in Paragraphs 75-77, *supra*.  Subject to all of the foregoing, FNN does not dispute that the testimony from Ms. Japaridze is accurately quoted, but it is incomplete insofar as it omits the very next sentence which is related to the answer being given:  "If he has time to notify the supervisor that he will be out, that would be the best practice."  (Pl.'s Ex. C, Japaridze Tr. 65:8-9.)

121.    The second bullet point is another admission that Donner was fired for calling in sick. *See* Exhibit 22.

> **Response:** FNN objects to this argumentative statement because there is no admissible evidence in the record in this action (or otherwise) that would support this assertion.  It is indisputable that the second bullet of the cited document does not purport to give a reason for Plaintiff's termination at all.  Only one of the talking points (the seventh bullet from the top, pertaining to Plaintiff's telephone call with Ms. Japaridze) states that behavior from Plaintiff was "totally unacceptable" and

"not behavior that is tolerated." The document speaks for itself. The words on the page are not in dispute. FNN does, however, object to Plaintiff's mischaracterization that this document is an admission of "Fox News," when Plaintiff elsewhere concedes (and the document itself demonstrates) that it was sent by a Human Resources representative (Ms. Campa), who Plaintiff does not contend made the termination decision.

122.    And again, the accusation that Donner failed to follow Fox News' sick policy is false because Donner had not only told Phares before 10 AM, but he also told Japaridze shortly thereafter in full compliance with Fox News' sick policy and Japaridze "granted" Donner's request for sick leave. Japaridze Dep. 37:18-39:23 (Ex. C).

> **Response:** FNN objects to the portion of the statement about Plaintiff's communications with Ms. Phares as immaterial. It is indisputable – even based on Plaintiff's counter statements above – that he did not request sick leave until he first called Ms. Japaridze. (*See* CSUF 71 (describing him as first requesting sick leave when he called Ms. Japaridze).) As to the remainder of this argumentative statement, FNN incorporates by reference the objections and responsive statements in response to the statements in Paragraphs 75-77, *supra*, as this statement suffers from the same problems and is likewise immaterial and incomplete.

123.    As to the third bullet point, after speaking with Donner, Phares confirmed she would cover the McConnel event, which is standard protocol when someone calls in sick. *See* ECF No. 30-20; Japaridze Dep. 40:12-20 (Ex. C).

> **Response:** This statement is immaterial. The document speaks for itself. Subject to the foregoing, disputed as incomplete. FNN incorporates by reference the objections and responsive statements in response to the statement in Paragraphs 67-69.

124.    According to Campa, the termination meeting scheduled for September 27, 2022, went according to plan as Boughton walked through each of the talking points with Donner. Campa Dep. 73:9-76:01 (Ex. B).

> **Response:** This statement is immaterial and disputed as inaccurate. Plaintiff indisputably misstates the testimony of Ms. Campa. Ms. Campa identified the respective sections that she and Mr. Boughton were "covering," respectively, but with respect to whether he addressed each of the points, Ms. Campa testified: "***I can't recall if he missed any specifically***." (Pl.'s Ex. B, Campa Tr. 75:3-8; Reply

41

Ex. 4, Campa Tr. 76:2-6 (Ms. Campa would have only covered the "last two bullets listed in the e-mail").)

125.    At the meeting, Donner met with Boughton and Campa in person, with Japaridze on the phone. *Id.*

**Response:** Undisputed.

126.    According to Campa, Boughton was the "one to go through the talking points and do the majority of the speaking" and he did in "go through the talking points." Campa Dep. 74:20-75:5, 76:2-6 (confirming that Boughton covered the first eight bullets from the talking points).

> **Response:** This statement is immaterial and disputed as inaccurate. Plaintiff indisputably misstates the testimony of Ms. Campa. Ms. Campa identified the respective sections that she and Mr. Boughton were "covering," respectively, but with respect to whether he addressed each of the points, Ms. Campa testified: "*I can't recall if he missed any specifically*." (Pl.'s Ex. B, Campa Tr. 75:3-8.)

127.    Boughton further confirmed that he fired Donner for missing work and violating the company policy because "he did not show up for work" and "he did not call in." Boughton Dep. 38:6-39:05 (Ex. A).

> **Response:** This statement is immaterial.  FNN objects to the gross mischaracterization of Mr. Boughton's testimony, and states that neither the cited evidence nor any other admissible evidence in this action would support the statement in Paragraph 127.  In the testimony that Plaintiff cites, far from confirming that he fired Plaintiff for missing work, it is indisputable that Mr. Boughton only testified: "I'm aware he did not show up for work the next day [September 26, 2022]" and that "he did not call in." (Pl.'s Ex. A, Boughton Tr. 38:11-20.) In fact, Mr. Boughton could not have been clearer in his testimony that he decided to terminate Plaintiff because he "was insubordinate to his manager." (FNN Ex. 7, Boughton Tr. 75:8-76:1.)

128.    According to Boughton, Japaridze provided him with this information. *Id.*

> **Response:**  This statement is immaterial.  FNN incorporates by reference the objections and responsive statements in response to the statement in Paragraph 127, *supra*.  Subject to the foregoing, FNN does not dispute that Ms. Japaridze quickly reported what happened during her September 27, 2022 phone call with Plaintiff to Mr. Boughton.

129. But he later admitted that he had no knowledge whether Donner did in fact call in to take a sick day, despite this being the reason for firing Donner. Boughton Dep. 55:9-15.

> **Response:** FNN incorporates by reference the objections and responsive statements in response to the statements in Paragraphs 127-128, *supra*. Subject to the foregoing, FNN does not dispute that Mr. Boughton testified that he could not recall whether Ms. Japaridze told him that Plaintiff called or did not call in to take a sick day. (Pl.'s Ex. A, Boughton Tr. 55:5-12.)

130. Indeed, to determine the reason for firing Donner, we also need to look no further than Fox News' answers to interrogatories wherein the company testified that Donner failed "to comply with FNN's policy to provide timely and ***appropriate notice*** of his September 26, 2022 absence." *Compare* Defs.' Ans. to Interrog. No. 4 (Exhibit 2); *with* Japaridze 61:15-62:11 (Donner "***handled it appropriate in calling in sick***.").

> **Response:** FNN objects to the extent that (as Plaintiff has used it in his opposition brief) this is being offered as an opinion with respect to the applicability or interpretation of FNN's sick leave policy. There is no allowable evidentiary basis to admit Ms. Japaridze's quoted testimony for that purpose. *See Ojeda v. Louisville Ladder Inc.*, 410 F. App'x 213, 215 (11th Cir. 2010) (summary judgment cannot be defeated with legal conclusions or improper lay witness testimony that would not be admissible at trial); *Athridge v. Iglesias*, 2004 WL 7345458, at *1 (D.D.C. Dec. 21, 2004) ("A lay witness may not, however, testify as to a legal conclusion."); *Bankers Standard Ins. Co. v. Anand*, 2020 WL 4698363, at *7 (D.D.C. Aug. 13, 2020) (statement by defendant that incident "was her 'fault'" could not be used to "show that she acted negligently (because that would be an improper legal conclusion)"). Further, there is nothing in the record indicating that Ms. Japaridze knew or even could have known that Plaintiff intended—at least one day prior to his Monday, September 26, 2022, absence from work—that he would take sick leave on Monday, September 26, 2022, as came to light in deposition testimony that occurred several days *after* Ms. Japaridze's deposition. (FNN Ex. 14, A. Donner Tr. 11:13-17, 103:3-104:17; Reply Ex. 1, A. Donner Tr. 103:2-105:18.) FNN also objects on the basis that the question put to Ms. Japaridze mischaracterized her prior testimony (which was the basis of the objection at the time) and cannot fairly be taken out of the context of her prior testimony. The statement in Paragraph 130 is also immaterial and incomplete. Subject to all of the foregoing, FNN does not dispute that the quotation stated in Paragraph 130 is accurately quoted from Ms. Japaridze's deposition transcript—specifically in a follow-up question put to Ms. Japaridze related to another question in which she was asked what Plaintiff could have done better, to which she responded: "In this particular case, he did what he could do, but I just wanted to make sure that he's aware that he can take time off if

43

he's not feeling well.  *If he has time to notify people, he should notify people.*"
(Pl.'s Ex. C, Japaridze Tr. 62:1-4 (emphasis added).)

131.  Fox News further stated under oath:

On September 26, 2022, Plaintiff also did not comply with FNN's
policy concerning sick leave, including by providing untimely and
inadequate notice of his absence, leaving his colleagues scrambling
at the last minute to cover Plaintiff's responsibilities and leaving his
supervisor to try to reach Plaintiff—because he had not proactively,
timely, and in conformance with FNN's policy provided adequate
notice to his supervisor of his absence.

Defs.' Ans. to Interrog. No. 11 (Exhibit 2).

**Response:**  Paragraph 131 is incomplete with respect to the content of the cited
document, and specifically omits the reasons that FNN gave for terminating
Plaintiff, which are not the statements in Paragraph 131.  (*See* Pl.'s Ex. 2 at 13
(Plaintiff has omitted the text beginning with the phrase "FNN states that Plaintiff
was terminated because …").)  For context, Interrogatory 11 calls for FNN to
provide the factual basis for FNN's affirmative defenses, and the quoted statement
in Paragraph 131 is FNN's factual support for its legal defense that the Sick Leave
Act does not apply to Plaintiff's conduct.  Plaintiff has mischaracterized it in his
argument because he has no actual evidence of Sick Leave Act retaliation.  Subject
to the foregoing, FNN does not dispute that the text quoted in Paragraph 131
appears in its response to Interrogatory No. 11.

132.  In addition, Donner testified that during the termination meeting:

They told me that I was -- I missed work, which I totally figured,
you know, was Monday. Told me I had missed work, I was
irresponsible, I was late, I let all my coworkers down, and that, you
know, I missed a very important McConnell event which -- excuse
me, the network missed a very important McConnell event, which it
didn't, because Kelly did it and sent it out. And we know she did it.
And I was being let go.

Donner Dep 301:3-302:5.

**Response:** Undisputed that Plaintiff made the above statement.

133.  Donner continued:

I was told that I was being fired because I was -- sorry. It was
because I was -- didn't show up to work, called out sick, that I was
irresponsible, that I let my coworkers down, that I would be late, and

that I missed an event that we didn't actually miss because my coworker Kelly did for it.

And it just -- it hurt the core of sort of who I was when that happened because I loved my job, but they told me that I was let go, fired, because I didn't show up to work, got -- called out sick, that I was late and irresponsible and lazy and let everybody down. And that's -- that's what happened.

Donner Dep. 16:13-17:5 (Ex. D); *see also* Pl.'s Ans. to Interrog. No. 14 ("Mr. Boughton told Mr. Donner that he was fired because he was late for work and did not show up for work.") (Exhibit 10).

> **Response:** FNN objects on the grounds that the statement is incomplete. (*See* FNN Ex. 1, J. Donner Tr. 306:15-309:18 (admitting there "could have" been other reasons given for the termination decision).) Subject to the foregoing, undisputed that Plaintiff made the above statement.

134. Immediately after the unlawful firing, Fox News had Donner "escorted out by security in front of the people who [he] had worked with for a very long time and like and respected." Donner Dep 303:3-15.

> **Response:** This argumentative statement contains a legal conclusion The Court need not treat it as true, even in the absence of a response from FNN. *Wheeler v. Georgetown Univ. Hosp.*, 52 F. Supp. 3d 40, 46 (D.D.C. 2014), *rev'd and remanded on other grounds*, 812 F.3d 1109 (D.C. Cir. 2016). This is because Rule 56's "deemed admitted" rules "apply only to facts." *Grimes v. D.C.*, 794 F.3d 83, 96–97 (D.C. Cir. 2015) (Griffith, J., concurring); *see also Johnson v. Washington Metro. Area Transit Auth.*, 314 F. Supp. 3d 215, 216 (D.D.C. 2018) ("The Court will not, however, accept facts that do not cite support from the record or ***conclusions masquerading as facts***." (emphasis added)). Subject to the foregoing, FNN does not dispute that Plaintiff was escorted by security following his termination.

135. "[I]t was a shocking, embarrassing moment because [he] had never expected that to happen."

> **Response:** Undisputed that Plaintiff made the above statement.

Dated: August 25, 2025                     Respectfully submitted,

By: */s/ Vincent H. Cohen, Jr.*
Vincent H. Cohen, Jr., Esq. (Bar No. 471489)
Christina G. Sarchio, Esq. (Bar No. 456254)
D. Brett Kohlhofer, Esq. (Bar No. 1022963)
DECHERT LLP
1900 K Street, N.W.
Washington, D.C. 20006-1110
Tel: 202 261 3300
Fax: 202 261 3333
vincent.cohen@dechert.com
christina.sarchio@dechert.com
d.brett.kohlhofer@dechert.com

J. Ian Downes (*Pro Hac Vice*)
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-2000
Fax: (215) 994-2222
Ian.downes@dechert.com

*Attorneys for Defendant Fox New Network, LLC*